**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 19-2250**

───────────────

TANNER HIRSCHFELD; NATALIA MARSHALL,

Plaintiffs – Appellants,

v.

BUREAU OF ALCOHOL, FIREARMS, TOBACCO & EXPLOSIVES; MARVIN
RICHARDSON, Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and
Explosives; MERRICK B. GARLAND, Attorney General,

Defendants – Appellees.

--------------------------------

BRADY; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE; EVERYTOWN
FOR GUN SAFETY SUPPORT FUND,

Amici Supporting Appellees.

───────────────

Appeal from the United States District Court for the Western District of Virginia, at
Charlottesville. Glen E. Conrad, Senior District Judge. (3:18−cv−00103−GEC)

───────────────

Argued: October 30, 2020                              Decided: July 13, 2021

───────────────

Before AGEE, WYNN, and RICHARDSON, Circuit Judges.

───────────────

Vacated, reversed, and remanded by published opinion. Judge Richardson wrote the
opinion, in which Judge Agee joined. Judge Wynn wrote a dissenting opinion.

───────────────

**ARGUED:** Elliott Michael Harding, HARDING COUNSEL PLLC, Charlottesville, Virginia, for Appellants. Thais-Lyn Trayer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Kirti Datla, HOGAN LOVELLS US LLP, Washington, D.C., for Amicus Brady. Angela Ellis, SULLIVAN & CROMWELL LLP, Washington, D.C., for Amicus Giffords Law Center to Prevent Gun Violence. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Thomas T. Cullen, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellees. Jonathan E. Lowy, Kelly Sampson, BRADY, Washington, D.C.; Michael J. West, Washington, D.C., Jon M. Talotta, HOGAN LOVELLS US LLP, Tysons, Virginia, for Amicus Brady. Hannah Shearer, Hannah Friedman, San Francisco, California, J. Adam Skaggs, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, New York, New York; Robert A. Sacks, Leonid Traps, Jackson Froliklong, Rachel H. Vangelder, SULLIVAN & CROMWELL LLP, New York, New York, for Amicus Giffords Law Center to Prevent Gun Violence. Eric Tirschwell, William J. Taylor, Jr., EVERYTOWN LAW, New York, New York; Darren A. LaVerne, Karen S. Kennedy, Jessica K. Weigel, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, for Amicus Everytown for Gun Safety Support Fund.

RICHARDSON, Circuit Judge:

When do constitutional rights vest?  At 18 or 21?  16 or 25?  Why not 13 or 33?  In the law, a line must sometimes be drawn.  But there must be a reason why constitutional rights cannot be enjoyed until a certain age.  Our nation's most cherished constitutional rights vest no later than 18.  And the Second Amendment's right to keep and bear arms is no different.

Plaintiffs seek an injunction and a declaratory judgment that several federal laws and regulations that prevent federally licensed gun dealers from selling handguns to any 18-, 19-, or 20-year-old violate the Second Amendment.  We first find that 18-year-olds possess Second Amendment rights.  They enjoy almost every other constitutional right, and they were required at the time of the Founding to serve in the militia and furnish their own weapons.  We then ask, as our precedent requires, whether the government has met its burden to justify its infringement of those rights under the appropriate level of scrutiny.  To justify this restriction, Congress used disproportionate crime rates to craft over-inclusive laws that restrict the rights of overwhelmingly law-abiding citizens.  And in doing so, Congress focused on purchases from licensed dealers without establishing those dealers as the source of the guns 18- to 20-year-olds use to commit crimes.  So we hold that the challenged federal laws and regulations are unconstitutional under the Second Amendment.  Despite the weighty interest in reducing crime and violence, we refuse to relegate either the Second Amendment or 18- to 20-year-olds to a second-class status.

## I.    Background

Prospective handgun buyers sued the Bureau of Alcohol, Tobacco, Firearms and Explosives seeking an injunction and a declaratory judgment that federal statutes prohibiting Federal Firearm Licensed Dealers from selling handguns and handgun ammunition to 18-, 19-, and 20-year-olds (and the federal regulations implementing those statutes) violate the Second Amendment. *See* 18 U.S.C. § 922(b)(1), (c)(1); 27 C.F.R. §§ 478.99(b)(1), 478.96(b), 478.124(a).[1]

Nineteen-year-old Natalia Marshall had good reason to seek protection. She had been forced to obtain a protective order against her abusive ex-boyfriend who, since the issuance of the order, had been arrested for unlawful possession of a firearm and controlled substances. He was released on bail but never came to court, leading to the issuance of a capias for his arrest. Along with the threat from her ex-boyfriend, Marshall works as an equestrian trainer, often finding herself in remote rural areas where she interacts with unfamiliar people. Having grown up training with guns, she believes that a handgun's ease of carrying, training, and use makes it the most effective tool for her protection from these and other risks. But because Marshall was 18 when she tried to buy a handgun, a federal law prevented her from buying from a licensed dealer who would perform a background check to verify that she was not a felon or other prohibited person. She preferred using a licensed dealer because they tend to have a wider supply, a good reputation, and a guarantee

---

[1] Plaintiffs also contend that the laws violate the equal-protection component of the Fifth Amendment's Due Process Clause. Because the laws violate the Second Amendment, we need not resolve that question.

that the guns have not been used, stolen, or tampered with.  She is now 19 and remains

unable to buy a handgun from a federally licensed dealer for self-defense.

The other Plaintiff, Tanner Hirschfeld, tried to buy a handgun from a licensed dealer

and was denied because he was only 20.  But he has since turned 21 and is no longer

affected by these laws.  His claims are therefore moot.  *See Craig v. Boren*, 429 U.S. 190,

192 (1976).  Marshall, however, is not yet 21, so this appeal may still proceed.

### A.      The challenged laws

In 1964, Congress, concerned about increasing gun violence, began a "field

investigation and public hearings."  S. Rep. No. 88-1340, at 1 (1964).  Congress concluded,

among other things, "that the ease with which" handguns could be acquired by "juveniles

without the knowledge or consent of their parents or guardians . . . is a significant factor in

the prevalence of lawlessness and violent crime in the United States."  Omnibus Crime

Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 901(a)(2), 82 Stat. 197,

225; *see, e.g.*, S. Rep. No. 90-1097, at 77 (1968).  Statistics, testimony from law

enforcement, and other evidence showed that a large portion of violent crime and its

escalation stemmed from minors with guns.[2]  Based on the testimony from Internal

---

[2] The legislative record established that "juveniles account for some 49 percent of the arrests for serious crimes in the United States and minors account for 64 percent of the total arrests in this category."  S. Rep. No. 90-1097, at 77 (1968).  "[M]inors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault" and 21 percent of the arrests for murder.  114 Cong. Rec. 12,279, 12,309 (1968) (statement of Sen. Dodd, Chairman, S. Subcomm. on Juvenile Delinquency).  Congress found "a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior."  Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 225–26.  Federal officials

Revenue Service Commissioner Sheldon Cohen, Congress concluded that juveniles obtained these guns from licensed dealers who sell to "emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior."  Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 226; *see Federal Firearms Act: Hearings Before the H. Comm. on Ways and Means*, 89th Cong. 31 (1965) (testimony of Sheldon S. Cohen) (explaining that "importers, manufacturers, and dealers who operate under licenses issued by the Federal Government" are responsible for putting firearms in the hands of juveniles).  They also found that "the handgun is the type of firearm that is principally used in the commission of serious crime" and "the most troublesome and difficult factor in the unlawful use of firearms."  S. Rep. No. 89-1866, at 4–7 (1966).  Seeking only to curtail the "clandestine" purchase of weapons by juveniles without their parents' knowledge, Congress sought to permit the ownership and use of firearms with parental permission.  *Id.* at 58–59; S. Rep. No. 90-1097, at 79; 114 Cong. Rec. 12,279, 12,309 (1968) (statement of Sen. Thomas J. Dodd).

To address these concerns, Congress passed the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197.  The preamble declares:

> [T]he ease with which any person can acquire firearms other than a rifle or shotgun
> (including criminals, juveniles without the knowledge or consent of their parents or

---

testified that "[t]he greatest growth of crime today is in the area of young people, juveniles and young adults" and that "[t]he easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly." *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 57 (1967) (testimony of Sheldon S. Cohen). Law enforcement officers from New York City, Los Angeles, St. Louis, Chicago, Philadelphia, and Atlanta provided Congress with "statistics documenting the misuse of firearms by juveniles and minors," which took on "added significance" because the "lawful acquisition of concealable firearms by these persons was prohibited by statute" in each of those cities.  S. Rep. No. 89-1866, at 58–60.

guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States.

*Id.* § 901(a)(2), 82 Stat. at 225.

The Act prohibited licensed dealers from selling handguns to anyone under age 21 but permitted the sale of shotguns and rifles to those individuals. *Id.* § 902, 82 Stat. at 230. Later that year, Congress amended the law to prohibit licensed dealers from selling any firearm to those under 18 and maintained the ban on the sale of handguns for 18-, 19-, and 20-year-olds. Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, § 102, 82 Stat. 1213, 1218.[3] The section, which has remained unchanged since 1968, reads:

> [It is] unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age.

*Id.* (codified at 18 U.S.C. § 922(b)(1)). The implementing regulation, 27 C.F.R. § 478.99(b)(1), contains similar language. The law did not eliminate any age group's

---

[3] The provisions of the Omnibus Crime Control and Safe Streets Act of 1968 cited here never took effect. That Act, passed June 19, 1968, would not have taken effect until 180 days later, or December 16, 1968. Pub. L. No. 90-351, tit. IV, § 907, 82 Stat. at 235. The Gun Control Act of 1968, passed October 22, 1968, supplanted the relevant sections of the Omnibus Crime Control and Safe Streets Act of 1968, *see* Pub. L. No. 90-618, tit. I, § 102, 82 Stat. at 1214, and took effect on December 16, 1968, *see id.* § 105(a), 82 Stat. at 1226.

ability to own, possess, or use a gun.  *Id.*[4]

Another part of the law requires licensed dealers to obtain a sworn statement of age before transferring a firearm to a remote purchaser.  18 U.S.C. § 922(c) (providing that a licensed dealer "may sell a firearm to a person who does not appear in person at the licensee's business premises . . . only if the transferee submits to the transferor a sworn statement" affirming "that, in the case of any firearm other than a shotgun or a rifle, [the buyer is] twenty-one years or more of age").  And regulations promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives require licensed dealers to keep a firearms transaction record, Form 4473, which records, among other things, each transferee's date and place of birth.  *See* 27 C.F.R. § 478.124(a) (mandating that "[a] licensed importer, licensed manufacturer, or licensed dealer shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record, Form 4473"); *id.* § 478.124(c)(1), (f) (describing the Form 4473 requirements).

The upshot of these statutes and regulations is that 18-, 19-, and 20-year-olds may not buy handguns or handgun ammunition from a licensed dealer.  This is what Marshall challenges.

---

[4]  Dealers may lawfully sell firearms to parents or guardians who may gift them to their minor children if the minors are not otherwise prohibited from receiving or possessing a firearm.  J.A. 45–49 (Opinion of ATF Chief Counsel, No. 23362 (Dec. 5, 1983)).  But parents may not buy firearms for their children with money provided by children under the age of 21.  *See* 18 U.S.C. §§ 922(a)(6), 924(a)(1)(A); *see also Abramski v. United States*, 573 U.S. 169, 193 (2014) (finding a violation of §§ 922(a)(6) and 924(a)(1)(A) when an individual prohibited from purchasing a gun used a straw man to acquire the gun).

## B.    Procedural history

Plaintiffs' complaint challenged the facial validity of the federal laws and regulations restricting their ability to buy a handgun from a licensed dealer.  For relief, they sought a broad declaration that the challenged provisions violate the Second Amendment and an injunction preventing their enforcement.  The government moved to dismiss for failure to state a claim, and Plaintiffs moved for summary judgment.

The district court held that the laws were facially valid because they "are among the 'longstanding prohibitions' and 'conditions and qualifications on the commercial sale of arms,' which the Supreme Court in *Heller* did not 'cast doubt' on."  *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 756 (W.D. Va. 2019). The court also found that the laws fell outside the scope of the Second Amendment because similar regulations were historically common among the states.  *Id*.  In the alternative, the court relied on the legislative record and some of the amici's evidence to find that the laws passed intermediate scrutiny.  *Id*. at 758.  So the court denied Plaintiffs' motion for summary judgment and dismissed the complaint.  Plaintiffs timely appealed.

We have subject-matter jurisdiction over this appeal under 28 U.S.C. § 1291.  The denial of summary judgment and the grant of a motion to dismiss are reviewed de novo. *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 142 (4th Cir. 2018); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019).

## II.    Discussion

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be

USCA4 Appeal: 18-2250   Doc: 71   Filed: 07/13/2021   Pg: 10 of 141

infringed." U.S. Const. amend. II. This "inherent," "fundamental," "pre-existing" individual right is not limited to militia service. *Dist. of Columbia v. Heller*, 554 U.S. 570, 592–95, 628 (2008). Its core is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635. So in *Heller*, the Court struck down a handgun ban and a law requiring guns to be unloaded and locked within the home as violating the core protection of the Second Amendment. *Id*. at 635–36. But in doing so, the Court made clear that the rights protected by the Second Amendment are not "unlimited." *Id*. at 626. It did not "cast doubt on" "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626–27, 627 n.26.

Several years later, the Court struck down a similar handgun ban in Chicago, holding that the Second Amendment was incorporated against the states. *McDonald v. City of Chi.*, 561 U.S. 742, 750 (2010). It explained that while the original understanding of the Second Amendment focused on opposing a tyrannical federal government with a standing army, that fear eventually dissipated. *Id*. at 770–78; *see also Heller*, 554 U.S. at 599. Instead, around the time of the Civil War, Congress repeatedly voiced concern that southern states were disarming abolitionists and freed slaves to harass and harm them. *McDonald*, 561 U.S. at 772–77. These concerns permeated the drafting and ratification of the Fourteenth Amendment, which reinforced the existing civil rights laws. *Id*. at 775. Reviewing this history, the Court held that "it is clear that the Framers and ratifiers of the

Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id*. at 778.

But the Court has cautioned that it has not "undertake[n] an exhaustive historical analysis [] of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. As a result, many questions remain, including what framework courts should use to analyze Second Amendment claims. To fill that gap, most circuits, including our own, seem to follow some variation of a two-part inquiry. *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).[5] And so we apply that inquiry here. *See United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) (holding that courts "generally engage in the . . . two-pronged [*Chester*] analysis for facial Second Amendment challenges").

The first step asks "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Chester*, 628 F.3d at 680. This "historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *Id*. The government bears the burden of showing that the conduct was not covered by the Second Amendment. *See id*. at 681–82; *see also Ezell v. City of Chi.*, 651 F.3d 684, 702–04 (7th Cir. 2011); *Tyler v.*

---

[5] *See Gould v. Morgan*, 907 F.3d 659, 668–69 (1st Cir. 2018); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chi.*, 651 F.3d 684, 702–04 (7th Cir. 2011); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*).

*Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016). If the historical record is silent or ambiguous, we assume the conduct is protected. *Chester*, 628 F.3d at 680–82. If, however, the challenged law does not impose a burden on conduct falling within the scope of the Second Amendment's historically understood guarantee, that is the end of the inquiry. *Id.* at 680.

But if the challenged law burdens Second Amendment rights, "we move to the second step of applying an appropriate form of means-end scrutiny." *Id*. Without articulating the applicable standard for Second Amendment challenges, the Supreme Court found that the handgun ban in *Heller* would fail any level of scrutiny that applies to enumerated constitutional rights. 554 U.S. at 628–29. It did offer some guidance, however, in rejecting a rational-basis test. *Id*. at 628 n.27. So at least some form of heightened scrutiny that places the burden on the government must be employed. *Chester*, 628 F.3d at 680.

To determine which form of heightened scrutiny applies to Second Amendment challenges, the Fourth Circuit has looked to the First Amendment. *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (en banc). Just as the First Amendment employs strict scrutiny for content-based restrictions but intermediate scrutiny for time, place, and manner regulations, the scrutiny in this context "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Chester*, 628 F.3d at 682.

The Second Amendment's "core protection" is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Kolbe*, 849 F.3d at 131

(quoting *Heller*, 554 U.S. at 634–35).  When this right is "severely burden[ed]," we apply the "demanding" strict scrutiny test, which requires the government to show that the challenged law is "'narrowly tailored to achieve a compelling governmental interest.'" *Id.* at 133, 145 (quoting *Abrams v. Johnson*, 521 U.S. 74, 82 (1997)).  But if the right is burdened only on the margins, intermediate scrutiny applies.  *See United States v. Masciandaro*, 638 F.3d 458, 470–71 (4th Cir. 2011).  And intermediate scrutiny in the Second Amendment context has been described as requiring "a 'reasonable fit' between the challenged regulation and a 'substantial' government objective." *Chester*, 628 F.3d at 683 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

Our inquiry into the challenged provisions' facial validity changes, however, if we find them to be presumptively valid based on *Heller*'s list of "presumptively lawful regulatory measure[s]." *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012); *see also Hosford*, 843 F.3d at 165–67.[6]  That list includes "longstanding prohibitions on the possession of firearms by felons and the mentally ill, [] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27, 627 n.26; *see* Christopher M. Johnson, *Second-Class:* Heller*, Age, and the Prodigal Amendment*, 117 Colum. L. Rev. 1585, 1600–03 (2017) (describing measures that seemingly fall within *Heller*'s list).  If a law falls within this list, we conduct a more

---

[6] Though we follow this framework, one might question relying on the list in *Heller* to carve out exceptions to the Second Amendment. *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 453–54 (7th Cir. 2019) (Barrett, J., dissenting) (rejecting reliance on the *Heller* list).

streamlined analysis. *Chester*, 628 F.3d at 679–80; *Moore*, 666 F.3d at 318; *Hamilton v. Pallozzi*, 848 F.3d 614, 624 (4th Cir. 2017). This often effectively ends the inquiry and upholds the law as facially valid. But not always. *Hamilton*, 848 F.3d at 624–25; *United States v. Pruess*, 703 F.3d 242, 245–46 (4th Cir. 2012). So before turning to the full two-part test our circuit has adopted, we begin with the presumptively lawful inquiry.

## A.    The challenged laws are not presumptively lawful

The government and amici argue that the challenged laws fall into two categories on *Heller*'s presumptively valid list: conditions on commercial sales and longstanding regulations. Both contentions are incorrect.

First, these laws are not "conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 627. A condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records. *See Hosford*, 843 F.3d at 166. Here, though, the restrictions operate as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms. There is nothing a law-abiding 18- to 20-year-old can do to buy a handgun from a licensed dealer except wait until she turns 21.

The amici compare this case to one of our precedents, *Hosford*, 843 F.3d at 165–67. There, we upheld a regulation requiring those who regularly sell firearms to obtain a license. *Id.* at 167. That law regulated only those who wanted to sell guns commercially, but it placed no restrictions on those seeking to buy guns. *Id.* at 166. We described the licensing law as a "mere condition" on commercial sales that "affects only those who regularly sell firearms, not owned for personal use, in the course of trade or business for

14

the principal purpose of profit." *Id.* In doing so, we found that requiring regular sellers of firearms to obtain a license was a limited condition on commercial sales. *Id.* (noting the requirements for obtaining a license).

*Hosford* recognized that a law's substance, not its form, determines whether it qualifies as a condition on commercial sales. *Id.* (explaining that though the regulation was "framed as a prohibition against unlicensed firearm dealing," it was "in fact a requirement that those who engage in the commercial sale of firearms obtain a license"). We cited a district court case as an example of a commercial law that would be "so prohibitive as to turn [a] condition or qualification into a functional prohibition": a Chicago ordinance that allowed firearm transfers only outside city limits. *Id.* (citing *Ill. Ass'n of Firearms Retailers v. City of Chi.*, 961 F. Supp. 2d 928, 938–939, 947 (N.D. Ill. 2014)). Similarly, in *Ezell*, the Seventh Circuit struck down a ban on firing ranges within city limits because the ban was "not merely regulatory" but "a serious encroachment" preventing "the 'law-abiding, responsible citizens' of Chicago from engaging in target practice in the controlled environment of a firing range." 651 F.3d at 708–09; *see also Ezell v. City of Chi.*, 846 F.3d 888, 894 (7th Cir. 2017) (*Ezell II*) (finding that a commercial zoning and distancing law worked in tandem to functionally preclude any gun ranges, thus "severely" restricting Second Amendment rights).

The nature of these functional bans is highlighted by *Heller*, where the Court struck down a handgun possession ban and a law requiring legally held guns to be unloaded and locked within the home. 554 U.S. at 635–36. As to the handgun possession ban, the Court explained that "the American people have considered the handgun to be the quintessential

self-defense weapon" and concluded that the ban "amount[ed] to a prohibition on an entire class of 'arms.'" *Id.* at 628–29. Similarly, the Court discussed how the law requiring legally held guns to be unloaded and locked within the home amounted to meaningless firearm possession because it "ma[de] it impossible for citizens to use [the firearms] for the core lawful purpose of self-defense." *Id.* at 630. While it was still theoretically possible to have a firearm, *Heller* recognized that the reality was a functional ban.

Here, the substance of the challenged laws dictates that they are a functional prohibition on buyers, not a mere condition or qualification on sellers. They ban an entire group of adult, law-abiding citizens from purchasing handguns from licensed dealers, substantially burdening the group's rights. The category of conditions and qualifications on commercial sales referenced in *Heller* is limited, as *Hosford* highlights, to laws that place conditions and qualifications on the seller, like licensing. It does not encompass a ban on a class of people seeking to purchase handguns from a qualified seller.

The dissent argues that any restriction on a buyer is also a restriction on a seller and vice versa. No doubt a restriction on buyers indirectly affects sellers by reducing demand. But that cannot be enough. If that was enough, then a ban on possession by 18-to 20-year-olds could qualify for this "exception" since that restriction on buyers also impacts the commercial sale of firearms. *Cf. United States v. Deeb*, 175 F.3d 1163, 1167–68 & n.8 (9th Cir. 1999) ("It is clear to us that the word 'sale' contained in all of these statutes and regulations refers only to sellers, not buyers."). In fact, the ban in *Heller* could be justified by blurring this divide. By the dissent's reading, this "exception" functionally swallows the Second Amendment. *Cf. Marzzarella*, 614 F.3d at 92 n.8.

Moreover, this restriction falls asymmetrically on buyers rather than sellers. While the licensing regime in *Hosford* placed burdens on sellers with an indirect effect on buyers, the restrictions here fall on the buyers and operate as a functional ban. Under these laws, sellers lose a subset of customers but may still sell to anyone above 20. Those in the restricted age range, however, can do nothing to purchase a handgun from a licensed dealer.[7] And other options are not always readily available to many individuals. Not all young adults have friends or family members who are able or willing to gift them a gun. And secondary markets are not always available to everyone or easy to navigate safely. On the other hand, licensed dealers come with assurances of quality, safety, legality, and more. These laws push young law-abiding adults to a less safe, less regulated market to defend themselves. *Hosford*, 843 F.3d at 169 (highlighting the benefits of pushing customers to licensed dealers for safety and regulatory purposes). Not to mention that these restrictions apply to ammunition as well. So the severity and difference in burdens shows why the laws at issue operate as a functional ban on 18- to 20-year-olds rather than a condition on the sale of firearms.

Second, some courts have found laws to be presumptively valid because similar regulations could be described as "longstanding." *See, e.g.*, *Heller II*, 670 F.3d at 1253–54; *Drake v. Filko*, 724 F.3d 426, 431–34 (3d Cir. 2013). The government and amici argue that age restrictions for purchasing guns are longstanding because many states had similar

---

[7] This contrasts with regulations that can be met through individual effort, like requiring a training course. With a readily accessible course, an individual can meet that "condition." Here, a person can do nothing but wait until their 21st birthday.

laws in the late nineteenth and early twentieth centuries. *See Nat'l Rifle Ass'n*, 700 F.3d at

196–97, 203–04. We do not, however, read the word "longstanding" in *Heller* as a

standalone exception to the Second Amendment. Consistent with the text of *Heller*, this

Court has never employed that novel view. In our only case discussing the "longstanding"

requirement, we correctly did not treat it as its own exception. *Hosford*, 843 F.3d at 166.

We instead treated it as a potential limit on commercial conditions, requiring the law to be

both a commercial condition *and* longstanding to be presumptively valid. *Id*. As *Hosford*

recognized, the sentence in *Heller* makes clear that "longstanding" serves as a modifier of

part or all of the sentence, not as a freestanding category.[8] *Heller*'s historical, textual, and

structural analysis counsels against creating a freestanding category of laws exempt from

Second Amendment scrutiny based solely on how long similar laws have existed.

The laws are therefore not presumptively lawful either as commercial conditions or

longstanding laws.[9]

---

[8] The sentence in *Heller* says, "[N]othing in our opinion should be taken to cast doubt on *longstanding* prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27 (emphasis added). "[L]ongstanding" modifies prohibitions on felons and the mentally ill. Perhaps it could also modify the other categories. But it is not a separate category itself. That we are looking at the sentence structure of dicta in a judicial opinion affirms the need for more guidance from the Supreme Court. *See Kanter*, 919 F.3d at 453–54 (Barrett, J., dissenting) ("[J]udicial opinions are not statutes, and we don't dissect them word-by-word as if they were.").

[9] Even if the laws were presumptively valid, the presumption could be rebutted. *Binderup v. Att'y Gen. U.S. of Am.*, 836 F.3d 336, 350–51 (3d Cir. 2016) (en banc) (plurality opinion) (holding that presumptions from *Heller*'s list may be rebuttable because "[u]nless flagged as irrebuttable, presumptions are rebuttable"). For while we need not

**B.      Step one:  18- to 20-year-olds are protected by the Second Amendment**

At step one of the *Chester* inquiry, we ask "whether the conduct at issue was understood to be within the scope of the right *at the time of ratification*."  *Chester*, 628 F.3d at 680 (emphasis added) (citing *Heller*, 554 U.S. at 625).  The government bears the burden to show that the regulation clearly falls outside the scope of the Second Amendment.  *See id.* at 681–82; *Ezell*, 651 F.3d at 702–03; *Tyler*, 837 F.3d at 688.  And in the face of historical silence or ambiguity, we assume the conduct is protected.  *Chester*, 628 F.3d at 680–82.  At the very least, this inquiry requires us to consider text, structure, history, and practice to reveal the original public meaning of the Second Amendment.  *See Heller*, 554 U.S. at 576–628.  The relevant question is:  What did the right to keep and bear arms mean to the public at the time of ratification?

When evaluating the original understanding of the Second Amendment, 1791—the year of ratification—is "the critical year for determining the amendment's historical meaning."  *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (citing *McDonald*, 561 U.S. at 765 & n.14).  Sources near the time of ratification help us understand the original public meaning of the Second Amendment.  Those sources shed light on how language was

---

undertake a historical inquiry for every presumptively valid law, a challenger may still seek to rebut the presumption with affirmative historical evidence.  But it would be the challenger's burden to make that affirmative showing.  So while historical silence or ambiguity would typically mean that conduct is covered by the Second Amendment, *see Ezell*, 651 F.3d at 702–03; *Chester*, 628 F.3d at 681–82, we would presume that conduct regulated by a presumptively valid law falls outside the Second Amendment in the face of silence or ambiguity, *see Heller II*, 670 F.3d at 1254–55 (upholding a handgun registration scheme as presumptively valid after noting that they found "no basis in either the historical record or the record of this case to rebut that presumption").

understood and how similar laws were read at the time. But because language, laws, cases, treatises, practices, and understandings change over time, the light provided dims as we move further from ratification. *Heller*, 554 U.S. at 601–03, 614; *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 714 F.3d 334, 337, 339 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc).

One relevant source is state law, as various state statutes and constitutions illuminate the pre-existing right embodied in the language of the Second Amendment. *See Heller*, 554 U.S. at 584–86, 600–03 (relying on state constitutions and statutes to clarify the linguistic meaning of the Second Amendment). Indeed, the definitions and interpretive tools that would have been used to understand the language of state laws would have also been used by the public to understand the Constitution. John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 Nw. U. L. Rev. 751, 769–70 (2009). State laws prove especially helpful in determining who the public would have considered to be included in the "militia." This is especially true prior to ratification, as organized militias were creatures of state law.[10]

---

[10] ARTICLES OF CONFEDERATION art. VI, § 4 (1777) (requiring that "every State [ ] always keep up a well regulated and disciplined militia" but largely leaving governance to the states); *Parker v. Dist. of Columbia*, 478 F.3d 370, 387–88 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570 (2008) ("[T]he existence of the militia preceded its organization by Congress."); David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 590 (2019) (lack of uniformity or control over the militia is part of the reason the Founders sought a stronger federal government).

In 1788, however, the Constitution granted the federal government the power to call "forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions" and "provide for organizing, arming, and disciplining, the Militia." *See* U.S. Const. art. I, § 8, cl. 15, 16. And the Supreme Court has held that state militia laws were preempted to the extent they conflicted with federal militia laws. *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 24 (1820); J. Norman Heath, *Exposing the Second Amendment: Federal Preemption of State Militia Legislation*, 79 U. Det. Mercy L. Rev. 39, 43–47, 67 (2001). So after 1788 federal law became more relevant to understanding the linguistic meaning of the term "militia" as used in the Bill of Rights.

This is not to suggest that state militia laws became irrelevant, as the Constitution still recognized important roles for the states in governing and defining their own militias.[11] Indeed, besides appointing officers, the states could pass laws governing their militias to the extent they did not conflict with federal law and could freely control their militias when

---

[11] *See* U.S. CONST. art. I, § 8, cl. 16 (acknowledging the role of state law in defining the militia even when called by Congress by "reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress"); THE FEDERALIST No. 46, at 321 (James Madison) (J. Cooke ed., 1961) (extolling the virtue of "subordinate governments to which the people are attached, and by which the militia officers are appointed"); David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 606–07 (2000) (finding that the militia mainly remained a state institution); *cf.* Robert Leider, *Federalism and the Military Power of the United States*, 73 VAND. L. REV. 989, 1004–07, 1013–16 (2020) (finding that the federal role in controlling the militia was much greater but states still had some concurrent authority and control when the militia was not called by the federal government).

they were not called on by the federal government, which was almost always the case.[12]

And the public would be most familiar with the composition of their own state militia. So

both federal and state laws inform the linguistic meaning of "militia" near the time of

ratification.

But state laws are less illuminating the further one moves from ratification. This is,

in part, because the states initially were not restricted by the Bill of Rights. *Barron v. City*

*of Balt.*, 32 U.S. (7 Pet.) 243, 247–48 (1833). And as time passes, states may diverge from

a common understanding and experiment, and language is more likely to evolve. *New*

*State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) (praising

---

[12] In *Houston v. Moore*, 18 U.S. 1, 3–4 (1820), a militiaman failed to attend a federal muster in Pennsylvania and was convicted by a military tribunal convened under the authority of Pennsylvania. Houston argued that federal law preempted state law on this issue. *Id*. The Court agreed that federal militia laws could preempt state laws but found that the militia law did not preclude concurrent jurisdiction in that case. *Id*. at 29–32. In coming to that conclusion, the Court acknowledged the importance of state law for the militias and emphasized that in the absence of a conflict with federal law, state law governs:

> It may be admitted at once, that the militia belong to the States, respectively, in which they are enrolled, and that they are subject, both in their civil and military capacities, to the jurisdiction and laws of such State, except so far as those laws are controlled by acts of Congress constitutionally made. Congress has power to provide for organizing, arming, and disciplining the militia; and it is presumable, that the framers of the constitution contemplated a full exercise of all these powers. Nevertheless, if Congress had declined to exercise them, it was competent to the State governments to provide for organizing, arming, and disciplining their respective militia, in such manner as they might think proper.

*Id*. at 21. And "militia members served their states far more than they served the national government," leaving most control in the hands of the states. Michael J. Golden, *The Dormant Second Amendment: Exploring the Rise, Fall, and Potential Resurrection of Independent State Militias*, 21 WM. & MARY BILL RTS. J. 1021, 1033 (2013).

states as laboratories of democracy); Thomas R. Lee et al., *Corpus Linguistics & Original Public Meaning: A New Tool to Make Originalism More Empirical*, 126 Yale L. J. Forum 20, 22 (2016). The *Heller* Court recognized this, as it looked to state constitutions and laws at the time of ratification to determine the Second Amendment's public meaning but noted that post-Civil War sources "do not provide as much insight into its original meaning as earlier sources." 554 U.S. at 614; *Nat'l Rifle Ass'n*, 714 F.3d at 337, 339 & n.5 (Jones, J., dissenting) (discounting late nineteenth- and early twentieth-century sources). Indeed, the Supreme Court has made clear that *Heller* relied on nineteenth-century sources "as mere confirmation of what the Court thought had already been established" by Founding-era sources. *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019). To the extent later sources conflict with evidence closer to ratification, their relevance is limited.

Evidence about the ratification of the Fourteenth Amendment also highlights the waning usefulness of state laws. While the Founders sought to oppose a tyrannical federal government, the self-defense of freed Blacks was central to the passage of the Fourteenth Amendment. Akhil Reed Amar, Heller*, HLR, and Holistic Legal Reasoning*, 122 Harv. L. Rev. 145, 176 (2008). And *McDonald* reviewed pre- and post-Civil-War-era laws to show that a right to self-defense was part of the Second Amendment that was intended to be incorporated. 561 U.S. at 770–78. But in doing so, the Supreme Court's review focused on federal laws, such as the Freedmen's Bureau Act of 1866, and debates in Congress. *Id*. at 773–77. Many of those debates focused on legislators' alarm about southern laws and militias being employed to disarm recently freed slaves. *Id*. at 772, 775–76. The ineffectiveness of federal law at preventing southern states from disarming free people

motivated Congress to enact the Fourteenth Amendment to stop states from violating the right to keep and bear arms. *Id*. So we should hesitate to look to Civil-War-era state laws that restricted the right to bear arms as evidence of the scope of the Second Amendment right at the time of the Founding.

Looking through this historical lens to the text and structure of the Constitution reveals that 18- to 20-year-olds have Second Amendment rights. Virtually every other constitutional right applies whatever the age. And the Second Amendment is no different. The militia laws in force at the time of ratification uniformly required those 18 and older to join the militia and bring their own arms. While some historical restrictions existed, none support finding that 18-year-olds lack rights under the Second Amendment.

### 1.    The text and structure of the Constitution

As with any matter of constitutional interpretation, "our inquiry begins with the text of the Constitution." *Altman v. City of High Point*, 330 F.3d 194, 200 (4th Cir. 2003). Both the text and structure of the Second Amendment, along with its place within the Constitution as a whole, reveal that it protects 18- to 20-year-olds. First, nothing in the text of the Second Amendment limits its application by age. Second, the most analogous rights to the Second Amendment, those in the First and Fourth Amendments, similarly contain no age limits. Third, most other constitutional rights are not age limited. And fourth, the few rights that may not apply to those under 18 or that change by age are not analogous to the Second Amendment, and most of those rights become applicable at age 18, not 21.

As to the first point, while various parts of the Constitution include age requirements, the Second Amendment does not. The Founders set age requirements for Congress and the Presidency, but they did not limit any rights protected by the Bill of Rights to those of a certain age. *See* U.S. Const. art. I, § 2 (age 25 for the House); *id.* art. I, § 3 (age 30 for the Senate); *id.* art. II, § 1 (age 35 for the President); *cf. id.* amend. XXVI (setting voting age at 18). In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment.

Turning to the second point, the two rights most like the Second Amendment apply to all people regardless of age. The Second Amendment refers to the "right of the people," which is a phrase also used in the First and Fourth Amendments to denote an individual right. *Heller*, 554 U.S. at 579. Like the Second Amendment, both the First and Fourth Amendments codify a pre-existing, fundamental, inalienable individual right. *Id*. at 592.

The Supreme Court and the Fourth Circuit have used First Amendment law as a guidepost for interpreting the Second Amendment. *Heller*, 554 U.S. at 591, 595, 626; *Kolbe*, 849 F.3d at 133; *Chester*, 628 F.3d at 678, 682. And the First Amendment applies to all persons, even those under 18. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (free speech); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (free exercise). To be sure, minors' First Amendment rights are qualified to some degree, *see Tinker*, 393 U.S. at 506, 513, but those qualifiers do not eliminate the rights altogether, for time, place, and manner regulations are a part of everyone's First Amendment rights regardless of age, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791

(1989). Instead, *Tinker* presumes minors have similar rights as adults because they do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506; *accord Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011) (enjoining a California law prohibiting the sale of violent video games to those under 18 without a guardian's permission as a violation of the First Amendment).

The logic of *Tinker* has also been applied in the Fourth Amendment context. It is "indisputable" that the Fourth Amendment protects the rights of all persons, including minors. *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985). But like the First Amendment, the context matters in determining the scope of the right. *See id.* at 337–38 (explaining that minors' expectations of privacy differ based on the item searched and whether the search occurs on or off school property). But the existence of the right is not limited by age.

To be clear, in considering analogous rights from the First and Fourth Amendments and their application to minors, we are not suggesting that the protections of the Second Amendment necessarily extend in full force to those under 18.[13] Nor do we suggest that minors have an unfettered right to purchase firearms. We merely emphasize that the First and Fourth Amendments' protection of "the people," including those under 18, confirms that "the people" protected by the Second Amendment includes at least those 18 and older.

As for the third point, less-analogous rights, such as the enumerated rights to due process and equal protection, also apply to all persons, including minors. *See, e.g.*, *Brown*

---

[13] Indeed, we do not address the Second Amendment's application to those under 18 at all. As discussed in this section, while other constitutional rights apply by at least age 18, some have age variation. And the history of the right to keep and bear arms, including militia laws, may well permit drawing the line at 18.

*v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954) (Do separate-but-equal schools "deprive the children of the minority group of equal educational opportunities? We believe that [they] do[]."); *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (due process). Newer unenumerated rights do as well. *See, e.g.*, *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 74 (1976) (enjoining a law requiring a minor to obtain parental consent to get an abortion, declaring that "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority").

And while the Eighth Amendment applies differently based on age, it does so by providing *greater* constitutional protection to those under 18. In *Roper v. Simmons*, 543 U.S. 551, 574 (2005), the Supreme Court held that the Eighth Amendment's application to minors prohibited the use of the death penalty for those who were under 18 at the time they committed the offense. The Court drew the line at that age and has held to it. For "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is . . . the age at which the line for death eligibility ought to rest." *Id*. Since *Roper*, no federal court has expanded this logic to provide greater protection to those over 18. Similarly, no federal court has ever held that one *loses* protection under the Eighth Amendment—or somehow escapes its applicability altogether—by reaching the age of majority.

Finally, there are some rights that do not apply to those under 18. But those rights also suggest that 18-year-olds are protected by the Second Amendment because the Court has drawn the line for their application at age 18, not 21. The jury trial right does not apply to juvenile proceedings, *McKeiver v. Pennsylvania*, 403 U.S. 528, 545, 550–51 (1971), but

many state laws end the jurisdiction of juvenile courts at age 17, with a few at age 16 and just recently one at age 18, Anne Teigen, *Juvenile Age of Jurisdiction and Transfer to Adult Court Laws*, Nat'l Conf. St. Legis. (April 8, 2021), (saved as ECF opinion attachment). And many view the protections of juvenile proceedings for minors as better and want to increase the age at which they apply. *See McKeiver*, 403 U.S. at 545, 550. The other relevant right is voting, which the Constitution explicitly limits to those 18 and older. U.S. Const. amend. XXVI.

There are only two unenumerated rights states may restrict for those under a certain age: marriage and sex. *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (finding a right for sexual autonomy but differentiating minors); *Obergefell v. Hodges*, 576 U.S. 644, 675 (2015) (holding that the right to marry is fundamental). But even still, the legal age of marriage in all but two states is 18, and even in those two states it appears that one can marry at 18 with parental consent. *See* Miss. Code Ann. § 93-1-5; Neb. Rev. Stat. §§ 42-105, 43-2101. For sex, the oldest state-imposed age of consent (the age at which an individual can legally consent to sexual intercourse) is 18.[14] So even these rights apply to some degree to 18-, 19-, and 20-year-olds.

But whatever their import, the treatment of these rights cannot overcome the strong evidence that the Second Amendment right vests at least at age 18. Indeed, it would be odd to treat the Second Amendment like marriage and sex rather than contemporaneously

---

[14] Office of the Assistant Secretary for Planning and Evaluation, *Statutory Rape: A Guide to State Laws and Reporting Requirements. Sexual Intercourse with Minors*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Dec. 15, 2004), (saved as ECF opinion attachment); *see, e.g.*, TENN. CODE ANN. § 39-13-506 (age 18); CAL. PENAL CODE § 261.5 (age 18).

USCA4 Appeal: 18-2250      Doc: 71          Filed: 07/13/2021      Pg: 29 of 141

ratified rights such as the First and Fourth Amendments that have been described as fundamental pre-existing rights analogous to the Second Amendment. *Heller*, 554 U.S. at 592.

There are many things that minors and even those under 21 cannot do. *See Ent. Merchs. Ass'n*, 564 U.S. at 836–37 (Thomas, J., dissenting) (explaining that minors cannot drive for hire or drive a school bus, buy tobacco, play bingo for money, or execute a will). But none of those restrictions implicate constitutional rights, so states have great leeway to regulate those activities under their general police powers. And while the Court has "recognized that the State has somewhat broader authority to regulate the activities of children than of adults," that does not mean that children necessarily have different rights than adults. *Danforth*, 428 U.S. at 74. Often they have the same rights as adults, but the states' interests are stronger with regard to minors so restrictions may more easily pass constitutional scrutiny. *Ent. Merchs. Ass'n*, 564 U.S. at 794–95. So it is hard to conclude that 18- to 20-year-olds have no Second Amendment rights when almost every other constitutional right affords them protection. This conclusion becomes inescapable when we consider the history.

### 2.    Founding-era militia laws

The historical evidence from the Founding shows that 18- to 20-year-olds are protected by the Second Amendment. Founding-era militia laws provide powerful historical evidence. Near the time of ratification, the federal government and every state required 18-year-old men to be part of the militia and bring their own arms. *See Heller*,

554 U.S. at 596, 627. This evidences the Founding public's understanding that the "militia," and thus the Second Amendment, encompassed 18-year-olds.

These Founding-era militia laws illuminate the broader individual right enshrined in the Second Amendment. *Id.* at 600–03. The phrase "[a] well regulated Militia, being necessary to the security of a free State" augments the individual "right of the people" and helps us understand its scope and resolve ambiguities. *Id.* at 577–78, 595–99.

The civic purpose of preserving our nation's security sits at the Second Amendment's core. *Id.* at 597–98. Being part of the militia, having a firearm, and being prepared for action were vital to protecting the new Republic. This civic purpose addressed internal threats because there was no police force. So members of the militia "served various law enforcement functions," including protection "against private thugs, such as pirates and renegade Indians, as well as against more organized threats." Amar, *supra*, at 164. For this reason, many states required citizens to be armed and keep firearms at home even outside militia service.[15] Indeed, these practices have deep roots in the common-law

---

[15] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 145–48 (2007); Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON FIREARMS & PUB. POL'Y 1, 1–15 (2004); *Young v. State*, 992 F.3d 765, 795–96 (9th Cir. 2021) (en banc); *Heller*, 554 U.S. at 601 (citing 19 COLONIAL RECORDS OF THE STATE OF GEORGIA 137–39 (A. Candler ed., 1911 (pt. 1)) (1770), for the idea that some states required citizens to take guns to church); *see, e.g.*, A Supplementary Act to the Act Entitled, an Act for Better Settling and Regulating the Militia of this Colony of New Jersey § 4 (1757), *in* ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW JERSEY 139, 141 (1761) (requiring individuals to keep firearms in their homes); An Act for the Better Security of this Province Against the Insurrections and Other Wicked Attempts of Negroes and Other Slaves § 1 (1747), *in* STATUTES AT LARGE OF SOUTH CAROLINA 417, 417–19 (1836) (requiring guns at church due to a fear of slave uprisings); NEW HAVEN'S SETTLING IN NEW ENGLAND AND

doctrines of hue and cry and the *posse comitatus*, where privately armed citizens would be called to respond to crimes or other public emergencies.[16]

Militias were also important to repel invasions while reducing the need for the standing army feared at the time of the Founding. *Heller*, 554 U.S. at 597–98; The

---

SOME LAWS FOR GOVERNMENT 64 (London, C. J. Hoadly ed., 1656) (requiring constant readiness and arms for patrol); An Act for Establishing a Militia Within this Government (1742), *in* LAWS OF THE GOVERNMENT OF NEW-CASTLE, KENT AND SUSSEX UPON DELAWARE 171, 171 (1741) (requiring the keeping of arms and ammunition by individuals' side for the duration of the act); Proceedings of the Virginia Assembly (1619), *in* NARRATIVES OF EARLY VIRGINIA 245, 273 (Lyon Gardiner Tyler ed., 1907) (all must be armed in church); Records of the General and Particular Courts (1643), *in* THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 1, 95 (1850) (requiring guns at public meetings and to travel because of the threat of Native Americans); Proceedings of the Council of Maryland (1642), *in* 3 ARCHIVES OF MARYLAND 45, 103 (1885) (requiring guns in church and to respond to alarms); Laws of the Colony of New Plymouth (1657), *in* THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 28, 102 (1836) (requiring guns in church seasonally); The Colony Records (1636), *in* 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 71, 190 (1853) (requiring those age 18 and older to bring guns to public meetings and to travel); Newport Records (1639), *in* 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS IN NEW ENGLAND 87, 94 (1856) (requiring guns for public meetings and travel).

[16] *See* David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. CRIM. L. & CRIMINOLOGY 761, 788–805 (2014); Brittany Occhipinti, *We the Militia of the United States of America: A Reanalysis of the Second Amendment*, 53 WILLAMETTE L. REV. 431, 444–46 (2017); *see also* James Wilson, *Lectures on Law*, *in* 2 COLLECTED WORKS OF JAMES WILSON 1017 (Kermit L. Hall & Mark David Hall eds., 2007) ("No man above fifteen and under seventy years of age, ecclesiastical or temporal, is exempted from" *posse comitatus* service.); 3 JOHN ADAMS, LEGAL PAPERS OF JOHN ADAMS 285 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965) (During the trial of the soldiers responsible for the Boston Massacre, the court's charge to the jury included the traditional duty of private persons to respond to the hue and cry and to carry arms: "It is the duty of all persons (except women, decrepit persons, and infants under fifteen) to aid and assist the peace officers to suppress riots &c. when called upon to do it. They may take with them such weapons as are necessary to enable them effectually to do it.").

Federalist No. 29, at 182–87 (Alexander Hamilton) (J. Cooke ed., 1961); The Federalist No. 46, at 321 (James Madison).[17]  The third purpose of the militia is closely related:  to act as a check on a tyrannical government.[18]  Many feared that a standing army would be used to disarm and oppress the people.[19]  The militia democratized self-defense and gave the people an important check on and voice in government action.[20]  In order to serve these purposes, a wide swath of the public had to be armed.

As George Mason observed, "[T]o disarm the people; that [is] the best and most effectual way to enslave them."  3 Jonathan Elliot, *The Debates in the Several State*

---

[17] A militia was first established by King Alfred in the ninth century to protect communities from Danish incursions.  Kopel, *supra* note 16, at 771–72; Occhipinti, *supra* note 16, at 444–46.  The public was called upon to bring their own arms in defense of their communities during an emergency.  Occhipinti, *supra* note 16, at 444; *see, e.g.*, Assize of Arms (1181), *reprinted in* 1 SOURCES OF ENGLISH CONSTITUTIONAL HISTORY 85 (Carl Stephenson & Frederick George Marcham eds. & trans., 1937) (requiring all freemen to possess arms in defense of the nation).  The militia and related *posse comitatus* were vital to the American Revolution, as a privately armed and trained population could respond quickly to British incursions within their communities.  *See* Kopel, *supra* note 16, at 792–95; Golden, *supra* note 12, at 1030, 1039–41.

[18] *Heller*, 554 U.S. at 597–98, 608–09; Ronald S. Resnick, *Private Arms as the Palladium of Liberty: The Meaning of the Second Amendment*, 77 U. DET. MERCY L. REV. 1, 40–41 (1999); Occhipinti, *supra* note 16, at 460–62; Golden, *supra* note 12, at 1029, 1047–50, 1063–67.

[19] *United States v. Miller*, 307 U.S. 174, 179 (1939); Golden, *supra* note 12, at 1029, 1047–50; Resnick, *supra* note 18, at 29; Yassky, *supra* note 11, at 597.

[20] Occhipinti, *supra note* 16, at 444–46; Golden, *supra* note 12, at 1029, 1047–50; *see also* JOEL BARLOW, ADVICE TO THE PRIVILEGED ORDERS IN THE SEVERAL STATES OF EUROPE RESULTING FROM THE NECESSITY AND PROPRIETY OF A GENERAL REVOLUTION IN THE PRINCIPLE OF GOVERNMENT 24–25 (3d ed. 1793) (noting that Europeans did not trust their people with arms because they saw arms "as a mark of an uncivilized people, extremely dangerous to a well ordered society" but because Americans were their own sovereign, "the people are civilized, that they are with safety armed").

*Conventions on the Adoption of the Federal Constitution* 380 (1863).  Hamilton noted "[i]f the representatives of the people betray their constituents, there is then no resource left but in the exertion of that original right of self-defence, which is paramount to all positive forms of government."  The Federalist No. 28, at 178 (Alexander Hamilton) (J. Cooke ed., 1961); *see also* 3 Joseph Story, *Commentaries on the Constitution of the United States* 746 (1833) (calling the right to keep and bear arms "a strong moral check against the usurpation and arbitrary power of rulers").  Thus, as Patrick Henry concluded, the people must "[g]uard with jealous attention the public liberty.  Suspect every one who approaches that jewel.  Unfortunately, nothing will preserve it but downright force.  Whenever you give up that force, you are inevitably ruined."  Elliot, *supra*, at 45.  So "[t]he great object is, that every man be armed . . . . Every one who is able may have a gun."  *Id*. at 386.

Madison and other Founders often explained how the militia was key to safety and defense broadly.  To serve those functions, and to avoid becoming a standing army, individuals needed to be privately armed.  Indeed, one of the "advantage[s]" that Madison thought "Americans possess over the people of almost every other nation" was the "advantage of being armed."  The Federalist No. 46, at 321 (James Madison).

In public discourse, Madison contrasted this American advantage of an armed citizenry with Europe, where governments were "afraid to trust the people with arms."  *Id*. at 322.  For European governments recognized an armed citizenry could not be conquered by the largest standing army that could be supported.  *Id*.  Indeed, the American Revolution proved this very point, as American militias could not be conquered by British regulars.  *Id*. at 321.  If European powers permitted an armed citizenry *and* local governments that

appointed militia officers, then "the throne of every tyranny in Europe would be speedily overturned, in spite of the legions which surround it." *Id.* at 322. For Madison, this combination in America—the "advantage of being armed" alongside "the existence of subordinate governments, to which the people are attached and by which the militia officers are appointed"—formed "a barrier" against tyranny. *Id.* at 321–22. And the Constitution protected both advantages to check arbitrary power: Its structural design protected local governments separate from the federal government and the Second Amendment protected private citizens' right to privately keep and bear arms.

This civic purpose reflected the central belief that people voluntarily created the state to protect their own rights from others.[21] And one of those rights was self-preservation, which citizens could assert individually in self-defense.[22] The privately armed populace furthered these interconnected rights and duties at the core of the state and

---

[21] 1 WILLIAM BLACKSTONE, COMMENTARIES 123–25, 130 (St. G. Tucker ed., 1803); M. de Montesquieu, *The Spirit of the Laws* bk I, pp. 4–6, bk XXVI, pp. 211 & 231, *in* THE COMPLETE WORKS OF M. DE MONTESQUIEU (London: T. Evans 1777); John Locke, TWO TREATISES OF GOVERNMENT 129–30 (Haffner Pub. 1947) (1694); Thomas Hobbes, LEVIATHAN ch. XIII–XIV (London, George Routledge & Sons ed., 1894) (1651); *see also* Kopel, *supra* note 16, at 826; Don B. Kates Jr., *The Second Amendment and the Ideology of Self-Protection*, 265 CONST. COMMENT. 87, 89–92, 101–04 (1992).

[22] Hobbes, *supra* note 21, at ch. XIII–XIV; Brannon P. Denning, *Palladium of Liberty? Causes and Consequences of the Federalization of State Militias in the Twentieth Century*, 21 OKLA. CITY U. L. REV. 191, 207 (1996) ("[T]he Founders believed that the right to arms was a necessary ingredient of the moral duty of self-defense." (quoting Kates, *supra* note 21, at 91)).

the Second Amendment:  defense of oneself and one's community.  *See Heller*, 554 U.S. at 577–78.[23]

So while the individual right of self-defense was "the central component" of the Second Amendment, the civic purpose "was codified" based on the fear that a tyrannical government would eliminate the civically minded militia.  *Id.* at 597–99.  Both reflected the pre-existing right of self-defense that the Founders valued as the core purpose of the state.  "In the Founders' world, individual self-protection and community defense were not wholly separate spheres."  Amar, *supra*, at 164.[24]

The relationship between the narrower civic purpose and the broader individual right provides us one way to understand the scope of the individual right.  The individual right belongs to "the people," which "unambiguously refers to all members of the political community."  *Heller*, 554 U.S. at 580.  The "militia," on the other hand, is "a subset of 'the people'—those who were male, able bodied, and within a certain age range."  *Id.*  Those excluded from the militia were not excluded from the Second Amendment, but those

---

[23] Kopel, *supra* note 16, at 826; Occhipinti, *supra* note 16, at 457–58; Golden, *supra* note 12, at 1024.

[24] Indeed, some militias were voluntary and used private arms, such as privateers protecting merchants with private battleships during the 1798–1800 Quasi-War between the United States and France.  *See* An Act to Authorize the Defence of the Merchant Vessels of the United States Against French Depredations, ch. 60, §§ 1–2, 1 Stat. 572, 572 (1798) (authorizing private ships to resist hostilities from French ships, capture them in return, and receive a portion of the salvage); An Act Further to Protect the Commerce of the United States, ch. 68, § 2, 1 Stat. 578, 579 (1798) (allowing commissioned private ships to capture armed French ships to the same extent as the Navy).  *See generally* Alexander Tabarrok & Alex Nowrasteh, *Privateers! Their History and Future*, FLETCHER SECURITY REV., Winter 2015, at 55; Golden, *supra* note 12, at 1030, 1063–65.  The civic and individual purposes could and did reinforce each other.

included in the militia were surely covered by the Second Amendment.  So because the militia is a subset of "the people," those in the militia share the same rights as "the people."

With this in mind, we look to militia laws in effect at the time of ratification to determine how the public at that time would have understood the word "militia."  Those who were obligated to serve in the militia and bring their own arms fall unambiguously within the original public meaning of "the people" who had a right "to keep and bear Arms."

### a.    Militia laws at the time of the Founding show that 18-year-olds have Second Amendment rights

"*Men trained to Arms from their Infancy, and animated by the Love of Liberty, will afford neither a cheap or easy Conquest.*"[25]

Every militia law near the time of ratification required 18-year-olds to be part of the militia and  bring their own arms.  Around the time the Second Amendment was ratified in 1791, Congress began debating invoking its power under the Militia Clauses to better organize the militias for federal use in emergencies.  U.S. Const. art. I, § 8, cls. 15–16.  The effort was pushed by Secretary of War Henry Knox, who argued to Congress that while the "military age has generally commenced at sixteen," the age for the federal select militia should be set at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field."  2 Annals of Cong. 2088, 2092, 2099 (1790).  One of the first rejected proposals

---

[25] 2 JOURNALS OF THE CONTINENTAL CONGRESS, 1774–1789, at 169 (1905) (Continental Congress's address to the inhabitants of Great Britain in 1775).

suggested that the federal government would arm everyone, but this drew sharp rebukes, such as Representative Wadsworth arguing "their parents would rather give them guns of their own, than let them take others from the U.S. which were liable to be taken away at the very moment they were most wanted." 14 Documentary History of the First Federal Congress: Debates in the House of Representatives, Third Session: December 1790–March 1791, at 62 (1995). This proposal raised the concern that any check on tyranny could be undermined by federal control of the militia's arms. In the end, Congress settled on the first federal Militia Act in 1792. That Act required "each and every free able-bodied white male citizen of the respective states, resident therein, *who is or shall be of the age of eighteen years*, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271 (emphasis added). The Act also required that "every citizen so enrolled and notified, shall, within six months thereafter, provide himself" with a firearm and ammunition. *Id.*[26]

---

[26] "That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service." Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271. This act was superseded by the Act of February 28, 1795, 1 Stat. 424, which kept the same substantive provisions but made the President's authority to call the militia permanent.

State laws also help us understand the original public meaning of "militia" because, as the Constitution recognizes, many militias were defined by state laws. *See* U.S. Const. art. I, § 8, cl. 16. And those state laws only further prove the point.

Before ratification, when militias were solely defined by state law, most colonies and states set the age for militia enlistment at 16.[27] Right after ratification, when federal law set the age at 18, every state also set their militia age at 18. *See* Appendix 2. Like the federal Militia Act, these state militia laws required enrolled citizens, including 18-year-olds, to bring their own firearms and ammunition either explicitly or as a general background principle.[28] Generally firearms were owned privately and kept by the members

---

[27] J.A. 303–05; Cramer, *supra* note 15, at 2–10. While not every state set its militia enlistment age at 16 before ratification and some fluctuated, no state appears to have set its age higher than 18 in decades preceding ratification. *See* Appendix 1.

[28] Every militia act around the time of ratification required enlistees to bring their own equipment, including a rifle or musket. As the Supreme Court has said, "the Militia comprised all males physically capable of acting in concert for the common defense. 'A body of citizens enrolled for military discipline.' . . . And further, that ordinarily when called for service *these men were expected to appear bearing arms supplied by themselves* and of the kind in common use at the time." *Miller*, 307 U.S. at 179 (emphasis added); *see id.* at 179–82 (citing some of the same militia laws and explaining that "as in England, the militia system was based on the principle of the assize of arms. This implied the general obligation of all adult male inhabitants to possess arms, and, with certain exceptions, to cooperate in the work of defence," and noting that the colonies enacted laws "intended to insure the possession of arms and ammunition by all who were subject to military service" (quoting 1 OSGOOD, THE AMERICAN COLONIES IN THE 17TH CENTURY, ch. XIII)); *see also, e.g.*, An Act to Amend & Reduce into One Act, the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions & Insurrections, ch. 1, § 3 (1785), *in* 12 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9, 12 (1823) (cited by *Miller* and requiring personal arms); An Act to Organize the Militia of this State § 10 (1794), *in* AT THE GENERAL ASSEMBLY OF THE GOVERNOR AND COMPANY OF THE STATE OF RHODE-ISLAND AND PROVIDENCE-PLANTATIONS, BEGUN

of the militia in their homes as the government did not provide or keep the guns unless the citizen was too poor to afford one.[29]   That 18-year-olds had to be part of the militia and bring their own arms establishes that 18-year-olds were included among "the people" who enjoyed the Second Amendment right to keep and bear arms.  *See Heller*, 554 U.S. at 580.

Many of those in the militia were quite young.  As the Founder Tench Coxe wrote, "the powers of the sword are in the hands of the yeomanry of America from sixteen to

---

AND HOLDEN BY ADJOURNMENT AT EAST-GREENWICH, WITHIN AND FOR THE STATE AFORESAID, ON THE LAST MONDAY IN MARCH, IN THE YEAR OF OUR LORD ONE THOUSAND SEVEN HUNDRED AND NINETY-FOUR, AND OF INDEPENDENCE THE EIGHTEENTH 14, 15, 21–22 (1794) (requiring those enlisted in Rhode Island to bring firearms and ammunition); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania §§ 2, 5 (1793), *in* THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 454, 456–57 (1909) (same requirement for all except those under 21 during peacetime).  And it was generally understood as a background principle that enlistees had to provide their own weapons unless they were too poor to do so.  *See* Churchill, *supra* note 15, at 147 (concluding that those eligible for militia duty generally had to bring their own guns); Cramer, *supra* note 15, at 2 ("[A]lmost all colonies *required* white adult men to possess firearms and ammunition" and "[s]ome statutes were explicit that militiamen were to keep their guns at home; others imply the requirement, by specifying fines for failing to bring guns to muster or church."); James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 WM. & MARY L. REV. 1777, 1782 (2002) ("[G]uns were required by law to be supplied by adult males as part of their militia service.").

Some laws provided by the government also make this point.  A few laws exempted those under 21 from serving in the militia during peacetime.  But those laws still required those enrolled to bring their own firearm.  *See, e.g.*, An Act to Establish an Uniform Militia Throughout this State §§ 1, 4, *in* LAWS OF THE STATE OF DELAWARE 123, 123, 125–26 (1807).  Similarly, later state laws that held parents liable for a minor's fees and equipment still required minors to bring their own firearm and ammunition; the laws just mandated that the minor's parents provide his firearm or pay a fee if the minor could not afford a gun.  J.A. 298–301; *see, e.g.*, An Act, for Regulating and Governing the Militia of this State § 15 (1797), *in* 2 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED: INCLUDING THE DECLARATION OF INDEPENDENCE, THE CONSTITUTION OF THE UNITED STATES, AND OF THIS STATE 122, 131–32 (1808).

[29]  Churchill, *supra* note 15, at 141–42, 145–47; Cramer, *supra* note 15, at 24–30.

sixty . . . . Their swords . . . are the birthright of an American." Tench Coxe, A Pennsylvanian, No. 3, Pa. Gazette, Feb. 20, 1788, at 22. Because the individual right is broader than the Second Amendment's civic purpose, those required to serve in the militia and bring arms would most assuredly have been among "the people" who possessed the right. *See Heller*, 554 U.S. at 579–81. And the indisputable historical evidence establishes that 18-year-olds had to join the militia and bring their own firearms. So those 18 and older would have been understood to be covered by the Second Amendment at the Founding.

> **b.** **The militia laws cited by the government do not undermine the conclusion that 18-year-olds are protected**

Despite the overwhelming evidence that federal and state militia laws around the Founding required those 18 and older to serve in the militia with their own firearm, the government suggests that more specific militia exclusions and requirements undermine the general laws. But none of the laws it cites undermine the Founding-era evidence that those older than 18 have Second Amendment rights.

In the decades after ratification, several states enacted laws that at times raised the age for mandatory militia service to 21. But even if 18-year-olds were not part of the compulsory militia, they were not necessarily excluded either from service in the militia or the Second Amendment's protection. For, once again, the militia is but a subset of those with Second Amendment rights. *Heller*, 554 U.S. at 580. For example, most militia laws did not require those over a certain age to serve in the militia, but we would not suggest that those over that age lack any Second Amendment rights. Militia laws are helpful because they provide a baseline for determining the relevant political community that

enjoyed Second Amendment rights.  They support the affirmative conclusion that 18-year-olds are protected by the Second Amendment.  But even if history were less clear, 18-year-olds would not necessarily be excluded from the Second Amendment's protections.[30]

Further, the substance and timeline of those laws fail to aid the government.  The law closest to ratification cited by the government was enacted by Pennsylvania in 1793.  That law, like all the militia laws at the Founding, required 18-year-olds to join the militia.[31]  It only exempted those under 21 from active militia service during times of peace.  The next closest law to ratification comes from Delaware in 1807.  It also required 18-year-olds to be enrolled in the militia, only exempting those under 21 from duty in peacetime.[32]  The remaining laws are decades newer, and even some of those only provide peacetime

---

[30] Had 18- to 20-year-olds not been required to join the militia at the Founding, perhaps Plaintiffs would be left with silence or ambiguity.  If *Heller*'s list of presumptively lawful measures were then to apply, the challengers would lack the necessary affirmative historical evidence to overcome it.  But neither is the case here, as the presumption does not apply and even if it did, the laws put forth by the government do little to undermine the affirmative case that those 18 and older are protected.

[31] J.A. 289; An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 1 (1793), *in* 14 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 454, 455 (1909).

[32] J.A. 287; An Act to Establish an Uniform Militia Throughout this State §§ 1, 4 (1807), *in* LAWS OF THE STATE OF DELAWARE PASSED AT A SESSION OF THE GENERAL ASSEMBLY WHICH WAS BEGUN AND HOLDEN AT DOVER, ON TUESDAY THE FOURTH, AND ENDED ON THURSDAY THE THIRTEENTH OF AUGUST, IN THE YEAR OF OUR LORD, ONE THOUSAND EIGHT HUNDRED AND SEVEN 123, 123, 125 (1807).  Another Delaware law closer to ratification also required 18-year-olds to enlist but similarly excepted those 21 and younger from militia duty.  *See* An Act for Establishing the Militia in this State, §§ 1– 2 (1793), *in* 2 LAWS OF THE STATE OF DELAWARE FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE THOUSAND SEVEN HUNDRED AND NINETY-SEVEN 1134, 1134–35 (1797).

exemptions.  J.A. 287–89; *see also Nat'l Rifle Ass'n*, 714 F.3d at 342 (Jones, J., dissenting) (making a similar argument that a 1843 Ohio law fails to show that 18-year-olds lack Second Amendment rights because even though they were exempt from service during peacetime, they were still required to be in the militia).[33]  These peacetime-exemption laws do not exclude those under 21 from enrolling in the militia.  In fact, they often still required 18-year-olds to join the militia.  They just exempted them from certain militia requirements during peacetime, such as bringing a firearm.  So these laws do not undermine, but instead reinforce, the conclusion that 18-year-olds were included in the public's conception of the militia.

And, as noted previously, because states were not subject to the Bill of Rights, the further one moves from ratification, the more state variation will occur and the less

---

[33] Ohio set the mandatory militia enlistment age at 18 in 1837.  *See* An Act to Organize and Discipline the Militia § 1 (1837), *in* ACTS OF A GENERAL NATURE, PASSED AT THE FIRST SESSION OF THE THIRTY-FIFTH GENERAL ASSEMBLY OF THE STATE OF OHIO 18, 18 (1837).  In 1843, Ohio exempted those under 21 from duty during peacetime but still required them to be enrolled, like most other peacetime exemption laws.  An Act to Amend the Act Entitled "An Act to Regulate the Militia" § 6 (1843), *in* ACTS OF A GENERAL NATURE, PASSED BY THE FORTY FIRST GENERAL ASSEMBLY OF THE STATE OF OHIO 99, 100 (1843).  The next year, Ohio exempted the entire public from militia duties during peacetime—reflecting the decline in the importance of militias—and set the age for mandatory enlistment at 21.  An Act to Regulate the Militia §§ 1–2 (1844), *in* ACTS OF A GENERAL NATURE, PASSED BY THE FORTY SECOND GENERAL ASSEMBLY OF THE STATE OF OHIO 53, 53 (1844).  But the law also made clear that 18-year-olds could volunteer for the militia.  *Id.* § 14, *in* ACTS OF A GENERAL NATURE PASSED BY THE FORTY SECOND GENERAL ASSEMBLY OF THE STATE OF OHIO 55.

probative the laws will be in interpreting the Second Amendment.[34]  While we should not completely discount evidence closer to the Civil War, these later militia laws are less instructive.  In the decades after the Founding, the militia had become much less important while individual self-defense became more meaningful.[35]  As a result, fewer people needed to be in the militia, and militias were less tied to gun ownership.  Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L.J. 1587, 1634 (2014).  So militia laws enacted decades after ratification, especially when the militias were in decline, provide limited evidence of the original public meaning of the Second Amendment.  *See Nat'l Rifle Ass'n*, 714 F.3d at 339, 342 (Jones, J., dissenting).

The government also relies on a 1778 New Jersey law that set the militia age at 21 for a single call to arms.  That New Jersey law called for 1,000 men ages 21 and older to enlist to defend the frontiers.  *See generally* An Act to Embody, for a Limited Time, One Thousand of the Militia of this State, for the Defence of the Frontiers Thereof §§ 1, 3 (1778), *in* Acts of the General Assembly of the State of New Jersey. At a Session Begun at Trenton on the 27th Day of October, 1778 and Continued by Adjournments 58, 58–59

---

[34]  The first state after ratification to adopt a law that set the minimum age for militia service at 21 was Kansas in 1859.  *See* KAN. CONST. of 1859, art. 8, § 1.  But there may be other laws that the parties, cases, articles, and our own efforts have yet to uncover.

[35]  *McDonald*, 561 U.S. at 770–77; 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 746–47 (1833) (lamenting the declining importance of militias); *see also* JAMES B. WHISKER, THE RISE AND DECLINE OF THE AMERICAN MILITIA SYSTEM 330–31 (Susquehanna Univ. Press 1999); Gerald Orlo Van Slyke, Jr., The Citizen Militias of the United States: Their Antecedents, Development, and Present Condition 221–58 (Apr. 2016) (Ph.D. dissertation, Montana State University), (saved as ECF opinion attachment).

(1778).  The government's reliance on this law reveals the sinking sand on which it stands.

This law was a one-time call to arms for 1,000 people for a single purpose.  *Id*.  It permits

officers to enlist those ages 16 to 21 but only calls upon those 21 and older for this particular

service.  *Id*. § 3.  Moreover, New Jersey still generally required 16-year-olds to enroll in

the militia, both before and after this temporary call to arms.[36]  The mandatory enrollment

age increased to 18 around ratification[37] and remained there through 1829 when the state

---

[36] An Act for the Better Regulating the Militia § 1 (1777), *in* ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, AT A SESSION BEGUN AT PRINCETON ON THE 27TH DAY OF AUGUST 1776, AND CONTINUED BY ADJOURNMENTS 26, 26 (1777) (setting the age at 16 a year prior); An Act for the Regulating, Training, and Arraying of the Militia, and for Providing More Effectually for the Defence and Security of the State § 10 (1781), *in* ACTS OF THE FIFTH GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, AT A SESSION BEGUN AT TRENTON ON THE 24TH DAY OF OCTOBER, 1780, AND CONTINUED BY ADJOURNMENTS 39, 42 (1781) (affirming the age group to be enrolled in the state militia as 16 to 50).

[37] An Act for Organizing and Training the Militia of this State § 4 (1792), *in* ACTS OF THE SEVENTEENTH GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY. AT A SESSION BEGUN AT TRENTON THE 23D DAY OF OCTOBER 1792, AND CONTINUED BY ADJOURNMENTS 824, 825 (1792) (age 18); A Supplement to the Act, Intitled, 'An Act for Organizing and Training the Militia of this State' § 6 (1793), *in* ACTS OF THE SEVENTEENTH GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY.  AT A SESSION BEGUN AT TRENTON THE 23D DAY OF OCTOBER 1792, AND CONTINUED BY ADJOURNMENTS 850, 853 (1793) (same); An Act for the Regulation of the Militia of New-Jersey § 1 (1799), *in* ACTS OF THE TWENTY-THIRD GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, AT A SESSION BEGUN AT TRENTON, ON THE TWENTY-THIRD DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED AND NINETY-EIGHT, AND CONTINUED BY ADJOURNMENTS 609, 609 (1799) (same); An Act for Establishing and Conducting the Military Force of New-Jersey, § 1, ACTS OF THE THIRTIETH GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, AT A SESSION BEGUN AT TRENTON, ON THE FIFTH DAY OF FEBRUARY, ONE THOUSAND EIGHT HUNDRED AND SIX, AND CONTINUED BY ADJOURNMENTS 536, 536 (1806) (same).

enacted a peacetime-exemption law for those under 21.[38]  Taken together, none of these New Jersey laws reflect that 18-year-olds were excluded from militia service.

The government also points to a series of Virginia laws that set varying ages for militia service.  But at the time of ratification, Virginia required militia service for all men ages 18 and older.  An Act for Regulating the Militia of this Commonwealth § 12 (1792), *in* A Collection of All Such Acts of the General Assembly of Virginia 282, 284 (1792).  In 1705, Virginia set the age of service at 16.  An Act for Settling the Militia (1705), *in* 3 William Waller Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 335, 335 (1823).  In 1723, Virginia raised the mandatory age for enlistment to 21 but made it clear that 16-year-olds could be admitted as substitutes.  An Act for the Settling and Better Regulation of the Militia § 2, *in* 4 William Waller Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 118, 118 (1820).  Virginia kept the minimum age for enlistment at 21 in 1738 and used that age of service for a special call to arms for the French and Indian War in 1754.[39]  The next

---

[38]  J.A. 288; An Act to Exempt Minors from Militia Duty in Time of Peace § 1 (1829), *in* ACTS OF THE FIFTY-FOURTH GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, AT A SESSION BEGUN AT TRENTON, ON THE TWENTY-SEVENTH DAY OF OCTOBER, ONE THOUSAND EIGHT HUNDRED AND TWENTY-NINE 3, 3 (1829).

[39]  An Act, for the Better Regulation of the Militia § 2 (1738), *in* 5 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 16, 16 (1819); An Act for Raising Levies and Recruits to Serve in the Present Expedition against the French, on the Ohio §§ 1–3, *in* 6 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A

year, however, Virginia adopted 18 as the age of service, then reduced the age to 16 during the Revolutionary War, and returned to age 18 near the time of ratification.[40]

Pennsylvania follows a similar story. In 1755, at the height of the French and Indian War, Benjamin Franklin drafted and got passed a militia law that required the enrollment

---

COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 438, 438–39 (1819).

[40] An Act for the Better Regulating and Training the Militia § 3 (1755), *in* 6 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 530, 531 (1819) (age 18); An Ordinance for Raising and Embodying a Sufficient Force, for the Defence and Protection of this Colony (1775), *in* 9 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9, 16–17 (1821) (age 16); An Act for Amending the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections § 2 (1784), *in* 11 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 476, 476–77 (1823) (age 18); An Act for Regulating the Militia of this Commonwealth § 12 (1792), *in* A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 282, 284 (1792) (age 18).

of men over 21.[41]  But in 1777 Pennsylvania lowered the age to 18 where it remained

through ratification.[42]

So every state required enrollment at least by age 18 during the decades around

ratification, which is the critical time for determining the historical meaning of the Second

Amendment.  *See Moore*, 702 F.3d at 935 (citing *McDonald*, 561 U.S. at 765 & n.14);

*Chester*, 628 F.3d at 680 (citing *Heller*, 554 U.S. at 625).

Next, the government points to three state laws requiring parental consent to enlist

in the militia.  J.A. 291.  But two of those states were not states at the Founding and their

---

[41] Even so, those under 21 could enlist with parental consent.  An Act for the Better Ordering and Regulating Such as Are Willing and Desirous to Be United for Military Purposes Within this Province § 2 (1775), *in* 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 197, 200 (1898).  And Pennsylvania quickly moved to ask 16-year-olds to voluntarily enroll and imposed a tax on those who did not.  *See* Kopel & Greenlee, *supra* note 10, at 561 (first citing Resolves of Assembly, Agreed to November 8th, 1775 para. 3, *in* 8 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 492, 492 (1902); and then citing Resolutions Directing the Mode of Levying Taxes on Non-Associators para. 1–2, *in* 8 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 538, 539 (1902)).

[42] An Act to Regulate the Militia of the Commonwealth of Pennsylvania § 4 (1777), *in* 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 75, 77 (1909) (age 18); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 3 (1780), *in* 10 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 144, 146 (1904) (age 18); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 2 (1793), *in* 14 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 454, 455 (1909) (age 18); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 1 (1799), *in* 16 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 276, 276 (1911) (age 18); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 1 (1802), *in* 17 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1802 TO 1805, at 174, 174 (1915) (age 18); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 2 (1807), *in* 18 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1806 TO 1809, at 572, 573 (1915) (age 18).

laws were not passed until 1835 and 1863 respectively.[43]  The earliest of these laws was

passed by New York in 1818, but it is a stretch to claim that it required parental consent

for anyone under 21, as the law required 18-year-olds to enroll in the militia and only

required parental consent to join particular companies such as cavalry and artillery.[44]

Before ratification New York set the enlistment age at 16 and right after ratification it was

raised to 18 in line with the federal Militia Act.[45]  And even true parental-consent laws

exempted 18-year-olds from mandatory service in the militia but still permitted them to

join with their parents' permission.

The government also points to a handful of laws requiring parents to furnish arms

and pay fees for their enlisted children.  J.A. 298–301.  But those laws do little to suggest

that those under 21 were not required to keep and bear arms.  Most of those laws require

18-year-olds to enlist but do not set an age for parental liability, just requiring guardians

to be liable for the equipment and food of those "who shall be under their care."  *Id.*  And

the existence of these laws is unsurprising given that some states required those older than

---

[43] An Act to Organise, Govern, and Discipline the Militia art. IV, § 22 (1835), *in* 2 LAWS OF A PUBLIC AND GENERAL NATURE OF THE STATE OF MISSOURI, PASSED BETWEEN THE YEARS 1824 & 1836, at 512, 521 (1842); An Act for the Reorganization of the Military Forces of the State of Michigan § 6 (1863), *in* 1 JAMES S. DEWEY, THE COMPILED LAWS OF THE STATE OF MICHIGAN 317, 320 (1872).

[44] An Act to Organize the Militia § 33 (1818), *in* LAWS OF THE STATE OF NEW YORK, PASSED AT THE FORTY-FIRST SESSION OF THE LEGISLATURE 211, 225 (1818).

[45] An Act to Regulate the Militia (1786), *in* 1 THOMAS GREENLEAF, LAWS OF THE STATE OF NEW YORK 227, 227 (1792) (age 16); An Act to Organize the Militia of this State (1793), *in* 3 LAWS OF THE STATE OF NEW YORK 440, 440 (1887) (age 18).

16 to enroll in the militia.[46]  Regardless, "the point remains that those minors were in the militia and, as such, they were required to own their own weapons," even if their parents had to buy those weapons or consent to them joining.  *Nat'l Rifle Ass'n*, 714 F.3d at 342 (Jones, J., dissenting).

So contrary to the government's claims, state and federal militia laws show that 18-year-olds had a right to keep and bear arms.  Near ratification, every state and the federal government required 18-year-old men to be in the militia and have their own weapons, meaning that those people were part of "the people" protected by the Second Amendment.[47]  Nothing in the few and distant militia laws the government identifies undermines this conclusion.

---

[46] Appendix 1; Kopel & Greenlee, *supra* note 10, at 585–86.  *Compare, e.g.*, An Act, for Regulating and Governing the Militia of this State § 15 (1797), *in* 2 THE LAWS OF THE STATE OF VERMONT DIGESTED AND COMPILED 122, 131–32 (1808) (parents must provide weapons for "those of [the] militia who shall be under their care and command"), *with* An Act Regulating the Militia of the State of Vermont (1787), *in* STATUTES OF THE STATE OF VERMONT 94, 94 (1787) (16-year-olds must join the militia).  The 1797 Vermont law requires 18-year-olds to enroll but does not set an age under which parents must provide arms for those "under their care and command."  An Act, for Regulating and Governing the Militia of this State § 15 (1797), *in* 2 THE LAWS OF THE STATE OF VERMONT DIGESTED AND COMPILED 122, 131–32 (1808).  This is typical of these laws.

[47] A fairly recent law review article confirms our research on the militia laws during the eighteenth century.  *See generally* Kopel & Greenlee, *supra* note 10.  With the exceptions of Virginia and Pennsylvania, where the age cutoff fluctuated as discussed earlier, every colony and state during the eighteenth century required 18-year-olds to serve in the militia and bring their own arms.  *Id*. at 536–89.  This was uniform in the decades surrounding the ratification of the Second Amendment.  *Id*.  And most states required 16-year-olds to serve prior to the federal Militia Act but raised their enlistment age to 18 in line with the federal act for the rest of the century.  *Id*.  So at the very least 18-year-olds were unambiguously required to be in the militia and thus are included in the Second Amendment.  *Id*. at 499–504.

### 3.    The government's arguments do not point to a different conclusion

Founding-era militia laws provide strong evidence that 18-year-olds were covered by the Second Amendment.  So to undermine this evidence, the government turns to other historical arguments.  First, the government contends that the Second Amendment is tied to virtue and minors were not considered virtuous.  The government thus posits that because the age of majority at the Founding was 21, those under 21 were not covered by the Second Amendment.  Second, it points to state laws in the late nineteenth and early twentieth centuries that restricted the sale of handguns based on age.  We find neither argument persuasive.

### a.    The age of full majority

Both parties rely on the age of majority to make their case, but they look to the age of majority from different time periods.  Neither is relevant.

Plaintiffs argue that because the age of majority is now 18, 18-year-olds have Second Amendment rights.  In response to a similar argument, the Fifth Circuit correctly explained that "'majority or minority is a status'" that "lack[s] content without reference to the right at issue."  *Nat'l Rifle Ass'n*, 700 F.3d at 204 n.17 (quoting Jeffrey F. Ghent, Annotation, *Statutory Change of Age of Majority as Affecting Pre–Existing Status or Rights*, 75 A.L.R.3d 228 § 3 (1977)).  Yet inexplicably, the Fifth Circuit then concluded that 18-year-olds do not have Second Amendment rights because the age of majority was 21 at the Founding.  *Id.* at 201–03.  The government likewise relies heavily on the idea that the age of majority was 21 at the Founding.  *See* 1 William Blackstone, *Commentaries* 463

(St. G. Tucker ed., 1803); Black's Law Dictionary 847 (9th ed. 2009) (suggesting that the age of majority was 21 at the Founding).

But the age of majority—even at the Founding—lacks meaning without reference to a particular right.  As Blackstone's Commentaries makes clear, the relevant age of majority depended on the capacity or activity.  1 William Blackstone, *Commentaries* 463–64; *see also id.* at 465 (noting the "different capacities which [individuals] assume at different ages").  For example, a man could take an oath at age 12, be capitally punished in a criminal case at age 14, and serve as an executor at age 17.  *Id.* at 463–64.  And a woman could consent to marriage at age 12, choose a guardian at age 14, and serve as an executrix at age 17.  *Id.* at 463.  Both sexes had to wait until age 21 to dispose of their lands.  *Id*.  So while the full age of majority was 21, that only mattered for specific activities.  *Id*.  And even so, constitutional rights were not generally tied to an age of majority, as the First and Fourth Amendments applied to minors at the Founding as they do today.  So the age of majority Blackstone identifies for different activities tells us little about the scope of the Second Amendment's protections.

To square the circle, some have attempted to connect the age of majority to the Second Amendment by arguing that the right to keep and bear arms depends on "civic virtue," and those under 21—the Founding-era age of majority—were not considered virtuous.  *Nat'l Rifle Ass'n*, 700 F.3d at 201.  But even if a group could be categorically restricted from possessing Second Amendment rights because of the group's perceived virtue or dangerousness, we find the fact that those 18 and older had to serve in the militia

at the time of ratification means that they are not such a group.  Even so, any determination of a group's dangerousness fits more appropriately at step two of this analysis.

But this age-of-majority argument has been proffered at step one to contend that those historically considered without virtue are outside the scope of the Second Amendment's protection.  *See, e.g.*, *Nat'l Rifle Ass'n*, 700 F.3d at 200–01; *United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009).  There is an ongoing debate about the relevance of virtue,[48] but whether the Second Amendment hinges on notions of virtue is irrelevant for our purposes.  As the Sixth Circuit said, "that the Founders understood the Amendment to protect the virtuous does not explain who was counted among that class." *Tyler*, 837 F.3d at 688–90 (rejecting the claim that the mentally ill were categorically unvirtuous).  Even if virtue matters, there is no Founding-era evidence that 18- to 20-year-olds were considered unvirtuous, as only a few of the cited sources refer to minors and the ones that do fail to rely on primary sources.[49]  That is not historical evidence.

---

[48] *See, e.g.*, *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010); *United States v. Carpio-Leon*, 701 F.3d 974, 979–81 (4th Cir. 2012); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 L. & CONTEMP. PROBS. 143, 146 (1986); Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 679 (2002).  *But see Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912–20 (3d Cir. 2020) (Bibas, J., dissenting); *Kanter*, 919 F.3d at 462–64 (7th Cir. 2019) (Barrett, J., dissenting); Churchill, *supra* note 15, at 155–56, 165.

[49] The sources relied on for the notion that 18-year-olds were not considered virtuous "are like the layers of a matryoshka doll, each nested layer successively larger with little at the core." *Folajtar*, 980 F.3d at 915–18 (Bibas, J., dissenting); *see* Kates, *supra* note 48, at 146 (suggesting that minors were not among the "virtuous" citizenry allowed to own guns, citing only his own article, Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983), which does not provide any historical evidence from the Founding to support that

The cited evidence to support the contention that minors could be prevented from buying firearms comes from a passing reference in a footnote in Thomas Cooley's treatise, which was published nearly a century after ratification. Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883) ("[t]hat the State may prohibit the sale of arms to minors" (citing *State v. Callicutt*, 69 Tenn. 714 (1878), which held a Tennessee state law, 1856 Tenn. Pub. Acts 92, 92, that made it illegal for someone to sell, loan, or give a minor a pistol except for hunting was valid)). Putting aside the limited weight that should be given to this passing statement in a footnote, Cooley's lone source is a state case applying a state law from decades after ratification. *Id.* Neither the law nor the case carries much value in determining original public meaning. Moreover, the case cited, *State v. Callicutt*, relies on *Aymette v. Tennessee*, 21 Tenn. (2 Hum.) 154, 158 (1840), for the proposition that the Second Amendment only protects the right "to keep and bear arms for their common defense" in a military context, not an individual right. *Callicutt*, 69 Tenn.

---

proposition); Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1360 (2009) (cited by the government but only providing sources for felon restrictions, not restrictions on minors); Don B. Kates, Jr., *Second Amendment*, *in* 4 ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 1640 (Leonard W. Levy et al. eds., 1986) (claiming that minors could be prevented from buying firearms but providing no sources); Cornell, *supra* note 48, at 679 (discussing civic virtue but not discussing minors); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995) (implying minors are not virtuous based on Kates's scholarship); Yassky, *supra* note 11, at 588, 626 (cursorily discussing virtue and not in the context of minors). These sources merely cite each other without offering primary sources supporting the idea that minors were considered unvirtuous. *See Folajtar*, 980 F.3d at 915–18 (Bibas, J., dissenting); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1511–12 (2009) (arguing that a danger justification could apply to those under age 18 but the justification was not persuasive considering the other rights enjoyed by those 18 and older).

at 716 (also citing *Page v. State*, 50 Tenn. (3 Heisk.) 198 (1871)).  Not only did *Heller* explicitly reject this limited military and collective view of the Second Amendment, but it also rejected *Aymette* as offering an "odd reading of the right . . . [and] not the one we adopt."  554 U.S. at 579–80, 613.  So the only primary source the government can muster, that comes long after ratification, does nothing to support its case.

And even so, in Cooley's separate discussion of the Second Amendment as an individual right he states that "[t]he meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose."  Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880).  So if anything, Cooley's perspective on the Second Amendment reinforces our conclusion that those who were in the militia at the time of ratification had Second Amendment rights.

The idea that 18- to 20-year-olds are not virtuous in the same manner as felons is a strange contention.  Why would the federal government and every state require unvirtuous people to have guns and be in a militia?  Especially if being unvirtuous means that you can, and probably should, be disarmed?  It is also odd considering that this group has most other rights, while at least some of those rights are circumscribed for felons.  As a result, the government's arguments fail to persuade us that 18- to 20-year-olds were considered unvirtuous and thus outside the Second Amendment's protections.

### b.    Historical gun regulations

Failing to find purchase in Founding-era militia laws or the age of majority, the government turns to historical gun regulations.  *See Nat'l Rifle Ass'n*, 700 F.3d at 200–01.

54

While some gun regulations existed at the Founding, there were no regulations restricting minors' ability to possess or purchase weapons until two states adopted such laws in 1856. *See id.* at 202 n.14. The Fifth Circuit relied on the prevalence of gun-safety regulations around the Founding to conclude that "gun use and gun control have been inextricably intertwined" and that restrictions on particular groups were also allowed. *Id.* at 200–01. Ironically, the very laws the Fifth Circuit relied on to permit general gun regulation were rejected in *Heller* as justifications for broader regulations. *Id.* at 337–38 (Jones, J., dissenting) (rejecting the majority's argument based on *Heller*). *Compare id.* at 200–01 (majority opinion), *with Heller*, 554 U.S. at 683–86 (Breyer, J., dissenting) (using similar laws as the panel majority in *Nat'l Rifle Ass'n*), *and id.* at 631–34 (majority opinion) (rejecting those laws as not probative). Perhaps for that reason, the government does not force this argument but turns instead to laws that deal with age.

The government offers a long list of state laws that set various ages for purchasing or possessing guns. J.A. 51–71. At least at step one of our analysis, however, these laws carry little weight. Instead, the list reveals that near the time of ratification there were no laws restricting the sale of firearms to 18-year-olds. The earliest laws cited were passed over 60 years after ratification, and most were enacted after the Civil War.

According to the government, by the end of the nineteenth century, 18 states and D.C. in some way restricted gun ownership by those under age 21. *Id.* This was less than half of the 45 states admitted by 1899. Only 5 states and D.C. explicitly restricted gun

ownership for those under 21;[50] the rest, the government argues, restricted gun ownership

by "minors" and those under 21 were considered minors.[51]   But the nineteenth-century

cases that are typically cited to support such restrictions either do not deal with this issue,

---

[50] These states did so expressly:  Indiana, 1875 Ind. Acts 59, 59; Maryland, 1882 Md. Laws 656, 656; West Virginia, 1882 W. Va. Acts 421, 421 (good cause and home exceptions); Louisiana, 1890 La. Acts 39, 39; Wyoming, 1890 Wyo. Sess. Laws 127, 140. J.A. 50–71.  The District of Columbia did so expressly as well.  27 Stat. 116, 117 (1892); *see also* J.A. 53.  Nevada only restricted concealed carry by those under 21, not purchase, possession, or open carry.  *See* 1885 Nev. Stat. 51.  As a result, we do not include Nevada in our numbers.

[51] These state statutes do not define the term "minors" so the government infers from other laws that the term includes all those under age 21:  Alabama, 1856 Ala. Laws 17, 17 (males only); Tennessee, 1856 Tenn. Pub. Acts 92, 92 (hunting exception); Kentucky, 1860 vol. 1 Ky. Acts 242, 245 (guardian can transfer to minors); Georgia, 1876 Ga. Laws 112, 112 (exception for defense); Mississippi, 1878 Miss. Laws 175, 175 (cannot sell to minors); Missouri, 1883 Mo. Laws 76, 76 (parental-consent exception); Delaware, 16 Del. Laws 716, 716 (1881) (prohibiting sales to minors); Illinois, 1881 Ill. Laws 73, 73 (guardian can transfer to minors); Kansas, 1883 Kan. Sess. Laws 159, 159; Wisconsin, 1883 vol. I Wis. Sess. Laws 290, 290; Iowa, 1884 Iowa Acts 86, 86; North Carolina, 1893 N.C. Sess. Pub. Laws 468, 468; and Texas, 1897 Reg. Sess. Tex. Gen. Laws 221, 221 (parental-consent exception).

The government relies on caselaw to show that "minors," as used in these statutes, meant those under 21.  But many cases it cites were decided much earlier or later than the gun restrictions, addressed matters unrelated to gun ownership, or both.  *See, e.g.*, *Walker v. Walker*, 17 Ala. 396, 398–99 (1850) (assuming that where a will used the term "become of age," it meant when the beneficiaries reached 21); *Doe v. Archdiocese of Milwaukee*, 700 N.W.2d 180, 188 (Wis. 2005) (explaining in 2005, 122 years after the relevant Wisconsin law was passed, that before 1971 the age of majority was 21 for tolling a statute of limitations).  As the government points out, Illinois, Missouri, and Oklahoma set the age of majority at 21 for men and 18 for women.  *See Anderson v. Williams*, 104 N.E. 659, 661 (Ill. 1914); *Reisse v. Clarenbach*, 61 Mo. 310, 313 (1875); *Bassett v. Bassett*, 521 P.2d 434, 435 n.2 (Okla. Civ. App. 1974).

apply only to those under 18, do not address constitutional concerns, or rely on logic rejected by *Heller*.[52]

By the early 1920s, another state explicitly restricted gun ownership by those under age 21 while two others did so by implication, bringing the grand total to 21 states and D.C.[53]  So even if we consider laws from more than a century after the Founding era, a majority of states, 27, seem not to have restricted 18-year-olds from purchasing or

---

[52] David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119, 121–31 (2018) (reviewing cases cited by *Rene E.*, 583 F.3d at 14–15, and *Nat'l Rifle Ass'n*, 700 F.3d at 202).  For example, in *McMillen v. Steele*, 119 A. 721, 722 (Pa. 1923), the Pennsylvania Supreme Court made clear that age 16 was being used as a substitute "for the proof necessary to show lack of capacity," as "[c]hildren under that age have been legislatively declared utterly unfit to handle firearms."  Virginia's Supreme Court instead drew the line at 18, saying:  "We know, as a matter of fact, that at the age of eighteen, a man is capable intellectually and physically of bearing arms," recognizing that such a line had been drawn by all "States of the Union, perhaps without exception."  *United States v. Blakeney*, 44 Va. (3 Gratt.) 405, 418 (1847).  *Tankersly v. Commonwealth*, 9 S.W. 702, 703 (Ky. 1888), was brief and decided on jurisdictional, rather than Second Amendment, grounds.  *State v. Quail*, 92 A. 859, 859 (Del. 1914), addressed only whether a concealed unloaded revolver could still be considered a concealed "deadly weapon" and did not consider the Second Amendment validity of the law.  In *Parman v. Lemmon*, 244 P. 227, 230 (Kan. 1925), the court first held that shotguns were dangerous weapons that could not be sold to minors.  A forceful dissent noted the historical importance of armed minors to the republic.  *Id.* at 231–32 (Dawson, J., dissenting).  On rehearing, the court reversed, saying "the Legislature did not intend to make law violators of 60 per cent. of the militia of the state, it being estimated that 60 per cent. of the personnel of that body are minors" and adopted the dissenters' views from the original case.  *Id.* at 233.

[53] New Hampshire's law (1923) was explicit while Oklahoma (1890, admitted as a State in 1907) and South Carolina's (1923) laws functioned by implication.

possessing handguns; they instead restricted younger people.[54]  In fact, the cited 1868

Oregon law affirmatively *protects* the gun rights of those older than 16.[55]

---

[54] The government admits that some of these laws set the minimum age between 12 and 20.  In the late nineteenth and early twentieth centuries, many states set the age limit at or below 18:  Oregon (1868) (age 16), Ohio (1880) (age 14), Florida (1881) (age 16), Pennsylvania (1881) (age 16), New Jersey (1882) (age 15), Michigan (1883) (age 13), Rhode Island (1883) (age 15), New York (1883) (age 18), Massachusetts (1884) (age 15), Minnesota (1889) (age 14), Virginia (1889) (age 16), Washington (enacted 1883, admitted as a State in 1889) (age 16), Vermont (1896) (age 12), South Dakota (1903) (age 15), Utah (1905) (age 14), Montana (1907) (age 14), Idaho (1909) (age 16), Arizona (enacted 1883, admitted as a State in 1912) (age 14), California (1923) (age 18), and Connecticut (1923) (age 18).  Later, age-related restrictions were also enacted by New Mexico (1971) (unlawful to hunt or shoot a firearm unless completed hunter-safety course, 18 or older, or supervised by adult), Arkansas (1975) (prohibiting sale of firearm to minor without consent of parent), Nebraska (1977) (unlawful for those under 18 to possess pistol), Alaska (1978) (barring possession of a firearm by unemancipated minors under 16 without consent of a parent), North Dakota (1985) (barring person under 18 from possessing a firearm without supervision from an adult), Hawaii (1988) (limiting licensing for unconcealed carry to those 21 or older), and Colorado (1993) (barring handgun possession under 18).  J.A. 51–71.  While these laws may provide evidence that some age restrictions are acceptable, they do not suggest that 18-year-olds are not protected by the Second Amendment.  Moreover, their passage so far removed from ratification makes their evidentiary value minimal.  That many of these laws came so late also suggests—at least for states or territories that existed earlier—that these states had no age restrictions before these laws.

[55] 1868 Or. Laws 18, 18–19.  One reason the government may have included this law is because it implies that age restrictions are generally allowed.  But it reads more like a gap-filling or enforcement law rather than a law implicitly condoning age restrictions.  The law states, "[w]hereas, [t]he constitution of the United States" and "the constitution of the State of Oregon" protect the right to bear arms, the Oregon legislature "therefore" protects the rights of those over 16.  That is, the "whereas" and "therefore" structure reads: "Reflecting" the protections of the U.S. and Oregon Constitutions, the Oregon legislature protects those over age 16, suggesting that the U.S. and Oregon Constitutions protect those over 16.  This law makes clear that this age group is protected in line with the constitutional right, which may have been uncertain in the absence of this law.  It also prohibits state officials from taking the firearms of those over age 16, providing practical enforcement of their Second Amendment rights.  None of this implies that age restrictions are acceptable.  Quite the opposite.

As explained earlier, we focus the historical inquiry in step one on the time of ratification in 1791. *Chester*, 628 F.3d at 680 (citing *Heller*, 554 U.S. at 625); *Moore*, 702 F.3d at 935 (citing *McDonald*, 561 U.S. at 765 & n.14). At the time of ratification, there were no laws restricting minors' possession or purchase of firearms. Most laws affecting minors post-date the Civil War, and the only two states to pass such laws before the Civil War did so immediately before the war (over 60 years after ratification). *See* J.A. 51–71; 1856 Ala. Acts 17, 17; 1856 Tenn. Pub. Acts 92, 92. These laws from later time periods provide little insight into the Amendment's original public meaning. *Heller*, 554 U.S. at 614; *Nat'l Rifle Ass'n*, 714 F.3d at 337, 339 (Jones, J., dissenting) (discounting late nineteenth- and early twentieth-century sources). And these laws were passed by states that were not bound by the Second Amendment. *See Barron*, 32 U.S. (7 Pet.) at 247–48; *New State Ice Co.*, 285 U.S. at 311; Lee, *supra*, at 22; Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1354, 1359, 1368–69 (2009).

It would also be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period. Amar, *supra*, at 176; *McDonald*, 561 U.S. at 770–78. State laws passed decades after the ratification restricting gun ownership—at a time when state laws were used to disarm disfavored groups—is weak evidence of the original scope of the Second Amendment.

\*       \*       \*

A review of the Constitution's text, structure, and history reveals that 18-year-olds are covered by the Second Amendment. *See Nat'l Rifle Ass'n*, 714 F.3d at 337 (Jones, J., dissenting). Like most other constitutional rights, the Second Amendment has no explicit age limit, and the most analogous constitutional rights apply equally to everyone. And when a constitutional right applies differently to minors, the age cutoff has consistently been set at 18, not 21.

Founding-era history confirms that the public understood the Second Amendment to cover 18-year-olds. At the time of ratification, every state and the federal government required 18-year-old men to enroll in the militia. Those in the militia, as *Heller* reminds us, were a subset of the political community known as "the people" that enjoyed Second Amendment rights. 554 U.S. at 580. While most of the militia laws the government identifies still allowed 18-year-olds to join the militia, those that required enlistees to be 21 are few in number and distant in time from ratification. So the historical basis for those 18 and older having Second Amendment rights rests on firm ground.

Not only has the government failed to carry its burden to show that the regulated conduct was outside the Second Amendment's scope, *see Chester*, 628 F.3d at 680–81; *Ezell*, 651 F.3d at 702–03; *Tyler*, 837 F.3d at 688, but the Constitution's text, structure, and history affirmatively prove that 18-year-olds are covered by the Second Amendment.

## C. Step two: the laws do not pass intermediate scrutiny

Having found that 18-year-olds are protected by the Second Amendment, our precedent requires that we apply "an appropriate form of means-end scrutiny." *Chester*,

60

628 F.3d at 680. The Second Amendment's "core protection" is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 634–35). When that right is "severely burden[ed]," we apply the "'demanding'" strict scrutiny test. *Id*. at 133, 138 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)). But if the right is burdened only on the margins, intermediate scrutiny applies. *Masciandaro*, 638 F.3d at 470–71. Because we find that the laws do not even pass intermediate scrutiny, we need not decide how close to the core of the Second Amendment these laws strike.

Intermediate scrutiny requires the government to show "a reasonable fit between the challenged regulation and a substantial government objective." *Chester*, 628 F.3d at 683 (internal quotations marks omitted).[56] Various evidence can be mustered to meet this standard but "reference to legislative findings, academic studies, or other empirical data is necessary." *Tyler*, 837 F.3d at 694; *see also Ezell*, 651 F.3d at 709 (lack of empirics doomed the range ban). And while "case law, and even common sense" may be relied on, the government may not "rely upon mere 'anecdote and supposition.'" *Tyler*, 837 F.3d at 694 (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000)). The government must therefore offer more than speculation to connect a ban on 18- to 20-year-

---

[56] Exactly what intermediate scrutiny requires in a given situation remains unclear. *Compare Chester*, 628 F.3d at 683 ("reasonable fit"), *with Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) ("substantially related"). Given the lack of descriptive clarity, its application varies widely. *See Duncan v. Becerra*, 970 F.3d 1133, 1165–67 (9th Cir. 2020) (noting varying standards and degrees of deference). In response, some have argued that courts' Second Amendment scrutiny should focus instead on the text, structure, history, and traditions of the Constitution. *See Heller II*, 670 F.3d at 1271–75 (Kavanaugh, J., dissenting).

olds purchasing handguns from licensed dealers to a substantial interest. *See* 18 U.S.C. § 922(b)(1).

To begin, the government's interests in preventing crime, enhancing public safety, and reducing gun violence are "not only substantial, but compelling." *Kolbe*, 849 F.3d at 139; *see Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted."); *Schenck v. Pro–Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (referring to the "significant governmental interest in public safety"); *see also Wrenn v. Dist. of Columbia*, 864 F.3d 650, 655 (D.C. Cir. 2017) ("[G]un laws almost always aim at the most compelling goal—saving lives—while evidence of their effects is almost always deeply contested."). Thus, we look to whether the regulations are a reasonable fit to that interest.

At the summary judgment stage, the government only proffered evidence from the Congressional Record to support finding a reasonable fit between its compelling interests and the challenged laws. Before the district court, amici offered more contemporary evidence to address the intermediate-scrutiny analysis. The government, however, neither adopted nor relied on that evidence. So it is unclear whether we may rely on amici's evidence on appeal.[57] But even if we consider amici's evidence, it does not change our

---

[57] In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720–21 (2014), the Supreme Court refused to consider statistics raised by amici because it "do[es] not generally entertain arguments that were not raised below and are not advanced in th[at] Court by any party." The Court justified this conclusion because the government may not have agreed with amici's "intensely empirical argument" and plaintiffs would not have a fair chance to respond to it. *Id.* at 721.

analysis, for amici merely offer contemporary evidence to reinforce the congressional record, and that evidence does not alter or remedy its flaws.

The basic logic of the argument is: (1) the brains of those under age 25 are not fully developed so those individuals are prone to reckless and emotional behavior;[58] (2) because of this underdevelopment, youth, especially those ages 18 to 20, commit a disproportionate

---

But unlike in *Hobby Lobby*, the amici's arguments here were raised and adopted by the district court, and some of their evidence is in the record. J.A. 341–401; *Hirschfeld*, 417 F. Supp. 3d at 758–59 (depending on the Congressional Record and Fifth Circuit's reasoning but noting that amici's evidence supported the conclusion). As in *Hobby Lobby*, however, amici offer an "intensely empirical argument," and it is not clear that the government shares their views.

[58] The Congressional Record concludes that "[t]he greatest growth of crime today is in the area of young people, juveniles and young adults. The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly." *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 57 (1967) (testimony of Sheldon S. Cohen).

Amici support this contention with recent scientific studies showing that those under 25 have underdeveloped brains that lead them to make emotional, reckless, and violent decisions. *See, e.g.*, J.A. 342–54 (reprinting Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453, 456 (2013)); J.A. 356–65 (reprinting Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124, 125 (2010)); Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the USA and in nearly all industrialized cultures. Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time." (internal citations omitted)).

amount of violence;[59] (3) handguns are the main tool used to commit that violence;[60] and (4) many of those handguns are bought from licensed dealers, so restricting that avenue of purchase for the relevant age group will reduce crime.[61]  Amici then try to tie the bow by

---

[59] Congress concluded that the growth in crime it investigated was largely attributable to youth.  *See Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 57 (1967) (testimony of Sheldon S. Cohen).  Congress's investigation had shown that "juveniles account for some 49 percent of the arrests for serious crimes in the United States," while "minors account for 64 percent of the total arrests in this category."  S. Rep. No. 90–1097, at 77.  Specifically, "minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault" and 21 percent of the arrests for murder.  114 Cong. Rec. 12,279, 12,309 (1968) (statement of Sen. Thomas J. Dodd).  Law enforcement officers from New York City, Los Angeles, St. Louis, Chicago, Philadelphia, and Atlanta provided Congress with "statistics documenting the misuse of firearms by juveniles and minors," which "take on added significance" given that minors were prohibited from acquiring concealable firearms in those cities.  S. Rep. No. 89-1866, at 58–60.

Amici offered contemporary evidence to support this claim.  *See, e.g.*, J.A. 371 ("Age-specific homicide offending rates rise sharply in the late teens and peak at age 20" with a peak homicide rate of around 16 per 100,000.).  Though 18-, 19-, and 20-year-olds make up around 4% of the population, they account for about 15% of homicide arrests and a disproportionate amount of other violent crimes.  *Compare* Federal Bureau of Investigation, *2018: Crime in the United States, Arrests by Age, 2018*, (saved as ECF opinion attachment), *with* U.S. Census Bureau, *Current Population Reports: Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 to 2050*, at 76, (saved as ECF opinion attachment).

[60] Congress found that "the handgun is the type of firearm that is principally used in the commission of serious crime" and "the most troublesome and difficult factor in the unlawful use of firearms."  S. Rep. No. 89-1866, at 4–7.  Congress also found "a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior."  Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 225–26.

[61] Congress relied on IRS Commissioner Cohen's testimony for the proposition that

[t]he vast majority, in fact, almost all of these firearms, are put into the hands of juveniles by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government . . . .  The way to end this

arguing that the passage of state gun laws has coincided with decreases in youth suicides and unintentional deaths.[62]

Whatever credence these contentions may have, we find that this chain of logic suffers from two debilitating flaws: (1) a showing of *disproportionate* bad conduct by a group cannot justify categorical restrictions on rights when the percentage of the group engaged in the unwanted conduct is minuscule, and (2) the evidence does not sufficiently link purchases from licensed dealers to crimes committed by youth.

---

dangerous practice is to stop these Federal licensees from selling firearms to juveniles and this is one of the major things that [the proposed legislation] would do.

*Federal Firearms Act: Hearings Before the H. Comm. on Ways and Means*, 89th Cong. 31 (1965) (testimony of Sheldon S. Cohen); Pub. L. No. 90–351, tit. IV, § 901(a)(6), 82 Stat. at 226 (finding that concealable firearms had been "widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior"); *id.* § 901(a)(3), 82 Stat. at 225 (concluding that "only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible").

Amici offer other evidence to support this proposition. J.A. 387–92 (reprinting Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26, 29–30 (2013)).

[62] J.A. 394–401 (reprinting Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 THE SOC. SCI. J. 168, 173 (2015) (finding that youth suicides and accidental deaths decreased after Congress increased the minimum age for gun possession to 18)); Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004) (state laws raising the minimum age for handgun purchases to 21 were linked to a 9% decline in firearm suicide rates among 18- to 20-year-olds).

The Supreme Court case *Craig v. Boren*, 429 U.S. 190 (1976), guides much of our analysis. In the first case to announce the intermediate-scrutiny standard, the Court enjoined an Oklahoma law that prohibited licensed sellers from "sell[ing], barter[ing] or giv[ing]" low-alcohol beer (3.2% alcohol) to males under the age of 21 and females under the age of 18 because the state could not show that the sex classification was "substantially related" to road safety. *Id*. at 191 n.1, 204 (quoting Okla. Stat. tit. 37, § 241 (1953); Okla. Stat. tit. 35, § 245 (1972)).[63] The Court reviewed studies that showed that 18-, 19-, and 20-year-old males were disproportionately arrested for, killed by, and injured by drunk driving. *Id*. at 200–01. The Court accepted that only 0.18% of females compared to 2% of males had been arrested for drunk driving (over 10 times as many). *Id*. at 201–02. But it rejected this evidence as sufficient to satisfy intermediate scrutiny: "[I]f maleness is to

---

[63] The dissent argues that the firearm regulations at issue in this case are narrow and uses this purported narrowness to help find that the laws pass intermediate scrutiny. Dissenting Op. at 99–101, 106–08. But the constitutional burden here is no narrower than the burden in *Craig*. In *Craig*, the law only prohibited licensed sellers from selling or giving low-alcohol beer to men ages 18 to 20 even though they could sell it to women of the same age. The constitutional burden here is quite similar. Both laws only restrict licensed sellers, allowing a minor to obtain the product by other means. Both laws are also temporary, only applying until one turns 21. And both laws only restrict access for one particular group of people to one particular product out of a larger category (handguns versus all guns compared to low-alcohol beer versus all alcohol). And despite the dissent's claim that the availability of long guns lessens the burden, *Heller* explicitly rejected a similar argument. *See* 554 U.S. at 629.

Moreover, the alternatives for acquiring a handgun are not as straightforward as the dissent envisions. Many young people lack friends or family who can afford to gift them a gun. And the secondary market is often not readily available. Further, the federally licensed dealers assure the safety, reliability, and legality of the weapons, unlike sellers on the secondary market. The ban here also applies to ammunition. So these burdens are hardly narrow or minor, especially when compared to the burdens placed on men by the disparate restrictions in *Craig*.

serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit.'" *Id*. The Court also found it significant that the state did not "measure the use and dangerousness of 3.2% beer as opposed to alcohol generally" to tie the challenged restriction to its interest in reducing drunk driving. *Id*. at 203. So in total, the state's evidence did "not satisfy [the Court] that sex represents a legitimate, accurate proxy for the regulation of drinking and driving." *Id*. at 204.

The same flaws plague the evidence here.[64] First, while 18- to 20-year-olds commit a *disproportionate* amount of crime compared to other age groups, very few members of that group commit crime, making the correlation between age and gun crimes "an unduly tenuous 'fit.'" *Id*. at 201–02. Second, like the connection between low-alcohol beer and drunk driving, the connection between handgun purchases from licensed dealers—as opposed to the many other ways to obtain handguns—and crimes committed by 18- to 20-year-olds has not been made. So just as sex was a poor proxy for drunk driving in *Craig*, age is a poor proxy for gun violence in this case.

---

[64] The dissent claims that the Second Amendment is not treated as a second-class right. But then the dissent says that legislatures should receive more deference when regulating guns. Dissenting Op. at 104–05, 138–39. *But see Chester*, 628 F.3d at 683 (quoting language from *Marzzarella*, 614 F.3d at 98, suggesting that the various descriptions of intermediate scrutiny describe the same test, including that from the progenitor of intermediate scrutiny, *Craig*, 429 U.S. at 197). And even though *Craig* created the intermediate-scrutiny test, the dissent says *Craig* is inapplicable, in part, because of the history of sex discrimination that makes the issue in *Craig* "repugnant to the nation's commitment to equal protection in a way the challenged provisions in this case are not." Dissenting Op. at 136; *cf. Duncan*, 970 F.3d at 1165–67 (noting that some courts seem to apply a lower form of intermediate scrutiny to the Second Amendment). We refuse to create this hierarchy of constitutional rights.

### 1. Disproportionate rates cannot justify vastly over-inclusive group restrictions

The laws at issue here rest on the premise that young adults' Second Amendment rights can be limited because they are responsible for a disproportionate amount of violent crime.  But these laws over-inclusively restrict the rights of a large group of law-abiding citizens to target a tiny portion of them.  In 1967, Congress was concerned about a disproportionate increase in crimes committed by youth.  But the disproportionate rate of crime committed by this group tells us nothing about the percentage of the group that commits gun violence.  Amici's contemporary sources purport to show that 18-, 19-, and 20-year-olds make up around 4% of the population but account for around 9.4% of violent crime arrests (about 37,000 of the 400,000 arrests each year).[65]  So while 18- to 20-year-olds may commit a disproportionate share of violent crime, an exceedingly small

---

[65] Federal Bureau of Investigation, *2018: Crime in the United States, Arrests by Age*, 2018, (saved as ECF opinion attachment); U.S. Census Bureau, *Current Population Reports: Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 to 2050*, at 76, (saved as ECF opinion attachment).  One can quibble with these statistics but only at the margins.  For example, the FBI Report covers about 80% of the population, so the number of violent crimes committed is likely 25% higher.  But the report also covers all violent crime, without accounting for the proportion of that crime committed using a handgun.  And while we lack detailed data on all violent crime, the FBI reports that handguns are used to commit around 47% of murders (and about 71% of murders involve some kind of firearm).  Federal Bureau of Investigation, *2017: Crime in the United States, Murder Victims by Weapon, 2013–2017*, (saved as ECF opinion attachment); *see also* J.A. 389 (finding that 81% of offenses committed with a firearm involved a handgun).

percentage, around 0.3% and definitely less than 1%, of the 13 million young adults in this group commit those crimes.[66] This alone cannot justify restricting the entire group's rights.

---

[66]  The amici's sources suggest that 0.3% of young adults ages 18 to 20 commit violent crime each year, while more recent data suggests only a slightly greater percentage, about 0.37%. There are several things worth noting about these calculations. First, we consider only the crime rates of 18-, 19-, and 20-year-olds because the laws do not apply once one turns 21. Second, while exact calculations are difficult, the sources consistently show that less than 1% of this age group is arrested for committing a violent crime each year. So we can comfortably say that the true value lies somewhere below 1%. Third, we calculate these numbers using the formula: violent crime arrests for 18-, 19-, and 20-year-olds / (the number of individuals in that age group * the percentage of the population the FBI statistics cover). This gives us the percentage of 18-, 19-, and 20-year-olds arrested for violent crimes, not reflecting the many repeat offenders. *See infra* note 67. We thus have a theoretical "maximum" percentage if every individual arrested was unique.

   To arrive at the 0.3% number, we used the data provided by amici. Amici provided a census report from 1996 that estimated that America's population would be 317 million by 2018. U.S. Census Bureau, *Current Population Reports: Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 to 2050*, at 32, (saved as ECF opinion attachment). We also took their estimate that 5% of the total population, or around 16 million people, would be 18-, 19-, and 20-year-olds. J.A. 206. We then used the FBI's 2018 data comprising 78% of the population which showed that 18-, 19-, and 20-year-olds were arrested a bit fewer than 37,000 times for violent crimes in 2018. *See* Federal Bureau of Investigation, *2018: Crime in the United States, Arrests by Age, 2018*, (saved as ECF opinion attachment). We plugged those numbers into the formula: 37,000 / (16,000,000 x 0.78) = 0.3%.

   Because amici's 1996 report underestimated America's total population by about 10 million, we used more recent data to calculate another estimate. Recent data estimates the total population at 327 million and 18- to 20-year-olds at only 13 million in 2018. *See* U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States: April 1, 2010 to July 1, 2019*, (saved as ECF opinion attachment) (for consistency we used the 2018 numbers adding 18- (4,311,728), 19- (4,253,664), and 20- (4,262,078) year-olds to get 12,827,470). The change in America's population meant that the FBI data only accounted for 76% of the population, so we also adjusted that number. Plugging these numbers in, we get 37,000 / (13,000,000 x 0.76) = 0.37%.

   Similarly, Judge Jones's dissent in *Nat'l Rifle Ass'n* notes that "only 0.58% of 18- to 20-year olds were arrested for violent crimes in 2010," which stemmed from the Fifth Circuit's Plaintiffs' Petition for Rehearing En Banc. 714 F.3d at 347 (Jones, J., dissenting). The plaintiffs in that case had divided the FBI violent crime arrest statistics by age (59,921)

What's more, those calculations do not account for repeat offenders. In fact, a year after being released, over 40% of criminals are arrested again, and that number approaches 80% in the 6 years after release.[67] This means that an even smaller portion of the group is likely responsible for its disproportionate commission of violent crime.

Beyond its overbreadth, consider the implications of this argument. Men commit disproportionally more violent crime than women.[68] Does that mean that the Second Amendment rights of men can be categorically restricted? *See* Volokh, *supra* note 49, at 1512–13. Treating the sexes differently would also receive intermediate scrutiny. So why not? A similar argument could be made for any number of groups, such as those living in a specific geographic location. *See Heller*, 554 U.S. at 681–82 (Breyer, J., dissenting)

---

by the group's total population (13,256,712) multiplied by the percentage of the total population that the FBI statistics covered (0.775). *See* Petition for Rehearing En Banc at 12 n.1, *Nat'l Rifle Ass'n*, 714 F.3d 334 (No. 11-10959) (citing FBI and census data). Plaintiffs' initial brief in *Nat'l Rifle Ass'n* uses the same method to find that 0.64% of young adults were arrested for committing a violent crime in 2009. *See* Opening Br. at 55 n.17, *Nat'l Rifle Ass'n*, 700 F.3d 185 (No. 11-10959) (citing FBI and census data). These similar numbers confirm our general point that a tiny fraction of individuals in this age group commit violent crimes.

[67] Bureau of Justice Statistics, *2018 Update on Prisoner Recidivism: A 9-Year Follow-up Period (2005–2014)*, at 4 (2018), (saved as ECF opinion attachment).

[68] Roughly 80% of violent crimes are committed by males. *See* Federal Bureau of Investigation, *2018: Crime in the United States, Arrests by Sex, 2018*, (saved as ECF opinion attachment). The more than 150 million men in America account for around 310,000 violent-crime arrests. *Id.*; U.S. Census Bureau, *Current Population Reports: Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 to 2050*, at 76, (saved as ECF opinion attachment). And males in prison are reported to be 2.5 to 3 times as likely as females to have possessed a firearm during the crime for which they are imprisoned. Bureau of Justice Statistics, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates*, at 6 (2016), (saved as ECF opinion attachment).

(arguing that because crime is higher in urban centers more restrictions are allowed); *id.* at 634 (majority opinion) (rejecting the dissent's "judge-empowering 'interest-balancing inquiry'" that permits greater regulation in urban areas).  And amici's own evidence and arguments would support restricting 21- to 25-year-olds' rights, if not older adults, as much as it supports drawing the line at age 21.  *See supra* notes 58, 59.  Is that acceptable, and if so, where is the line?

*Craig* explains why such laws would fail when it declared that "a correlation of 2% must be considered an unduly tenuous 'fit.'"  *Craig*, 429 U.S. at 201–02.  The question is not about the disparity between groups or the total crime each group commits, but the percentage of the group that uses a gun in an impermissible manner.  That statistic gives us some insight into the likelihood that any one person in the group will use a gun improperly and pose a danger to the public.  Whatever the precise answer to that question, here it falls well below the unduly tenuous threshold from *Craig*.

The rights of more than 99% of a group cannot be restricted because a fraction of 1% commit a disproportionate amount of violent crime.  And it is already illegal for felons, fugitives, drug users, and aliens unlawfully in the United States, among others, to buy firearms from licensed dealers.  So the laws at issue by their nature prevent a more law-abiding, less dangerous subset of 18- to 20-year-olds from purchasing from a more regulated market.  For reducing gun violence and crime, restricting a whole group that is almost entirely law-abiding is the definition of an unduly tenuous fit.  And, because those

who are young are also disproportionately the victims of crime,[69] preventing them from purchasing handguns implicates the self-defense core of the Second Amendment the most.[70]

The irony does not escape us that, under the government's reasoning, the same 18- to 20-year-old men and women we depend on to protect us in the armed forces and who have since our Founding been trusted with the most sophisticated weaponry should nonetheless be prevented from purchasing a handgun from a federally licensed dealer for their own protection at home. We refuse to accept this conclusion. These men and women who, historically, have served either voluntarily or by conscription may not be read out of "the people" in the Second Amendment.

### 2.    Handgun purchases from licensed dealers have not been connected to gun violence

The second major flaw with the laws at issue is that the licensed dealers whose sales to 18- to 20-year-olds are the subject of the challenged regulations are not connected to the incidence of crime Congress sought to control. It is not enough to target guns generally and argue that less access to guns means less crime, as this would justify almost any restriction and eviscerate the Second Amendment. In *Craig*, the government could not

---

[69] Bureau of Justice Statistics, *Criminal Victimization, 2019*, at 21, 45 (2019), (saved as ECF opinion attachment).

[70] *Cf.* INSTITUTE OF MEDICINE AND NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE 15 (Alan I. Leshner et al. eds., 2013) ("Almost all national survey estimates indicate that defensive gun uses by victims are at least as common as offensive uses by criminals.").

merely contend that access to alcohol generally led to drunk driving by men to justify a sex-based restriction on low-alcohol beer purchases.  429 U.S. at 203.  Instead, the Court was concerned that no objective evidence purported to "measure the use and dangerousness of 3.2% beer as opposed to alcohol generally."  *Id*.  The government needed to connect the low-alcohol beer to drunk driving to justify the disparate treatment.  *Id.* at 202–03.  So too here.  Access to guns through licensed dealers—rather than access to handguns generally— must be sufficiently connected to 18- to 20-year olds' use of those firearms to commit violence.  Yet neither the Congressional Record nor amici's evidence can draw this connection, further undermining any claim to a reasonable fit.

In its congressional findings, Congress concluded that concealable firearms had been "widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior," which caused an increase in crime.  Pub. L. No. 90–351, tit. IV, § 901(a)(6), 82 Stat. at 226; *see also id.* § 901(a)(3), 82 Stat. at 225.[71]  The basis for that conclusion appears to be the hearing testimony of IRS

---

[71]  The dissent attempts to add several new congressional justifications for the challenged restrictions.  First, the dissent pulls several quotes from the broad legislative history that reflect a general concern about suicides.  Dissenting Op. at 111–13, 120, 136– 37.  But those concerns were not tied to the provisions at issue here or to 18- to 20-year- olds generally.  *See, e.g.*, 109 Cong. Rec. 13,946, 13,948 (statement of Sen. Dodd) (referring to general suicide rates to support an early version of the bill that did not apply to those ages 18 to 20).  *Compare* 114 Cong. Rec. 12,305 (statement of Sen. Dodd) (comparing national suicide rates to support the bill generally), *with id.* at 12,309 (discussing only crime in relation to the challenged provision).  Second and similarly, the dissent argues that "Congress was also concerned with simple gun accidents and the toll they took on young people."  Dissenting Op. at 112.  Yet the only evidence the dissent can muster is a general statement about accidental tragedies in support of a mail-order ban and a single anecdote by an officer about a 20-year-old injuring himself by striking a handgun

Commissioner Sheldon Cohen. During one hearing, Commissioner Cohen stated that "[t]he vast majority, in fact, almost all of these firearms, are put into the hands of juveniles by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government." *Federal Firearms Act: Hearings Before the H. Comm. on Ways and Means*, 89th Cong. 31 (1965) (testimony of Sheldon S. Cohen); *see also Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 57 (1967) (testimony of Sheldon S. Cohen). The government and amici rely on this statement to connect guns bought from licensed dealers to crimes committed by young adults. But there are several problems with this line of reasoning.

First, Commissioner Cohen's testimony notes that "almost all" firearms in the hands of minors—not that "almost all" guns used by minors to commit violent crime—came from a licensed dealer. Cohen only discusses access to firearms generally, which tells us little about the connection between the guns minors bought from licensed dealers and the guns minors use in crime.

Second, his testimony could be read to make the point that "almost all" of the firearms have, at some point, come from federally licensed "importers, manufacturers, and dealers," even if *indirectly*. That fact, while true, does little to show the regulations are a reasonable fit to the goal of reducing gun violence. Most guns, at some point, come from

_____

with a hatchet to discharge it. Dissenting Op. at 112 (citing S. Rep. No. 88-1340, at 17 (1964)); *see also* S. Rep. No. 88-1340, at 1, 12, 27 (1964). Congress justified the challenged provisions based on violent crime committed by young adults and the desire to increase parental oversight. We may not now say that Congress had broader justifications by pointing to general statements about an omnibus crime bill.

a manufacturer whether they are later sold on the black market or by a licensed dealer.  So read, this statement provides no support for a link between handgun purchases directly from licensed dealers and gun violence committed by young adults.  So this reading of Cohen's statement is far too broad to tell us anything meaningful.

The only way Commissioner Cohen's statements could support this causal link is if he meant that "almost all" firearms that (1) are used by minors to commit *crimes* (2) were *directly sold* to those minors by "importers, manufacturers, and dealers."  But nothing in the Congressional Record says that, and Commissioner Cohen's statements fall considerably short of supporting such a contention.

To begin, while the IRS regulated licensed dealers, this information seems beyond Commissioner Cohen's experience.  He was not in law enforcement, did not know from experience where guns used in crimes come from, and presented no studies or expertise from law enforcement to support his contention.  *Federal Firearms Act: Hearings Before the H. Comm. on Ways and Means*, 89th Cong. 31 (1965) (testimony of Sheldon S. Cohen).  Interestingly, Commissioner Cohen did cite studies and the experiences of law enforcement to support many of his other statements, but he was brief and conclusory in his contention that almost all guns in the hands of minors came from licensed dealers.  *Id*.  While the studies sought in *Craig* may not always be necessary, one person's unsupported, inexpert, and conclusory testimony is not enough to establish a link between licensed dealers and gun crimes.

It is true that we sometimes give weight to Congress's "predictive judgments" under *Turner Broadcasting System Inc. v. FCC*, 512 U.S. 622, 665–66 (1994).  But this does not

mean that we should blindly abdicate our obligation to review Congress's actions under heightened scrutiny. Indeed, as we have made clear "[o]ur obligation is simply 'to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences *based on substantial evidence*.'" *Kolbe*, 849 F.3d at 140 (emphasis added) (quoting *Turner*, 512 U.S. at 666). As *Turner* explained, "deference afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.'" 512 U.S. at 666 (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989)); *see also Moore*, 702 F.3d at 942 (noting that the "legislative facts" used to determine the constitutionality of statutes do "not present factual questions for determination in a trial" but are instead questions of law that judges resolve outside the normal strictures of summary judgment or a motion to dismiss).

Congress's conclusion depends on Commissioner Cohen's testimony, which itself is conclusory and rests on no evidence. But the government "must supply actual, reliable evidence," such as empirical studies, not mere "speculation" even if facially reasonable. *Ezell*, 651 F.3d at 709; *see also Tyler*, 837 F.3d at 694. Yet all the government offers to connect licensed dealers to young-adult crime is a conclusory finding by Congress based on a conclusory statement from someone who is not an expert on this issue. That is not "substantial evidence," and it is not due deference. *Turner*, 512 U.S. at 666. Congress may not pass intermediate scrutiny by relying on unsupported conclusory testimony to justify its desired outcome. As the statements are merely conclusory, they are owed no special deference, lest we edge perilously close to rational-basis review, a standard *Heller* prohibits.

Furthermore, one of the contemporary studies provided by amici affirmatively undermines the connection between handguns bought from licensed dealers and violent crime.[72]  That study reflects self-reporting from 253 inmates convicted of offenses committed with any firearm.  Vittes et al., *supra* note 61, at 26–31.  Of those inmates, 13.4% claimed to have bought the firearm used to commit the crime from a gun store or pawn shop.  *Id.* at 30.  And only 11.8% of inmates in the study obtained their gun from that source legally.  *Id.*[73]  But unlike another study conducted by the Bureau of Justice Statistics, this study does not appear to account for whether the reported gun store or pawn shop was licensed or whether the purchase was made under the inmate's own name.  A Bureau of Justice Statistics study suggests that 1.9% of all prisoners possessing a firearm bought it from a retailer, and 7–8% of inmates who possessed a firearm during their offense bought the gun under their own name from a licensed firearm dealer while 1–2% used another name at the licensed dealer and 1–2% bought the gun from an unlicensed seller at a retail

---

[72] Amici cite the study for the proposition that a minimum legal age of 21 for *purchasing* firearms would have prohibited 17% of the offenders from obtaining firearms when their crimes were committed, a finding that "underscore[d] the importance of minimum-age restrictions."  J.A. 209–10 (quoting Vittes et al., *supra* note 61, at 29–30).  But both the study's finding and the cited quote expressly relate to laws banning *possession*, not the purchase, of all firearms by those under 21.  Vittes et al., *supra* note 61, at 30 ("These findings underscore the importance of minimum-age restrictions for firearms *possession* and disqualifications for serious offences committed as juveniles." (emphasis added)).

[73] Of the 253 inmates surveyed, only 34 bought a gun from a licensed dealer.  Of those 34, 4 did so illegally, and 30 did so legally.  So 11.8% of the surveyed inmates (30 divided by the total sample size of 253) legally bought a firearm from a licensed dealer to commit their crime.  Vittes et al., *supra* note 61, at 30.

source.[74]  As a result, very few inmates of any age bought the firearm used at licensed

dealers generally, much less legally.

Both studies substantially undermine Commissioner Cohen's claim that "[t]he vast

majority, in fact, almost all" firearms in the hands of minors come from licensed dealers.

*Federal Firearms Act: Hearings Before the H. Comm. on Ways and Means*, 89th Cong. 31

(1965) (testimony of Sheldon S. Cohen).  Instead, these studies show that few guns used

in crimes come from licensed dealers and those guns are rarely transferred from the dealer

directly to the criminal.  The majority come from friends and family, the black market, the

street, or some other unlicensed source.[75]  Commissioner Cohen's statement was already

insufficient to support the connection between licensed dealers selling firearms to minors

and minors using those firearms to commit crimes, and these studies show that his

contentions do not have legs to stand on.

This defect raises an under-inclusivity problem.  While under-inclusivity matters

much less than over-inclusivity, as Congress does not have to combat every facet of a

problem at once, a law that so under-inclusively addresses the government's interest by

---

[74] Bureau of Justice Statistics, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, at 1–2, 7–9 (2019), (saved as ECF opinion attachment).

[75] Amici's study shows that 34% of offenders received their guns from family members or friends and over 30% received them from the black market.  Vittes et al., *supra* note 61, at 29–30.  The Bureau of Justice Statistics study shows that the most common source (43%) of guns used to commit crimes was off-the-street or the underground market, 6.4% were stolen, and 17.4% came from other sources such as straw purchasers or the location of the crime.  Only 10% came from a retail source, including the secondary market, and only 8.2% came from a licensed dealer.  Bureau of Justice Statistics, *Source and Use of Firearms Involved in Crimes:  Survey of Prison Inmates, 2016*, at 7–8 (2019), (saved as ECF opinion attachment).

targeting one of the least problematic avenues of purchasing a handgun raises serious questions about whether the law actually furthers that interest. *Compare Buckley v. Valeo*, 424 U.S. 1, 105 (1976), *with Nat'l Inst. of Fam. & Life Advoc. v. Becerra*, 138 S. Ct. 2361, 2376–77 (2018). For example, in *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572–73 (2011), the Supreme Court found that a restriction on sharing prescriber information was too narrow to further the interest of physician confidentiality because it allowed the information to be given to anyone, just not for marketing purposes. The Court noted that a broader "more coherent" policy might withstand scrutiny, but the narrowness of the law as it stood burdened rights without meaningfully furthering the government's stated interests. *Id.*

The same is true here. At most, amici's study suggests that 11.8% of inmates who used guns to commit crimes bought them legally from licensed dealers. But even closing off access to licensed dealers does not mean that the 11.8% would no longer obtain guns, as they would likely move to unregulated markets, like most other criminals, without a background check or other safety measures. In fact, the study itself concludes that "criminals avoid the regulated gun market of licensed sellers and prefer the largely unregulated market involving unlicensed sellers . . . . The lack of regulation of firearm sales by unlicensed sellers is likely to significantly limit the government's ability to keep firearms from prohibited individuals." Vittes et al., *supra* note 61, at 30. Indeed, only 20% of inmates who could legally purchase a weapon from a licensed dealer chose that avenue rather than another more clandestine route. *Id.* Even aside from Commissioner Cohen's testimony, these studies undermine any argument that there is a connection between

licensed dealers and firearms used in crime. This is especially true for otherwise legally purchased firearms from licensed dealers, which is exactly what this law bans for 18- to 20-year-olds.

We previously relied on amici's study to conclude that "very few offenders purchased a weapon from a federal firearms dealer, in large part because of the background-check requirement." *Hosford*, 843 F.3d at 169. There, we upheld a licensing regime in part because the government established that pushing buyers into a regulated market reduced crime because the regulated market requires background checks, tracking, oversight, and more. *Id*. Yet strangely, the government here wants to push 18- to 20-year-olds *away* from licensed dealers and into the unregulated markets where most guns used for criminal purposes are obtained and where government oversight is more difficult.

Congress justified these restrictions to increase parental oversight of firearm purchases in order to reduce youth criminality, but Congress and the government have no evidence that parental oversight is effective, much less preferable, to the protections provided by licensed dealers. *See* Pub. L. No. 90-351, tit. IV, § 901(a)(3), 82 Stat. at 225; S. Rep. No. 90-1097, at 79; 114 Cong. Rec. 12,309 (statement of Sen. Dodd). In fact, Congress went to pains to assure the country that minors could still have various guns and possess handguns through other means. *See* 114 Cong. Rec. 12,309 (statement of Sen. Dodd); S. Rep. No. 90-1097, at 79; S. Rep. No. 89-1866, at 58; Pub. L. No. 90–351, tit. IV, § 901(b), 82 Stat. at 226. And the ban "perversely assures that when such young adults obtain handguns, they do not do so through licensed firearms dealers, where background checks are required, *see* 18 U.S.C. § 922(t), but they go to the unregulated market." *Nat'l*

*Rifle Ass'n*, 714 F.3d at 346 (Jones, J., dissenting).  These laws leave youth with three options:  (1) receive their gun as a gift from their parents or others (not an option for many), (2) buy it privately (this law does not provide parental oversight of those sales), or (3) obtain it illegally.  This incentivizes young adults to get guns in less regulated ways, all without assuring parental input.  So these laws seem to do little to increase parental guidance while pushing youth to unlicensed markets without background checks.

Finally, it is unclear whether these laws have been effective at all.  While we recognize that it would be difficult to determine the effectiveness of these laws now, Congress could have considered the effectiveness of similar state laws before passing these laws.  In fact, one study found that these laws did not influence youth crime rates.[76] Amici's evidence fares no better.  Their primary study shows a decrease in youth suicides and accidental deaths after the massive 1994 Crime Bill that, in part, banned firearm *possession* for those under 18.[77]  But that study has no nexus to 18- to 20-year-old adults. It is hard to draw any conclusions on the effect of a handgun-purchase ban from this narrow study of a broader ban.  And the study admits that state laws that prohibit handgun possession for those under a certain age have been ineffective.  Gius, *supra* note 62, at 169;

---

[76] *See* Gary Kleck, *Regulating Guns Among Young Adults*, 44 AM. J. CRIM. JUST. 689, 690–704 (2019) (analyzing data on the effectiveness of the Gun Control Act of 1968 and various state laws and finding them ineffective).

[77] Gius, *supra* note 62, at 173; *see also* Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS No. 2, at 3 (2019) (reviewing stricter state laws, many not dealing with age); Webster et al., *supra* note 62, at 598 (finding that state laws raising the minimum age for handgun purchases to 21 were linked to a 9% decline in firearm suicide rates among 18-to-20-year-olds).

*see also* Daniel W. Webster et al., *The Case for Gun Policy Reforms in America* 8 (2012) (noting that evaluations of laws setting a minimum legal age for handgun purchases or possession "have failed to find any beneficial effects of these laws on either juvenile homicide victimization or youth suicide").  The study also tells us nothing about crime and very little about the cause of the decrease in suicides, as it admits that there were many other gun-control regulations that could have been contributing causes. Gius, *supra* note 622, at 173.  At best, amici's study shows a potential correlation between one part of a much broader law and fewer suicides and accidental deaths decades after the law was passed.  And "the share of violent crime arrests among the 18- to 20-year age group has increased, and the use of guns by that group is still disproportionately high." *Nat'l Rifle Ass'n*, 714 F.3d at 346 (Jones, J., dissenting).  Neither the government nor amici can show that the burden the challenged laws impose on 18- to 20-year-olds' rights has led to any meaningful or measurable positive effects.  This highlights the lack of a reasonable connection between licensed dealers and gun crimes.

These laws are both over- and under-inclusive in contravention of the principles espoused in *Craig*.  As a result, the laws lack the reasonable fit required to pass intermediate scrutiny.

*          *          *

Those of good faith on both sides of the gun debate wish to protect lives and uphold individual rights.  We appreciate the seriousness of gun violence in this country and applaud Congress's laudable desire to curb senseless violence.  But we also recognize that the Second Amendment embodies a fundamental, pre-existing right that enables "the

people" to preserve their own life, liberty, and property. Striking a balance between those interests is a difficult exercise that draws intense passions on both sides. And that is for good reason.

But while Congress—or judges—may have struck a different balance long after ratification, that role is foreclosed to us by the balance that the Founders chose. We cannot now second-guess or undermine their choice. History makes clear that 18- to 20-year-olds were understood to fall under the Second Amendment's protections. Those over 18 were universally required to be part of the militia near the ratification, proving that they were considered part of "the people" who enjoyed Second Amendment rights, and most other constitutional rights apply to this age group. And Congress may not restrict the rights of an entire group of law-abiding adults because a minuscule portion of that group commits a disproportionate amount of gun violence. Congress's failure to connect handgun purchases from licensed dealers to youth gun violence only serves to highlight the law's "unduly tenuous 'fit'" with the government's substantial interests. *Craig*, 429 U.S. at 202.

Eighteen- to twenty-year-olds have Second Amendment rights, and the challenged laws impermissibly burden those rights. As a result, we vacate the district court's grant of the motion to dismiss, reverse the denial of summary judgment, and remand for further proceedings.

VACATED, REVERSED, AND REMANDED

| Appendix 1: Pre-Ratification Militia Laws | | |
|---|---|---|
| **Colony/State** | **Age** | **Citations** |
| Connecticut | 16 | An Act for Forming, Regulating, and Conducting the Military Force of this State (1786), *in* ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 144, 144, 150 (1786). |
| Delaware | 18 | An Act for Establishing a Militia Within this State §§ 2, 5 (1778). |
| Georgia | 16 | An Act for Regulating the Militia of the State, and for Repealing the Several Laws Heretofore Made for that Purpose (1786). |
| Maryland | 16 | An Act to Regulate the Militia § 2 (1777). |
| Massachusetts | 16 | An Act for Regulating and Governing the Militia of the Commonwealth of *Massachusetts*, and for Repealing All Laws Heretofore Made for that Purpose § 2 (1785), *in* THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, FROM THE COMMENCEMENT OF THE CONSTITUTION, IN OCTOBER 1780, TO THE LAST WEDNESDAY IN MAY, 1789, at 338, 339 (1789). |
| New Hampshire | 16 | An Act for Forming and Regulating the Militia Within this State, and for Repealing All the Laws Heretofore Made for that Purpose (1786), *in* THE LAWS OF THE STATE OF NEW-HAMPSHIRE, TOGETHER WITH THE DECLARATION OF INDEPENDENCE: THE DEFINITIVE TREATY OF PEACE BETWEEN THE UNITED STATES OF AMERICA AND HIS BRITANNIC MAJESTY: THE CONSTITUTION OF NEW-HAMPSHIRE, AND THE CONSTITUTION OF THE UNITED STATES, WITH ITS PROPOSED AMENDMENTS 356, 357 (1792). |
| New Jersey | 16 | An Act for the Regulating, Training, and Arraying of the Militia, and for Providing More Effectually for the Defence and Security of the State § 10 (1781), *in* ACTS OF THE FIFTH GENERAL ASSEMBLY OF THE STATE OF NEW-JERSEY, AT A SESSION BEGUN AT TRENTON ON THE 24TH DAY OF *OCTOBER*, 1780, AND CONTINUED BY ADJOURNMENTS 39, 42 (1781); An Act for the Better Regulating the Militia § 1 (1777), *in* ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF NEW-JERSEY, AT A SESSION BEGUN AT PRINCETON ON THE 27TH DAY OF AUGUST 1776, AND CONTINUED BY ADJOURNMENTS 26, 26 (1777). |
| New York | 16 | An Act to Regulate the Militia (1786), *in* 1 LAWS OF THE STATE OF NEW YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 227, 227 (1792). |

| North Carolina | 16 | An Act to Establish a Militia in this State § 2, (1777), *in* ACTS OF ASSEMBLY OF THE STATE OF NORTH CAROLINA 1, 1 (1777). |
|---|---|---|
| Pennsylvania | 18 | An Act to Regulate the Militia of the Commonwealth of Pennsylvania § 2 (1777), *in* 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 75, 77 (1903); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 3 (1780), *in* 10 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 144, 146 (1904). |
| Rhode Island | 16 | The Act for Better Forming, Regulating and Conducting the Military Force of this State (1779), *in* AT THE GENERAL ASSEMBLY OF THE GOVERNOR AND COMPANY OF THE STATE OF *RHODE-ISLAND*, AND *PROVIDENCE-PLANTATIONS*, BEGUN AND HOLDEN AT *SOUTH-KINGSTOWN*, WITHIN AND FOR THE STATE AFORESAID, ON THE LAST *MONDAY* IN *OCTOBER*, IN THE YEAR OF OUR LORD ONE THOUSAND SEVEN HUNDRED AND SEVENTY-NINE, AND IN THE FOURTH YEAR OF INDEPENDENCE 29, 29. |
| South Carolina | 16 | An Act for the Regulation of the Militia of this State (1782), *in* ACTS PASSED AT A GENERAL ASSEMBLY, BEGUN AND HOLDEN AT JACKSONSBURGH, IN THE STATE OF SOUTH-CAROLINA 20, 20. |
| Vermont | 16 | An Act Regulating the Militia of the State of Vermont (1787), *in* STATUTES OF THE STATE OF VERMONT, PASSED BY THE LEGISLATURE IN *FEBRUARY* AND *MARCH* 1787, at 94, 94 (1787). |
| Virginia | 16 (1775); 18 (1785) | An Ordinance for Raising and Embodying a Sufficient Force, for the Defence and Protection of this Colony (1775), *in* 9 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9, 16–17 (1821); An Act to Amend and Reduce into One Act, the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections § 3 (1785), *in* 12 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9, 10 (1823). |

| Appendix 2: Post-Ratification Militia Laws | | |
|---|---|---|
| **Colony/State** | **Age** | **Citations** |
| Connecticut | 18 | An Act for Forming and Conducting the Military Force of this State, Conformable to the Act of Congress, Passed the Eighth Day of May, A.D. 1792, Which Is as Follows:—"An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States" § 1 (1792), *in* ACTS AND LAWS OF THE STATE OF CONNECTICUT IN AMERICA 298, 298–99 (1796). |
| Delaware | 18 | An Act for Establishing the Militia in this State § 1 (1793), *in* 2 LAWS OF THE STATE OF DELAWARE FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE THOUSAND SEVEN HUNDRED AND NINETY-SEVEN 1134, 1134 (1797). |
| Georgia | 18 | An Act to Revise and Amend the Militia Law of this State, and to Adapt the Same to the Act of the Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety–Two, Entitled "An Act More Effectually to Provide for the National Defence, by Establishing and Uniform Militia Throughout the United States" § 9 (1792), *in* DIGEST OF THE LAWS OF THE STATE OF GEORGIA 348, 350 (1802). |
| Maryland | 18 | An Act to Regulate and Discipline the Militia of this State pmbl. (1793), *in* LAWS OF MARYLAND, NOVEMBER SESSION 1793 (1793). |
| Massachusetts | 18 | An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for that Purpose; Excepting an Act Intitled "An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within this Commonwealth, and also the Militia, When Called into Actual Service" § 2 (1793), *in* ACTS AND LAWS, PASSED BY THE GENERAL COURT OF MASSACHUSETTS, BEGUN AND HELD AT BOSTON, IN THE COUNTY OF SUFFOLK, ON WEDNESDAY THE TWENTY-NINTH DAY OF MAY, ANNO DOMINI, 1793, at 289, 290 (1793). |
| New Hampshire | 18 | An Act for Forming and Regulating the Militia Within This State, and for Repealing All the Laws Heretofore Made for that Purpose (1792), *in* THE LAWS OF THE STATE OF NEW HAMPSHIRE, PASSED AT A SESSION OF THE HONORABLE GENERAL-COURT, BEGUN AND HOLDEN AT EXETER, NOVEMBER 1972, at 441, 441 (1793). |

| New Jersey | 18 | An Act for Organizing and Training the Militia of this State § 4 (1792), *in* ACTS OF THE SEVENTEENTH GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY 824, 825 (1792). |
|---|---|---|
| New York | 18 | An Act to Organize the Militia of this State (1793), *in* LAWS OF THE STATE OF NEW YORK, PASSED AT THE SIXTEENTH SESSION OF THE LEGISLATURE 440, 440. |
| North Carolina | 18 | An Act for Establishing a Militia in this State § 1 (1786), *in* THE LAWS OF NORTH-CAROLINA 18, 18 (amended by An Act to Carry into Effect an Act of Congress, Entitled, "An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States," Also to Amend an Act, Passed at Fayetteville, in the Year One Thousand Seven Hundred and Eighty Six, Entitled, "An Act for Establishing the Militia in this State" (1793)). |
| Pennsylvania | 18 | An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 1 (1793), *in* THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 454, 455 (1909). |
| Rhode Island | 18 | * |
| South Carolina | 18 | An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress (1794), *in* ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY, OF THE STATE OF SOUTH-CAROLINA, PASSED IN APRIL, 1794, at 1, 2 (1794) (evidencing a shift from the former militia age of 16 mandated in An Act for the Regulation of the Militia of this State (1782), *in* ACTS PASSED AT A GENERAL ASSEMBLY OF THE STATE OF SOUTH-CAROLINA, &C, 20, 20). |
| Vermont | 18 | An Act, for Regulating and Governing the Militia of this State § 1 (1797), *in* 2 THE LAWS OF THE STATE OF VERMONT, DIGESTED AND COMPILED INCLUDING THE DECLARATION OF INDEPENDENCE, THE CONSTITUTION OF THE UNITED STATES, AND OF THIS STATE 122, 122 (1808). |
| Virginia | 18 | ** |

\* The most relevant Founding-era law we could find from Rhode Island set the militia age at 18 in 1794. An Act to Organize the Militia of this State (1794), *in* AT THE GENERAL ASSEMBLY OF THE GOVERNOR AND COMPANY OF THE STATE OF RHODE-ISLAND AND PROVIDENCE-PLANTATIONS, BEGUN AND HOLDEN BY ADJOURNMENT AT EAST-GREENWICH, WITHIN AND FOR THE STATE AFORESAID, ON THE LAST MONDAY IN MARCH, IN THE YEAR OF OUR LORD ONE THOUSAND SEVEN HUNDRED AND NINETY-FOUR, AND OF INDEPENDENCE THE EIGHTEENTH 14, 14–15 (1794) (reprinting the federal Militia Act and organizing the militia in line with federal law setting the age at 18). Prior laws had set the militia age at 16. The Act for Better Forming, Regulating and Conducting the Military

Force of this State (1779), *in* At the General Assembly of the Governor and Company of the State of *Rhode-Island*, and *Providence-Plantations*, Begun and Holden at *South-Kingstown*, Within and for the State aforesaid, on the Last *Monday* in *October*, in the Year of Our Lord One Thousand Seven Hundred and Seventy-Nine, and in the Fourth Year of Independence 29, 29; An Act, Regulating the Militia in this Colony, *in* The Charter, Granted by His Majesty, King Charles II. to the Governor and Company of the English Colony of Rhode-Island and Providence-Plantations, in New-England, in America 179, 179 (1767).

** Preceding ratification, Virginia required 18-year-olds to join the militia and bring their own arms. An Act to Amend and Reduce into One Act, the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections § 3 (1785), *in* 12 William Waller Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia, From the First Session of the Legislature, in the Year 1619, at 9, 10, 12 (1823). This law also created a separate company for 18- to 25-year-olds that trained more often than the rest of the militia. *Id.* § 3, *in* Hening, *supra*, at 14–15. Following ratification, Virginia's militia law did not mention age or equipment, focusing more on the organization by county. An Act for Regulating the Militia of this Commonwealth (1792), *in* A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 282, 282–90 (1803). But the act did not alter the age requirements set in 1785 and kept the light company of 18- to 25-year-olds. Like many other statutes at the time, however, Virginia's law said that it was helping to "carry the [federal Militia Act] into effect." *Id.* § 1, *in* A Collection of All Such Acts, *supra*, at 282. And the federal Militia Act required 18-year-olds to enlist and bring their own arms.

WYNN, Circuit Judge, dissenting:

Today, my good colleagues in the majority break new ground by invalidating a modest and long-established effort to control gun violence. The majority holds that Congress may not enact a law making 21 the minimum age to purchase handguns from federally licensed gun dealers.

But the majority's decision to grant the gun lobby a victory in a fight it lost on Capitol Hill more than fifty years ago is not compelled by law. Nor is it consistent with the proper role of the federal judiciary in our democratic system. *Cf. Kolbe v. Hogan*, 849 F.3d 114, 149–150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (arguing that because "[n]o one really knows what the right answer is with respect to the regulation of firearms," we federal judges ought not "[d]isenfranchis[e] the American people on this life and death subject" by arrogating to ourselves "decisions that have been historically assigned to other, more democratic, actors").

To be sure, the Second Amendment's right to keep and bear arms is an exceptional right, just not in the way the majority imagines. According to my colleagues, even though *all* individual constitutional rights are subject to limitations, the Second Amendment risks being relegated to a disfavored "second-class status." Maj. Op. at 3.

While they are not alone in this concern, *see, e.g.*, *Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari) (arguing that the Second Amendment protects a "disfavored right" that lower courts have treated "cavalierly"), I do not share it. Indeed, in a country that boasts a Congress, bench, bar, academy, and electorate that are all attentive to the prerogatives of gun owners, where many may conceal their

weapons,[1] carry them openly,[2] or "stand their ground,"[3] and where civilian gun ownership rates are second to none,[4] the majority's second-class status concern is simply surreal.[5]

No, the Second Amendment is exceptional not because it is uniquely oppressed or imperiled, but rather because it is singularly capable of causing harm. As other courts have recognized, while there are dangers inherent in other constitutionally protected rights—

---

[1] At present, "[e]very state—as well as the District of Columbia—allows the carrying of concealed weapons in some form." Giffords Law Center to Prevent Gun Violence ("Giffords"), *Concealed Carry*, https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/concealed-carry/.

[2] Giffords, *Open Carry*, https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/open-carry/ (noting that "many states now place few or no restrictions on open carry").

[3] Giffords, *Stand Your Ground*, https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/stand-your-ground-laws/, ("A majority of states (30) have now enacted Stand Your Ground laws applicable in all public places.").

[4] Aaron Karp, *Estimating Global Civilian-Held Firearms Numbers: Briefing Paper*, Small Arms Survey, June 2018 at 4, http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf (establishing that the United States has the highest rates of civilian possession of firearms, both in terms of absolute numbers and in terms of the number of firearms per 100 residents, and that our nearest peers on both fronts—India and Yemen, respectively—each come in a distant second).

[5] *Cf.* Linda Greenhouse, *Uncomfortable Timing for a Supreme Court Gun Fight*, N.Y. Times (Apr. 22, 2021), https://www.nytimes.com/2021/04/22/opinion/supreme-court-gun-rights-second-amendment.html ("I've always been puzzled by the notion that any limitation on the Second Amendment converts it into some sort of second-class right. I can't think of a constitutional right that the Supreme Court has interpreted as absolutely unlimited.").

like the rights to speak and assemble—the Second Amendment alone protects a direct and lethal right to endanger oneself and others.[6]

We are fortunate, then, that our courts have hitherto been careful to construe the Second Amendment in a manner that gives the people latitude to try to control gun violence through the democratic process. In the Fourth Circuit, as in nearly every other circuit, we protect the individual right to keep and bear arms while honoring the public's "right not to be shot," Lowy, *supra*, at 204, by applying a two-step analysis.[7]

---

[6] *E.g.*, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others."); *Heller v. Dist. of Columbia*, 801 F.3d 264, 283 (D.C. Cir. 2015) ("*Heller III*") (Henderson, J., concurring in part and dissenting in part) ("Although our Second Amendment precedent draws on First Amendment and voting-rights cases, the right to bear arms is meaningfully different from the rights to speak and vote. . . . [T]he reality of gun violence means our constitutional analysis should incorporate deference to the legislature." (internal citations omitted)); *Piszczatoski v. Filko*, 840 F. Supp. 2d 813, 816 (D.N.J. 2012) ("[The Second Amendment] privilege is unique among all other constitutional rights to the individual because it permits the user of a firearm to cause serious personal injury—including the ultimate injury, death—to other individuals, rightly or wrongly."), *aff'd sub nom. Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *see also* Jonathan Lowy & Kelly Sampson, *The Right Not to Be Shot: Public Safety, Private Guns, and the Constellation of Constitutional Liberties*, 14 Geo. J.L. & Pub. Pol'y 187, 194 (2016) ("No other right exposes the public to such grave risks of lethal, imminent harm.").

[7] On a public right to live—or "right not to be shot," *see* Lowy, *supra*, at 204–05. On the ubiquity of analyzing Second Amendment challenges through a two-step framework, *see* Maj. Op. at 11 n.5 (collecting cases). The Eighth Circuit, which has not expressly addressed the issue, appears to be the lone holdout in not adopting the Second Amendment two-step inquiry. *But see United States v. Adams*, 914 F.3d 602, 607–08 (8th Cir. 2019) (Kelly, J., concurring in the judgment) (faulting the majority for not applying the "sensible, two-pronged approach" employed by the other circuits for analyzing gun rights claims).

Under this approach, we first ask "whether the challenged regulation 'burdens or regulates conduct that comes within the scope of the Second Amendment.'" *Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir. 2021) (quoting *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)). Then, "[i]f the challenged regulation satisfies this first prong, or if we assume without deciding that the regulation meets this requirement, we turn to perform under our second prong a 'means-end' review, in which we consider the regulation under the appropriate level of constitutional scrutiny." *Id.* (quoting *Chester*, 628 F.3d at 680).

We have also applied a "simplifie[d]" version of this analysis for "prohibitions deemed 'presumptively lawful'" by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016). As discussed below, *Heller* deemed longstanding conditions and qualifications on the commercial sale of firearms to be presumptively lawful, and our circuit precedent in *United States v. Hosford* establishes that facial challenges against such regulations must fail.

Purporting to apply our two-step approach, the majority breaks new ground and creates a circuit split by striking down a modest effort at gun control passed more than fifty years ago that does not prevent young adults from purchasing, possessing, or using handguns.

Conversely, I would hold that the challenged provisions are facially valid longstanding conditions and qualifications on the commercial sale of arms. In the alternative, I would assume on the first prong of our two-part approach that the challenged provisions burden conduct protected by the Second Amendment. I would then join the Fifth

Circuit in holding on prong two that the challenged provisions easily survive intermediate scrutiny.

Because the majority holds otherwise, I respectfully dissent. In doing so, I consign neither "the Second Amendment [n]or 18- to 20-year-olds to a second-class status." Maj. Op. at 3.

I.

In *Heller*, the Supreme Court recognized the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. However, *Heller* itself emphasized that it was "not meant 'to clarify the entire field' of Second Amendment jurisprudence," *Hosford*, 843 F.3d at 165 (quoting *Heller*, 554 U.S. at 635), and that it should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27. *Heller* dubbed these sorts of firearm restrictions "presumptively lawful" and explained that it identified these measures "only as examples" and that its "list d[id] not purport to be exhaustive." *Id.* at 627 n.26.

This was no idle prattle. *Cf.* Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1372 (2009) (criticizing *Heller*'s discussion of presumptively lawful regulatory measures as "ad hoc" and "patchy" but nonetheless acknowledging that to the extent the discussion was

dicta, it was "dicta of the strongest sort"). In fact, in its only significant post-*Heller* Second Amendment case, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court "repeat[ed] [its] assurances" that its holding in *Heller* "did not cast doubt on such longstanding regulatory measures as . . . [']laws imposing conditions and qualifications on the commercial sale of arms.'" 561 U.S. at 786 (plurality opinion) (quoting *Heller*, 554 U.S. at 626–27).

As the majority recognizes, we have fashioned "a more streamlined analysis" for Second Amendment challenges to regulatory measures deemed presumptively lawful in *Heller*. Maj. Op. at 13–14. Specifically, we have held that facial challenges to such measures fail.[8] *Hosford*, 843 F.3d at 166 ("Hosford's facial challenge fails if the prohibition against unlicensed firearm dealing is the type of regulation deemed 'presumptively lawful' in *Heller*."). Because Plaintiff Natalia Marshall[9] brought a facial,

---

[8] In dicta, the majority suggests that a facial challenge to a presumptively lawful measure will not always fail. *See* Maj. Op. at 13–14 ("If a law falls within [*Heller*'s list of presumptively lawful measures], we conduct a more streamlined analysis. This often effectively ends the inquiry and upholds the law as facially valid. But not always." (internal citations omitted)). In support of that statement, the majority cites to our precedent in *Hamilton v. Pallozzi*, 848 F.3d 614, 624–25 (4th Cir. 2017), and *United States v. Pruess*, 703 F.3d 242, 245–46 (4th Cir. 2012). But it is unclear how these cases, both of which involved as-applied challenges to felon-in-possession laws, support the majority's position. To the extent that the majority believes a facial, rather than as-applied, challenge to a presumptively lawful measure can succeed, that belief squarely contradicts *Hosford*. *See Hosford*, 843 F.3d at 167 ("[T]he prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of firearms. As a result, Hosford's facial Second Amendment challenge fails."). To be sure, plaintiffs can still make as-applied challenges to presumptively lawful measures, *id.*, but no such challenge was brought in this case.

[9] As the majority finds, this case is moot as to Plaintiff Tanner Hirschfeld.

and not an as-applied challenge, we can therefore resolve this case quickly if we determine that the challenged provisions are presumptively lawful as (1) longstanding (2) conditions and qualifications (3) on the commercial sale of arms.[10] *Id.* at 166–67.

Here, the challenged provisions indisputably cover "only the commercial sale of firearms." *Id.* at 166. Young adults aged 18 to 20 may still possess and use handguns, may still receive handguns as gifts, and can even purchase handguns through unlicensed, but otherwise legal, private sales.[11] *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 189–90 (5th Cir. 2012) ("*NRA*"). In other words, in enacting the challenged provisions, Congress was careful not to burden use, possession, or non-commercial sales.[12]

The challenged provisions are also longstanding. Importantly, "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *NRA*, 700 F.3d at 196–97, 202–03 (collecting authorities and concluding that the same provisions at

---

[10] While the district court conducted both a facial and an as-applied analysis, "[w]e look to the scope of the relief requested to determine whether a challenge is facial or as-applied in nature." *AFSCME Council 79 v. Scott*, 717 F.3d 851, 862 (11th Cir. 2013) (citing *Doe v. Reed*, 561 U.S. 186, 194 (2010)). Here, Marshall requested a broad declaration that the challenged provisions were unconstitutional and requested that they be enjoined generally, not simply as to her. Her claim was thus facial in nature. The majority agrees.

[11] And, of course, they can still purchase and use long guns. *See* 18 U.S.C. § 922(b)(1).

[12] While every sale is "commercial" in the sense that an exchange of value occurs, we distinguish between commercial sales—that is, sales made by those who "regularly sell firearms, not owned for personal use, in the course of trade or business for the principal purpose of profit"—and non-commercial sales, that is, infrequent, non-professional sales as may occur, for example, between friends. *Hosford*, 843 F.3d at 166.

issue in this case are "consistent with [the] longstanding, historical tradition" of "age-based restrictions on the purchase of firearms"). Indeed, much more recent regulations can qualify. *See Hosford*, 843 F.3d at 166–67 (finding a licensing requirement for firearm dealers to be "longstanding" when it had been required by the federal government since 1938); *Drake*, 724 F.3d at 431–34 (relying on late nineteenth- and early twentieth-century authorities to conclude that a New Jersey law requiring applicants to demonstrate a "justifiable need" to obtain a permit to publicly carry a handgun was a "longstanding" regulation); *Silvester v. Harris*, 843 F.3d 816, 818 (9th Cir. 2016); *id.* at 831 (Thomas, C.J., concurring) (contending that California's ten-day waiting period to buy a gun was "longstanding" because it had been on the books in some form since 1923).

This rule follows from *Heller*, which listed "prohibitions on the possession of firearms by felons" as examples of the type of "longstanding" regulations that it did not "cast doubt on." *Heller*, 554 U.S. at 626–27. This is an illustrative example because, as the D.C. Circuit observed in *Heller II*, "states did not start to enact [prohibitions on the possession of firearms by felons] until the early 20th century." *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (citing C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009)). Furthermore, "*Heller* considered firearm possession bans on . . . the mentally ill to be longstanding" despite the fact that the "current version[] of th[is] ban[] [is] of mid-20th century vintage," dating back to 1968. *NRA*, 700 F.3d at 196–97 (citing *United States v. Skoien*, 614 F.3d 638, 640–41 (7th Cir. 2010) (en banc) (explaining that the federal ban on possession by the mentally ill was passed in 1968)).

Here, the challenged provisions are longstanding because they, just like the federal ban on possession of firearms by the mentally ill, were passed in 1968—over fifty years ago—and because similar provisions making 21 the minimum age to purchase or use certain firearms have been commonplace for more than a century. As the Fifth Circuit noted in *NRA*, "by the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of 'minors' to purchase or use particular firearms while the state age of majority was set at age 21." *Id.* at 202. Furthermore, by 1923, "twenty-two States and the District of Columbia had made 21 the minimum age for the purchase or use of particular firearms." *Id.* Considering this pedigree, the challenged provisions are sufficiently longstanding.[13]

The question of whether the challenged provisions constitute "conditions and qualifications" is somewhat trickier because the Supreme Court "did not explain what precisely it meant by the phrase." *Silvester v. Harris*, 41 F. Supp. 3d 927, 962 (E.D. Cal.

---

[13] The majority contends that the Fourteenth Amendment was enacted, in part, to protect the rights of recently emancipated slaves to bear arms in the face of southern efforts to disarm them and that we should therefore be cautious about using "Civil-War-era state laws that restricted the right to bear arms as evidence of the scope of the Second Amendment right at the time of the Founding." Maj. Op. at 24. However, here, I merely seek to understand whether laws restricting the ability of young adults to buy guns are "longstanding." The existence of antebellum and Reconstruction-era laws regulating the use of firearms by young adults is undoubtedly relevant to this inquiry. Furthermore, while I leave for another day the question of what—if any—role America's racial history ought to play in our Second Amendment jurisprudence, I am not convinced that the Second Amendment is best understood as a guarantor of the rights and liberties of freedmen and their descendants. *See generally* Carol Anderson, *The Second: Race and Guns in a Fatally Unequal America* (2021).

2014), *rev'd on other grounds*, 843 F.3d 816. Fortunately, the terms "conditions" and "qualifications" have uncontroversial common meanings. *Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring). A condition "is [s]omething established or agreed upon as a requisite to the doing or taking effect of something else" and a qualification is a "condition precedent that must be complied with for the attainment of a status," such as "for admission to an office." *Id.* (alteration in original) (quoting dictionary definitions). Thus, a condition and qualification on the commercial sale of arms is simply a prerequisite or requirement that a purchaser or seller must comply with before engaging in a commercial gun transaction.

In *Hosford*, we further refined this definition by distinguishing such conditions and qualifications—which, if they are also longstanding, are presumptively lawful—from regulations "so prohibitive as to . . . functional[ly] prohibit[]" the sale of firearms. 843 F.3d at 166. The challenged provision at issue in *Hosford* was a licensing scheme that required a prospective firearm dealer to obtain a license by submitting an application, paying a fee, establishing lawful premises for selling firearms, and being at least 21 years old. *Id.* In upholding the scheme, we distinguished it from the functional prohibitions on the sale of weapons discussed in two other cases. *Id.* (citing *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014); *Teixeira v. Cnty. of Alameda*, 822 F.3d 1047 (9th Cir. 2016), *rev'd on other grounds*, 873 F.3d 670, 673 (9th Cir. 2017) (en banc)).

The first, *Illinois Association of Firearms Retailers*, invalidated a Chicago law that totally banned the sale and transfer of *all* firearms except by inheritance. 961 F. Supp. 2d

at 930–931. In the second, a divided panel of the Ninth Circuit reasoned that a zoning ordinance that flatly banned the sale of guns would be subject to stricter scrutiny than an ordinance that merely regulated the location of gun stores. *Teixeira*, 822 F.3d at 1059–60. However, both the majority and the partially dissenting judge agreed that the zoning ordinance at issue—which prohibited establishing a gun store within 500 feet of a residentially zoned district—merely placed conditions and qualifications on the commercial sale of arms.[14] *Id.* at 1050, 1058; *id.* at 1064 (Silverman, J., concurring in part and dissenting in part).

In contrast, the challenged provisions here impose no functional prohibition on the sale, or, to flip to the other side of the coin, purchase, of firearms. Rather, they merely impose a limited condition and qualification on whom a subset of sellers (federally licensed dealers) may sell a subset of firearms—handguns—to (not those aged 18 to 20). Put another way, while the law at issue in *Heller* flatly banned handgun *possession*, and while the Chicago ordinance at issue in *Illinois Association of Firearms Retailers* banned all commercial sales (and even gifts) of guns generally, the challenged provisions in this case permit federally licensed dealers to sell handguns to most adults, and young adults aged 18 to 20 can still purchase handguns from other sources. Moreover, unlike regulations that amount to functional prohibitions on the sale of arms, this condition and qualification is of a temporary duration as to potential purchasers—it evaporates once the would-be purchaser turns 21.

---

[14] The panel majority nevertheless concluded that the law was not "longstanding" and therefore was not presumptively lawful under *Heller*. *Teixeira*, 822 F.3d at 1058.

I would therefore hold that the challenged provisions are presumptively lawful as longstanding conditions and qualifications on the commercial sale of arms and thus are facially constitutional.

The majority disagrees. While it does not contest the fact that the challenged provisions are longstanding and regulate only the commercial sale of arms, it contends that *Heller*'s presumptively lawful category of conditions and qualifications is limited "to laws that place conditions and qualifications on the seller, like licensing," and "does not encompass a ban on a class of people seeking to purchase handguns from a qualified seller." Maj. Op. at 16.

There are two problems with this claim. First, as explained above, the challenged provisions are neither a ban on selling handguns nor even a ban on young adults buying handguns. Second, and more fundamentally, the challenged provisions cannot be excluded from the ranks of presumptively lawful conditions and qualifications on the grounds that they place a greater burden on *buyers* than *sellers* because every restriction on a seller is also a restriction on a buyer, and vice versa.

Furthermore, the majority asserts that the challenged provisions cannot be conditions and qualifications on the commercial sale of arms because "[t]here is nothing a law-abiding 18- to 20-year-old can do to buy a handgun from a licensed dealer except wait until she turns 21." *Id.* at 14. I take the majority to mean that a condition and qualification must be something the burdened actor can overcome through her own initiative, rather than simply through aging. That is wrong under our precedent. As noted, one of the conditions

and qualifications to obtain a firearm license in *Hosford* was that the prospective dealer
"be at least twenty-one years old." 843 F.3d at 166.

The challenged provisions are therefore longstanding conditions and qualifications
on the commercial sale of arms. As such, Marshall's facial challenge fails. Case closed.

## II.

Even if Marshall's claim did not fail as a facial challenge to a longstanding condition
and qualification on the commercial sale of arms, it would still fail under our normal two-
step analysis of Second Amendment challenges.

## A.

Once again, at the first step of our two-step analysis, we ask "whether the challenged
regulation 'burdens or regulates conduct that comes within the scope of the Second
Amendment.'" *Harley*, 988 F.3d at 769 (quoting *Chester*, 628 F.3d at 680). "This historical
inquiry seeks to determine whether the conduct at issue was understood to be within the
scope of the right at the time of ratification." *Chester*, 628 F.3d at 680. "If it was not, then
the challenged law is valid." *Id.*

Here, the majority has done careful historical research and has assembled persuasive
evidence that young adults aged 18 to 20 had Second Amendment rights at the time the
amendment was ratified. In light of this evidence, and given this Circuit's "prudent"
practice of not "impart[ing] a definitive ruling" at the first step of our two-step inquiry, I
assume for purposes of this opinion that the challenged provisions burden or regulate
conduct within the scope of the Second Amendment. *Woollard v. Gallagher*, 712 F.3d 865,

875 (4th Cir. 2013); *see also, e.g.*, *Harley*, 988 F.3d at 769. I therefore proceed to the second step of our two-step inquiry.

## B.

Having assumed that the challenged provisions burden conduct within the scope of the Second Amendment, I move to our second step: considering the challenged provisions "under the appropriate level of constitutional scrutiny." *Harley*, 988 F.3d at 769.

Because *Heller* ruled out the possibility of applying rational-basis review to Second Amendment challenges, 554 U.S. at 628 n.27, we must "select between strict scrutiny and intermediate scrutiny," *Chester*, 628 F.3d at 682. In making this selection, courts consider "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.*

"[I]ntermediate scrutiny is the appropriate standard [where the challenged provision] does not severely burden the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home." *Kolbe*, 849 F.3d at 138. A law severely burdens this core right if it "effectively disarm[s] individuals or substantially affect[s] their ability to defend themselves." *Id.* at 139 (holding that a law that did not have this disarming effect was subject to intermediate scrutiny) (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015)). Extremely few laws are so burdensome. In fact, "there has been near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *Mai v. United States*, 952 F.3d 1106,

1115 (9th Cir. 2020) (quoting *United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019)).

Here, the majority assumes that intermediate scrutiny applies. This is a safe assumption. As the Fifth Circuit held in *NRA*, the challenged provisions should be subject to intermediate scrutiny because "they do not prevent 18-to-20-year-olds from possessing and using handguns in defense of hearth and home," and "regulate commercial sales through an age qualification with temporary effect." 700 F.3d at 206–07 (internal quotation marks omitted); *accord Nat'l Rifle Ass'n of Am., Inc. v. McGraw*, 719 F.3d 338, 342, 348 (5th Cir. 2013) (applying intermediate scrutiny to Texas law preventing adults under 21 from carrying handguns in public). Simply put, a temporary restriction on which sellers that young adults can buy handguns from does not severely burden the Second Amendment's core right to at-home self-defense. Accordingly, intermediate scrutiny applies.[15]

_____

[15] Plaintiff Marshall's arguments to the contrary are not compelling. First, she posits that we must apply strict scrutiny because the challenged provisions constitute a "universal prohibition on the . . . purchase of new or un-owned handguns and . . . ammunition," and that this prohibition is particularly suspect given the importance of handguns to self-defense. Opening Br. at 34–36. While the Fourth Circuit has shown special solicitude for handguns in the past, *see Kolbe*, 849 F.3d at 138–139, Marshall provides no authority for a constitutionally protected right to purchase a *new* weapon for self-defense. Her attempt to jury-rig a class of arms out of what is really a subset of handguns—those purchased from a federally licensed dealer—is unpersuasive. *See id.* at 138 ("The initial weakness in the plaintiffs' theory is that the banned assault weapons cannot fairly be said to be a 'class' like that encompassing all handguns, in that the banned assault weapons are just some of the semiautomatic rifles and shotguns in existence."). Second, Marshall argues that we should decline to apply traditional levels of heightened scrutiny altogether and should instead focus on the "text, history, and tradition" of the Second Amendment. Opening Br. at 31–32. Binding Fourth Circuit precedent forecloses this approach. *E.g.*, *Kolbe*, 849 F.3d at 133.

C.

"Under the standard of intermediate scrutiny, the government bears the burden of establishing a reasonable fit between the challenged law and a substantial governmental objective." *Harley*, 988 F.3d at 769. This fit need not be perfect or even the least intrusive means of accomplishing the desired objective, *United States v. Staten*, 666 F.3d 154, 162 (4th Cir. 2011), and a law "may meet this standard despite being overinclusive in nature," *Harley*, 988 F.3d at 769.

"[T]he Constitution does not mandate a specific method by which the government must satisfy its burden under heightened judicial scrutiny." *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012). Rather, as the majority recognizes, "[v]arious evidence can be mustered" to show a reasonable fit, including legislative findings, academic studies, case law, and even common sense, though "anecdote" and "supposition" alone will not cut it. Maj. Op. at 61 (collecting authorities) (internal quotation marks omitted).

Furthermore, in deciding whether a firearm regulation is reasonably related to a substantial government interest, we owe "substantial deference to the predictive judgments of [Congress.]" *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)); *accord Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (same); *Drake*, 724 F.3d at 436–37 (same). We owe such substantial deference "[i]n the context of firearm regulation" because "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S.

622, 665 (1994) (plurality opinion)); *accord Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (same).

Finally, as the Supreme Court has explained, the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised," with justifications that are plausible and not novel requiring less empirical support. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000); *see id.* at 391–95 (finding an affidavit from a state senator, citations to newspaper articles, and a statewide vote in support of campaign expenditure restrictions to be sufficient evidence to support a state law limiting campaign expenditures). Where, as here, intermediate scrutiny applies and the justifications offered by Congress are "both familiar and plausible," they need only be supported by "minimal" empirical evidence. *Carter*, 669 F.3d at 418 (citing *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 355, 360 (4th Cir. 2001)). In fact, "[e]ven when applying strict scrutiny— requiring a more taxing proof threshold than the one we apply here—the government may, in appropriate circumstances, carry its burden by relying *solely* on history, consensus, and simple common sense." *Id.*(emphasis added) (internal quotation marks omitted) (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995)).

With this framework in place, I will now consider whether the challenged provisions can withstand intermediate scrutiny. As set forth below, they can.

***

The majority's intermediate-scrutiny analysis gets off to a good start. As it correctly finds, "the government's interests in preventing crime, enhancing public safety, and reducing gun violence are 'not only substantial, but compelling.'" Maj. Op. at 62 (quoting *Kolbe*, 849 F.3d at 139). But the majority—essentially applying strict scrutiny in sheep's clothing—errs in concluding that no reasonable fit exists between the challenged provisions and these laudable objectives. To demonstrate the reasonableness of this fit, I first consider the provisions' text and legislative history, which establish that Congress designed a bespoke solution to a specific problem. I then consider scientific research on the immaturity of young adults, modern crime and accident statistics, and the state of state law on young adults and firearms, all of which further confirm the reasonableness of Congress's approach.

      *i.*     *The challenged provisions contain their own limiting principles*

The place to start a consideration of the fit between the challenged provisions and the government's interest in public safety is with the legislative text—that is, with what the law says it prohibits, and for how long. It cannot be repeated often enough: the provisions the majority strikes down today do not keep young adults from owning or using handguns, and they impose no limitations whatsoever on the use of long guns. *See* 18 U.S.C. § 922(b)(1), (c)(1); 27 C.F.R. §§ 478.99(b)(1), 478.96(b), 478.124(a). Little wonder, then, that the plaintiffs in this case never alleged that they have been unable to acquire handguns.

In this regard, the challenged provisions are much less restrictive than the restrictions imposed on various classes of individuals by 18 U.S.C. § 922(g), which forbids the *possession* of "*any* firearm or ammunition" by a member of a restricted class, generally

for life. 18 U.S.C. § 922(g) (emphasis added). And yet, appellate courts—including this Court—regularly uphold provisions of § 922(g) against Second Amendment challenges.[16] My point is not to compare law-abiding young adults to stalkers, fugitives, or other categories of persons prevented by federal criminal law from possessing firearms. Rather, I bring up those provisions to emphasize how much less restrictive the challenged provisions are than those lifelong bans. This "narrow ambit" weighs in favor of upholding the provisions. *NRA*, 700 F.3d at 205 (explaining that these same provisions' narrowness militated against applying strict scrutiny).

Moreover, the limited restrictions that the challenged provisions *do* impose are only imposed for a short time. All restrictions vanish when the clock strikes midnight and the young adult in question turns 21. As we explained in *United States v. Carter*, statutes with "limited temporal reach" are inherently "less intrusive than other statutes that impose a permanent prohibition on the possession of firearms." 669 F.3d at 419. This case involves time-limited provisions that "Congress tailored . . . to cover only the time period during

---

[16] *See, e.g.*, *United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012) (§ 922(g)(1)'s ban on felons possessing firearms is facially constitutional); *United States v. Carter*, 750 F.3d 462, 470 (4th Cir. 2014) (§ 922(g)(3)'s ban on possession by those unlawfully using or addicted to a controlled substance is constitutional); *Mai*, 952 F.3d at 1109 (§ 922(g)(4)'s ban on possession by those previously committed to a mental institution is constitutional as applied to plaintiff); *United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012) (§ 922(g)(5)'s ban on possession by those unlawfully in the United States is constitutional); *United States v. Jimenez*, 895 F.3d 228, 231 (2d Cir. 2018) (§ 922(g)(6)'s ban on possession by those dishonorably discharged from the military withstands intermediate scrutiny as applied to plaintiff); *United States v. Mahin*, 668 F.3d 119, 120 (4th Cir. 2012) (§ 922(g)(8)'s ban on possession while subject to a domestic violence protective order is constitutional); *Harley*, 988 F.3d at 769–70 (§ 922(g)(9)'s ban on possession by individuals convicted of domestic violence misdemeanors is constitutional as applied to plaintiff (citing *Staten*, 666 F.3d at 168)).

which it deemed [the prohibited] persons to be dangerous." *Id.* And this feature of the challenged provisions "contributes to [their] proportionality" under heightened review. *Id.* Thus, under our precedent—and indeed, under common sense—a time-limited regulation of Second Amendment rights is less burdensome and better-tailored to meet a substantial government objective than is a lifelong restriction.

In sum, the challenged provisions contain their own built-in limitations of scope and duration. These limitations are powerful evidence that the provisions burden no more conduct than is necessary to meet their objectives and so are constitutional.

ii.   *The legislative history of the challenged provisions strongly supports their constitutionality*

In addition to the legislative text, a provision's legislative history is one of the "wide range of sources" the government can rely on to "establish the fit between a regulation and a governmental interest" under intermediate scrutiny. *Id.* at 418. Here, the legislative history of the challenged provisions reinforces that they are reasonably related to the government's compelling interest in promoting public safety by limiting the ability of young adults to purchase handguns from federally licensed firearm dealers.

During the mid-1960s, "Congress conducted a multi-year investigation that revealed a causal relationship between the easy availability of firearms to young people under 21 and the rise in crime." *NRA*, 700 F.3d at 207. This investigation was led by Connecticut Senator Thomas Dodd and culminated in the enactment of the challenged provisions as part of the Omnibus Crime Control and Safe Streets Act and Gun Control Acts of 1968. *See generally* Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in*

*America*, 248–53 (2011) (describing Dodd's leadership role in Congressional efforts to regulate guns); William J. Vizzard, *The Gun Control Act of 1968*, 18 St. Louis Univ. Pub. L. Rev. 79, 79–86 (1999) (same); Gabrielle Westcott, *The Fight for the Gun Control Act of 1968*, Univ. of Conn. Library Archives and Special Collections Blog, Sept. 15, 2016 [hereinafter Westcott Blog] (same).[17]

Dodd's legislative efforts started in 1961 when he began serving as head of the Juvenile Justice Subcommittee of the Senate Judiciary Committee. Vizzard, *supra*, at 80. After two years of researching gun violence and in the immediate aftermath of President Kennedy's assassination, Dodd introduced a bill, S. 1975, that sought to address "the ease with which juveniles and criminals could anonymously purchase mail-order guns and thus circumvent state laws regarding the sale of firearms." Westcott Blog; *see also* Winkler, *supra*, at 248. This bill stalled and then died in committee. Vizzard, *supra*, at 80; Westcott Blog.

Following President Johnson's election in 1964, Dodd reintroduced his gun control bill at the start of the 89th Congress in January 1965. Vizzard, *supra*, at 80; Westcott Blog. But soon, at the Johnson Administration's behest, he introduced a new measure, Senate Bill 1592, that called for prohibiting the sale of handguns to those under 21. *See* Vizzard, *supra*, at 80, 82; Westcott Blog. Though it would take three more years to become law, this prohibition was eventually enacted in the form of the challenged provisions.

---

[17] Westcott's piece is available at blogs.lib.uconn.edu/archives/2016/09/15/the-fight-for-the-gun-control-act-of-1968/.

I start with this scene-setting to emphasize a basic point: the challenged provisions were not a slapdash effort. Rather, they were the careful, deliberative "culmination of five years of legislative effort and seven years of investigation on the part of Senator Dodd and the Subcommittee on Juvenile Delinquency." Westcott Blog. And what did Senator Dodd and his congressional colleagues find at the culmination of their years of inquiry? They found "a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior." Pub. L. No. 90-351, tit. IV, § 901(a)(6).

This conclusion tying young adults' ability to access handguns with threats to public safety is adequately supported by the legislative record, provided that we view our job as looking for a reasonable fit between government action and objective and not as "weigh[ing] conflicting evidence and mak[ing] policy judgments." *Kolbe*, 849 F.3d at 140 (quoting *Woollard*, 712 F.3d at 881). After all, the latter "is the legislature's job, not ours." *Id.* (quoting *Woollard*, 712 F.3d at 881). I consider Congress's chief conclusions step by step.

Start with Congress's determination that Americans under 21 pose a special danger to society and to themselves. As the majority notes, Congress had before it ample evidence that individuals under 21 were involved in a substantial share of the nation's criminal activity. *See* Maj. Op. at 5–6 & n.2 (acknowledging that at the time of the enactments, minors under 21 accounted for 64 percent of all arrests for serious crimes in the United States and "35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault and 21 percent of the arrests for murder" (internal

citations and quotation marks omitted)). For instance, Congress knew that in New York City in 1962, 46.3 percent of all those arrested for felonies were under 21. S. Rep. 88-1340, at 15–16 (1964). Indeed, during the 1960s, many believed the country to be experiencing an epidemic of youthful criminality. *See, e.g.*, Maj. Op. at 5–6 n.2 (quoting federal officials' testimony that the "greatest growth of crime [at the time was] in the area of young people, juveniles and young adults"). This fear was hardly baseless. *See, e.g.*, 109 Cong. Rec. 13946 (1963) (statement of Sen. Dodd) ("[A]ccording to the FBI, during the 5 years between 1955 and 1960, when the juvenile population increased by 25 percent, the number of youngsters arrested for carrying guns went up nearly twice as fast."); 114 Cong. Rec. 13322 (1968) (statement of Sen. Dodd) ("[S]ince 1960, arrests of juveniles [for robbery] have increased 55 percent.").[18]

In addition to worrying about youthful crime and gun violence, Congress was also concerned about self-harm and accidents involving firearms. Back in 1963, Senator Dodd lamented that "[o]f the more than 18,000 annual suicides [in the country], fully half [were] committed with the use of firearms." 109 Cong. Rec. 13946. He raised the same concerns

---

[18] While I recognize "the inherent danger of drawing causal connections between rates of arrest and incidences of criminal activity," *Powell v. Tompkins*, 926 F. Supp. 2d 367, 393 (D. Mass. 2013), other statistics help confirm that America did indeed experience an increase in violent crime during the 1960s, lessening any concern about relying on arrest statistics, *see, e.g.*, *Federal Firearms Legislation: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 90th Cong. 1 (1968) (statement of Senator Dodd) (citing FBI statistics establishing that between 1964 and 1967 murder by gun "increased 51 percent; aggravated assault by gun increased an incredible 84 percent; and armed robbery increased 57 percent"); Lauren-Brooke Eisen & Oliver Roeder, *America's Faulty Perception of Crime Rates*, Brennan Ctr. for Just. (Mar. 16, 2015), https://www.brennancenter.org/our-work/analysis-opinion/americas-faulty-perception-crime-rates ("[T]he violent crime rate increased by 126 percent between 1960 and 1970.").

during the final push to pass the Omnibus Crime Control and Safe Streets Act of 1968, stating on May 8, 1968 that "[t]he surest and easiest way to kill one's self is with a firearm—especially when the firearm is immediately at hand. And when it comes to suicides by firearms, the discrepancy between the rate in this country and the rate in other civilized countries is equally astounding." 114 Cong. Rec. 12305. He was joined in this sentiment by Attorney General Nicholas Katzenbach, who argued that "[i]n a country in which half the 20,000 suicides of 1963 were committed by firearms, congressional action is called for now." *Proposed Amendments to The National Firearms Act and The Federal Firearms Act: Hearings Before the Comm. on Ways and Means*, 89th Cong. 73 (1965) [hereinafter *Ways and Means: 1965 Hearing*] (statement of Attorney General Katzenbach).

Beyond suicide, Congress was also concerned with simple gun accidents and the toll they took on young people. For instance, Senator Dodd's Juvenile Delinquency Subcommittee heard testimony from a Pittsburg police officer who testified regarding a "typical case" of gun injury in his city in which a 20-year-old bought a handgun, loaded it, and then "attempted to expel the cartridge by striking it with a hatchet which resulted in his being wounded in the right cheekbone." S. Rep. 88-1340, at 17 (1964); *see also id.* at 27 (concluding that the "indiscriminate sale of [mail-order] firearms ha[d] resulted in accidental tragedies including loss of life and serious injury").

Though the majority ignores this evidence, prominent supporters of the challenged provisions also highlighted the depressing pervasiveness of gun accidents while advocating for passage of the Crime Control and Safe Streets Act. *See* 114 Cong. Rec. 12299 (1968) (statement of Sen. Fong) (estimating that in 1966, firearms were involved in 10,000

suicides and 2,600 accidental deaths and arguing that this "staggering toll" helped demonstrate "the urgent need for a comprehensive [gun] law"); *id.* at 12303 (statement of Sen. Dodd) (arguing that Title IV, which housed the challenged provisions, "represent[ed] a long-overdue legislative reaction to the terrible toll of life and limb extracted each year in our country by firearms," including an estimated "270,000 suicides, and 145,000 deaths by accident" between 1900 and 1966); c*f. Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 90th Cong. 29, 31 (1967) (speech of Sen. Kennedy of Mass.) (arguing that Senate Bill 1—a legislative predecessor to the challenged provisions that also prevented those under 21 from buying handguns from federally licensed dealers—could help "avoid one murder, one suicide, one accident, or ten, or a hundred, or a thousand" and was "the best measure anyone ha[d] devised" to prevent crime, suicides, and gun accidents).

Next, in contemplating its legislative options for responding to the significant harm caused by people armed with guns in the form of crime, suicides, and accidents, Congress heard from law-enforcement professionals who believed that further regulating access to firearms would promote public safety. For example, FBI Director J. Edgar Hoover concluded that "those who claim that the availability of firearms is not a factor in murders in this country are not facing reality." *Ways and Means: 1965 Hearing*, at 73 (statement of Attorney General Katzenbach (quoting Hoover's 1963 Law Enforcement Bulletin)).

Other law-enforcement professionals agreed that regulating *youth* access to firearms, in particular, would reduce gun injuries and deaths. Senator Dodd noted that "law enforcement experts virtually to a man agree that we can curb these serious increases in

crimes of violence by young people, by restricting the availability of guns to them." 114 Cong. Rec. 13643–44 (1968). In fact, broad swaths of the nation's law-enforcement establishment favored *stricter* gun control measures than those Congress ultimately enacted. *See* S. Rep. 90-1097, at 191 (1968) (statement of Sen. Tydings) ("The President, the Attorney General, the Director of the FBI, the President's Commission on Law Enforcement and the Administration of Justice, the International Association of Chiefs of Police, the American Bar Association, and state and local law enforcement officials all across the country have recommended federal firearms control legislation much more stringent than Title IV[, the provisions of the Crime Control and Safe Streets Act that barred those under 21 from purchasing handguns from federally licensed dealers,] provides.").

Further, as the majority notes, "[l]aw enforcement officers from New York City, Los Angeles, St. Louis, Chicago, Philadelphia, and Atlanta provided Congress with statistics documenting the misuse of firearms by juveniles and minors." Maj. Op. at 5–6 n.2 (internal quotation marks omitted). For instance, Herbert T. Jenkins, the chief of Atlanta's Police Department, stated that of 404 recent aggravated assaults involving firearms in his city, about 93 percent were committed by individuals under the age of 21. S. Rep. 89-1866, at 59 (1966) (from Individual Views of Senators Dodd, Bayh, Kennedy of Massachusetts, Tydings, Fong, Javits, Smathers, and Long of Missouri). And Chief Jenkins further concluded that "[m]*ost of these cases would have ended as a simple altercation, except for the ready availability of the gun.*" *Id.* (emphasis added).

Supporters of the enactments believed that limiting youth access to firearms would be a particularly effective way to limit violent deaths because keeping guns out of the hands

of young people could keep them from turning to crime or, if they did, could keep them from killing anyone while engaging in criminal activity. Notably, contemporary statistics showed that 21% of people who were assaulted with a gun died because of the assault, compared with just 3% of individuals assaulted with another weapon. 109 Cong. Rec. 13946 (statement of Sen. Dodd). They also showed that in 1962, "more than 3,200 persons met violent deaths by a gun *in the hand of a noncriminal*." *Id.* (emphasis added).

IRS Commissioner Sheldon Cohen and Attorney General Katzenbach also explained the link they saw between firearms, youth, and violence. According to Cohen— who, as IRS Commissioner, was the executive branch official then responsible for firearm regulation[19]—the "easy availability of weapons" exacerbated the "tendency [of young people, juveniles, and young adults] toward wild, and sometimes irrational . . . violent" and "deadly" behavior. *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 90th Cong. 57 (1967) (testimony of Commissioner Cohen). Likewise, Attorney General Katzenbach believed that while the

---

[19] *See Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 89th Cong. 29–30 (1965) [hereinafter *Firearms Act: 1965 Hearings*] (statement of Hon. Henry H. Fowler, Secretary of the Treasury) (explaining that Cohen, as IRS commissioner, was "responsible for the administration of the Federal Firearms Act" as the head of the IRS's Alcohol and Tobacco Tax Division, the forerunner to the modern Bureau of Alcohol, Tobacco, Firearms and Explosives). Given Cohen's subject-matter expertise in firearm regulation, the majority's dismissal of his testimony for lack of personal law-enforcement experience cannot hold water. We must defer to Congress's decision to trust someone with such clearly relevant credentials instead of conducting a kind of retroactive *Daubert* analysis. While courts of course have an obligation to serve as gatekeepers when it comes to expert testimony cited by the parties before us in the course of normal litigation, we also have an obligation to show a much greater level of deference when it is a coequal branch who has opted to rely on a particular expert when performing its constitutionally assigned duties.

gun control measures might only make it "a little harder" for "major criminals" to get guns, another purpose of the proposed measures was "to take guns away from people *who might not otherwise become criminals*," and to ensure that if they did, they would "at least" not "use guns to kill somebody in the process." *Ways and Means: 1965 Hearing*, at 85 (emphasis added).

Senator Dodd echoed the Commissioner and Attorney General's beliefs that keeping guns out of the hands of young adults would increase public safety. He argued:

> Some of the opponents of the bill . . . have also argued that it is not guns that kill people, but the criminals behind the guns. And they have further argued that, criminals being what they are, they will succeed in obtaining weapons despite any laws which we may enact. The basic fallacy in this argument is [that] it lumps all gun criminals together in a single criminal category. It may be true that the hardened criminal . . . will succeed in obtaining weapons no matter what laws we may pass. But the great majority of those involved in gun crimes are not professional criminals. They are . . . amateur criminals, some of them one-time offenders, some of them "hopped-up" juveniles involved in their first breach of the law. In the case of these amateur criminals, it is frequently the weapon that kills rather than the criminal himself. The professional criminal—and I have known some, I have spent some part of my life in criminal work—will not attempt to hold up an old man for the paltry few dollars he may have in his pocket, and then, if he encounters any resistance, panic and fire. He does not operate that way. But every year there are hundreds of murders perpetrated in precisely this way by amateur criminals—by kids, youngsters, and juveniles. . . . The amateur criminal [is frequently] a person of inferior intelligence and inferior initiative who would find it very difficult to obtain a gun for himself if the law placed a few obstacles in his way.

114 Cong. Rec. 12307–08 (1968).[20]

---

[20] Senator Dodd had intimate, first-hand experience with gun crime. As a special agent for the FBI during the 1930s, he partook in a shootout between the G-Men and John Dillinger's gang. Winkler, *supra*, at 248–49.

Agree or disagree with Senator Dodd's assessment, there is no denying that it had support at the time the challenged provisions were enacted. For instance, Curtis Brostron, St. Louis's Chief of Police, testified that he supported "mak[ing] the acquisition of firearms more difficult," in part because he believed young people would be less tempted to acquire weapons and to commit crime if obtaining a firearm were harder. *Firearms Act: 1965 Hearings* at 580–81 (statement of Chief Brostron). In short, Congress had ample evidence before it that, to truly enhance public safety, it would need to do more than target "major criminals" and repeat offenders.

Having identified a specific problem—death and injuries from guns in the hands of young people—and a general solution—regulating youth access to firearms—Congress then began tailoring a narrow fix.

First, it focused only on handguns, which it termed "the most formidable and most frequently used tool of the criminal." S. Rep. 89-1866, at 4 (1966). Congress reached this conclusion that handguns were uniquely the friend of criminals by relying on two sources of evidence: (1) "the existence in many States of laws controlling [handguns]" and (2) "statistics showing its dominance as the weapon used in unlawful activities." *Id.* First, as Congress noted, many states and cities regulated handguns to a "much greater extent" than long guns, suggesting a greater fear of their misuse. *Id.* Second, regarding crime statistics, Congress had before it FBI statistics and commentary from Director Hoover that "handguns were used in 70 percent of . . . murders committed with firearms" and in most armed robberies involving a gun. *Id.* at 5. Thus, Congress concluded "[f]rom these statistics

[and state and local regulations that] it [was] quite clear that the principal offender in the unlawful use of firearms is the handgun." *Id.*

Congress then further connected the broader trends of youth violence and handgun violence together by studying the very specific trend of *youth violence perpetrated with handguns*. For instance, in 1964, Senator Dodd's Senate Subcommittee on Juvenile Delinquency learned that from 1960 to 1962, firearms were involved in approximately seventy percent of all arrests in New York City of individuals under 21 for four kinds of violent felonies and that these firearms were mostly handguns. S. Rep. 88-1340, at 16 (1964).

Finally, having concluded that public safety could plausibly be addressed by regulations targeting youth access to handguns, Congress focused yet more narrowly on the specific problem of handguns purchased from federally licensed firearms dealers. *See NRA*, 700 F.3d at 208 ("The legislative record . . . demonstrates that Congress was particularly concerned with the [role federally licensed firearm dealers played] in the crime problem."). To this end, Congress heard from IRS Commissioner Cohen, who testified that the "misuse of firearms by juveniles" had "reached alarming proportions"; that "[t]he vast majority, in fact almost all of these firearms, are put into the hands of juveniles by . . . dealers who operate under licenses issued by the Federal Government"; and that "[t]he way

to end this dangerous practice [was] to stop these Federal licensees from selling firearms to juveniles."[21] *Firearms Act: 1965 Hearings* at 67 (statement of Commissioner Cohen).

Thus, in context, Commissioner Cohen's remarks demonstrate his conclusion that the ability of young adults to buy firearms from federally licensed dealers was contributing to the nation's crime problem. Congress agreed, and, combining this conclusion with its finding that handguns were the primary weapon of concern, concluded that handguns had been "widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior," leading to "youthful criminal behavior." Pub. L. No. 90–351, tit. IV, § 901(a)(6).

To summarize, as the Fifth Circuit found in *NRA*, "Congress was focused on a particular problem: *young persons under 21*, who are immature and prone to violence, easily accessing *handguns*, which facilitate violent crime, primarily by way of [*federally licensed dealers*]." 700 F.3d at 208. "Accordingly, Congress restricted the ability of *young persons under 21* to purchase *handguns* from [*federally licensed dealers*]." *Id.* Nothing in the majority's opinion contests that Congress studied this exact issue and agreed on a solution designed to solve it. Applying intermediate scrutiny, and not strict scrutiny masquerading as such, this ought to be enough.

Instead, in targeting the chain of conclusions that led Congress to enact the challenged provisions, the majority trains its fire on the weakest link: the specific

---

[21] While Commissioner Cohen did not clarify the exact age group he meant when he referred to "juveniles," these remarks came during his broader endorsement of Senate Bill 1592, which, as discussed above, endeavored to prevent individuals under twenty-one from purchasing handguns.

connection between federally licensed dealers and handgun crime. To be sure, Commissioner Cohen's testimony could have been more robust, and the legislative record does lack a study establishing that most guns used by young adults to commit crimes were sold to them directly by federally licensed dealers. But, for several reasons, I would not find this shortcoming in the record to be fatal to the challenged provisions.

First, the majority's exclusive focus on the link between guns sold by federally licensed dealers to young adults and *crime* is too narrow. The legislative history establishes that Congress was concerned not just with crime, but also with accidents and suicides. And common sense tells us that fewer law-abiding young adults will harm themselves with handguns if they cannot purchase them from federally licensed dealers.[22]

---

[22] The commonsense idea that reducing access to lethal weapons will reduce firearm accidents and suicides is also supported by the scientific literature. *See, e.g.*, Matthew Miller et al., *Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis & Prevention 477, 479–480 (2001) (finding that "children and adults, men and women, and members of all racial groups were significantly more likely to die from unintentional firearm injuries if they lived in states with more rather than fewer guns," and that this "robust, positive and statistically significant association" between gun availability and fatal gun accidents persisted "even after controlling for state level poverty, urbanization and regional location"); David M. Studdert et al., *Handgun Ownership and Suicide in California*, 382 New Eng. J. of Med., 2220, 2228 (2020) ("Our study bolsters and extends the message from previous research: ready access to firearms, particularly handguns, is a major risk factor for suicide."); Matthew Miller et al., *Suicide Mortality in The United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 Ann. Rev. of Pub. Health 393, 397, 401–03 (2012) (providing figures that establish that in 2001, approximately 84.9% of suicide-by-firearm attempts in America were fatal compared with just 4.1% of all non-firearm attempts and discussing the "potential for reducing the population-level suicide burden by reducing population-level access to lethal means").

A recent study following more than 26 million Californians over the age of 21 for up to 12 years dramatically illustrates this relationship between access to firearms and suicide. It found that despite having "lower rates of all-cause mortality than nonowners,"

Second, the challenged provisions aimed to prevent crime not just by keeping handguns out of the hands of hardened criminals, but also by making it somewhat harder for law-abiding young adults to obtain handguns and to then turn, gun in hand, to crime in the first place. The majority's statistics on the percentages of gun crimes committed with legally purchased weapons do not address these potential crimes that may have been prevented by the challenged provisions. Such potential crimes are easy to imagine when we consider Congress's findings on the impulsivity and hotheadedness of youth. Thus, even assuming that relatively few young adults commit a gun crime with a handgun they purchased directly from a federally licensed dealer, it was reasonable for Congress to believe that the challenged provisions could help reduce gun crime.

Third, it is important to remember what we are supposed to be doing here: "weighing a legislative judgment, not evidence in a criminal trial" or even an agency's record in an administrative proceeding. *Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018) (explaining the proper application of intermediate scrutiny to a Second Amendment challenge). When Congress enacts a statute, it "is not obligated . . . to make a record of the

---

handgun owners committed suicide at much higher rates than nonowners. Studdert, *supra*, at 2220, 2224. Specifically, from 2004 to 2016, male handgun owners committed suicide at a rate three times higher than male nonowners, and female handgun owners took their lives at a rate seven times higher than female nonowners. *Id.* at 2224. These differential rates were "attributable to much higher rates of suicide by firearm," not to "higher rates of suicide by other methods." *Id.* at 2224, 2226. While these precise numbers could theoretically prove unique to California, or to those over age 21, we also know that suicide attempts "are often impulsive acts, driven by transient life crises," and that "most people who attempt suicide do not go on to die in a future suicide." *Id.* at 2221. It therefore stands to reason that reducing access to firearms—which are extremely effective as a means of death—will reduce suicides. *See id.*

type that an administrative agency or court does to accommodate judicial review," even as to constitutional issues. *Satellite Broad. & Commc'ns Ass'n*, 275 F.3d at 358 (quoting *Turner*, 512 U.S. at 666 (plurality opinion)) (First Amendment case). Thus, when considering legislative judgments to determine if an enactment survives intermediate scrutiny, not only do we defer to the policy judgments of the legislature, we also "allow [the government] to rely on any material 'reasonably believed to be relevant' to substantiate its interests." *Mai*, 952 F.3d at 1118 (alteration in original) (quoting *Pena*, 898 F.3d at 979) (discussing judicial review of congressionally enacted gun control measure). Commissioner Cohen's testimony regarding federally licensed dealers surely meets that standard.

Plus, as noted, the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon*, 528 U.S. at 391. And where the justifications offered by Congress are "both familiar and plausible," they need only be supported by "minimal" empirical evidence. *Carter*, 669 F.3d at 418 (quoting *Satellite Broad. & Commc'ns Ass'n*, 275 F.3d at 360).

Here, it is undeniable that the justifications Congress offered for enacting the challenged provisions were both familiar and plausible to the legislators who passed the bills and to the voters that elected them. That's why proponents of the measures made

repeated appeals to common sense in pushing for their passage[23] and why the enactments had such broad-based public support.[24] As such, the provisions need only be supported by minimal empirical evidence, a bar they easily clear.

Finally, even if I thought that Congress did not sufficiently show its work back in 1968 by justifying the challenged provisions through detailed studies of the public-safety impacts of preventing young adults from buying handguns from federally licensed dealers—which I do not—I still would not find the absence of such studies to cut decisively against the government in our intermediate-scrutiny inquiry. To do so would be profoundly anachronistic. As the Third Circuit noted in *Drake*, legislatures contemplating gun control measures pre-*Heller* can hardly have been expected to "muster . . . reports, statistical information, and other studies" to fortify their bills against Second Amendment challenges

---

[23] *See, e.g.*, *Firearms Act: 1965 Hearings* at 32 (statement of Secretary Fowler) ("I think it is self-evident that minors [under age 21] should not have access to pistols [or] other concealable firearms and weapons of vast destructive power . . . ."); *Ways and Means: 1965 Hearing* at 28 (statement of Hon. Joseph W. Barr, Undersecretary of the Treasury) (making the same statement); 114 Cong. Rec. 13643 (1968) (statement of Sen. Dodd) ("[I]t is simply common[ ]sense not to allow federally licensed dealers to dispense weapons of death to the young and immature. Unless they are properly supervised, firearms in the hands of juveniles can result in great tragedy. There are scores of thousands of tragedies in the police files of our country to attest to this.").

[24] Polling from the spring of 1968 showed that Americans favored "strict control over the sale of firearms by 71 to 23 percent" and that gun owners favored such controls by 65 to 31 percent. S. Rep. 90-1097, at 184 (individual views of Senator Fong) (discussing a Harris Poll from April 22, 1968 and contending that it represented Congress's "clear mandate from the people" to expand Title IV to include long guns in addition to handguns). This popular support translated into endorsements for the enacted measures from all walks of American life. *See, e.g.*, 114 Cong. Rec. at 12314–16 (1968) (statement of Sen. Dodd) (documenting support for the challenged provisions from, among others, the American Bar Association, the AFL-CIO, civil rights leader Roy Wilkins, and the General Federation of Women's Clubs, "the parent organization of some 15,000 women's clubs").

when the Supreme Court had not yet taught us that the Second Amendment protected an individual right to bear arms. 724 F.3d at 437–38; *see also Dearth v. Lynch*, 791 F.3d 32, 49 (D.C. Cir. 2015) (Henderson, J., dissenting) ("The plaintiffs also fault the Government for submitting what is admittedly a sparse evidentiary record demonstrating the Congress's rationale for applying the ban on receipt of firearms to non-resident citizens. It is hardly surprising that the Government is not able to offer more because the provisions at issue here were enacted in 1968 and 1994—long before the individual-right view of the Second Amendment became the law of the land." (internal citation omitted)). So too here.

In conclusion, the legislative history of the challenged provisions illustrates that Congress studied a very specific problem—threats to public safety caused by youth access to handguns purchased from federally licensed dealers—and aimed to address that exact problem through the challenged provisions. This evidence strongly supports holding that the challenged provisions are a reasonable fit for the government's compelling interest in public safety.

### iii. *The challenged provisions are supported by modern scientific research*

Beyond the evidence cited in the legislative history and common sense, Congress's decision to restrict the ability of young adults aged 18 to 20 to purchase handguns from federally licensed dealers is also supported by more recent scientific research showing that the youngest adults, as a group, are decidedly less mature than other adults—even those

just a few years older.[25] *See Carter*, 669 F.3d at 418 (explaining that courts can consider "empirical evidence" in assessing the fit between a government's interest and its enactment).

Importantly, the majority does not question the accuracy of this body of research. This is a wise decision given that courts around the country have looked to similar scientific evidence to uphold age-based restrictions on Second Amendment rights. *See NRA*, 700 F.3d at 210 n.21 (concluding that "Congress's finding that minors under 21 are prone to violent crime, especially with guns-in-hand," the very finding at issue here, was entitled to deference and was otherwise supported by modern scientific research on the impulsivity of young adults); *Horsley v. Trame*, 808 F.3d 1126, 1127, 1133 (7th Cir. 2015) (finding that "scholarly research on development through early adulthood" supported the constitutionality of an Illinois measure that prevented those under 21 from possessing a firearm without the approval of their parents or the Director of State Police); *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 990, 995–96 (W.D. Wa. 2020) (relying in part on research "show[ing] that 18- to 20-year-olds are developmentally immature compared with older

---

[25] While the government has not put forward all the scientific evidence and crime and accident statistics I discuss, the amici in this case introduced similar evidence before the district court, and—like other courts—the district court explicitly relied on that evidence. *See* Maj. Op. at 62–63 n.57 ("[T]he amici's arguments here were raised and adopted by the district court, and some of their evidence is in the record."); *Hirschfeld v. BATFE*, 417 F. Supp. 3d 747, 759 (W.D. Va. 2019) (district court below finding that "the Amici parties highlight substantial evidence supporting Congress's decision to draw the line at age 21"); *NRA*, 700 F.3d at 210 n.21 (relying on sources cited by amici in a separate case to uphold the same provisions at issue here). These facts mitigate any concern about considering arguments put forward on appeal by the amici.

adults" to uphold the constitutionality of a Washington law barring adults under 21 from purchasing semiautomatic rifles).

As surely as "any parent knows" that children are less mature and responsible than adults, *Roper v. Simmons*, 543 U.S. 551, 569 (2005), so too does any older adult know that late adolescence or early adulthood is a distinct and often more chaotic season of life than the ages that follow, *cf.* Jeffrey Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Rev. 339, 339–40 (1992) (defining American adolescence as "extending from puberty to the early 20's" and explaining that "[a]dolescence bears a heightened potential for recklessness compared to other developmental periods in every culture and in every time").

But I need not rest on the wisdom of age to substantiate this difference between the youngest adults and older adults, for it is well-established in the scientific literature. We now know, for example, that while "a 19-year-old might possess a brain that looks 'adult-like' and that supports mature cognitive performance under calm or 'neutral' conditions, that same brain tends to look much more like that of a younger kid when evocative emotions are triggered, resulting in significantly weaker cognitive performance." Jason Chein, *Adolescent Brain Immaturity Makes Pending Execution Inappropriate*, Bloomberg Law (Sept. 17, 2020 4:00 AM), https://www.bloomberglaw.com/bloomberglawnews/us-law-week/XBBCKGKK000000; *see also, e.g.*, Adam Ortiz, Juvenile Justice Ctr., Am. Bar Ass'n, *Cruel and Unusual Punishment: The Juvenile Death Penalty; Adolescence, Brain Development and Legal Culpability*, 2 (Jan. 2004) ("The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern

impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable . . . . Indeed, age 21 or 22 would be closer to the 'biological' age of maturity." (quoting declaration of Dr. Ruben Gur of the University of Pennsylvania Medical Center)).

Furthermore, modern research also instructs that the prefrontal cortex, the part of the brain that makes it possible to "exercise good judgment when presented with difficult life situations," does not finish maturing until age 25. J.A. 346, 352 (reprinting Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 453, 459 (2013)); *see also United States v. Ramsay*, ---F. Supp. 3d---, 2021 WL 1877963, at *9 (S.D.N.Y. May 11, 2021) (Rakoff, J.) (surveying the literature on "psychosocial maturity—the capacity to exercise self-restraint, especially in emotionally-arousing contexts," and noting that this kind of maturity "continues to mature throughout the teens and into the twenties," perhaps even to age 30 (cleaned up)).

The upshot of these findings is that in precisely the situations where violence is most likely—that is, emotionally evocative situations or situations requiring the intense weighing of the exigencies of the moment against future consequences—*young adults think more like children than they do like older adults*. *See* Daniel W. Webster et al., John Hopkins Ctr. for Gun Policy and Research, *Firearms on College Campuses: Research Evidence and Policy Implications* (Oct. 15, 2016), at 19 (explaining that "[g]uns may be

called on in the very situations in which adolescents are most developmentally vulnerable").[26]

In short, as the Fifth Circuit has already concluded in its study of this exact issue, "modern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be [less mature] than young adults aged 21 and over." *NRA*, 700 F.3d at 210 n.21. I would therefore join the courts around the country that have held that this science buttresses reasonable restrictions on the gun rights of minors and young adults.

### iv.   The challenged provisions are supported by crime and accident statistics

Based on the most up-to-date scientific evidence, therefore, we should expect that young adults are more likely to be involved in violent crime than older adults, given their  biological immaturity. It is thus completely unsurprising that abundant modern evidence shows that young adults in fact perpetrate more violent crime generally and more

---

[26] The phenomenon of young adults under twenty-one thinking and behaving more like children than they do like older adults is also well-established in legal scholarship, much of which has focused on questioning whether the death penalty is appropriate for those whose crimes were committed as children or young adults. *See, e.g.*, John H. Blume et al., Essay, *Death By Numbers: Why Evolving Standards Compel Extending* Roper*'s Categorical Ban Against Executing Juveniles from Eighteen to Twenty-One*, 98 Tex. L. Rev. 921, 930–35 (2020); Andrew Michaels, *A Decent Proposal: Exempting Eighteen-to-Twenty-Year-Olds From the Death Penalty*, 40 N.Y.U. Rev. L. & Soc. Change, 139, 161–67 (2016); Melissa S. Caulum, Comment, *Postadolescent Brain Development: A Disconnect Between Neuroscience, Emerging Adults, and the Corrections System*, 2007 Wis. L. Rev. 729, 731–33 (2007); Tirza A. Mullin, Note, *Eighteen Is Not A Magic Number: Why The Eighth Amendment Requires Protection for Youth Aged Eighteen to Twenty-Five*, 53 Mich. J.L. Reform, 807, 812–16 (2020); Zoe Jordan, Note, *The* Roper *Extension: A California Perspective*, 71 Hastings L.J. 197, 206–210 (2019).

firearm crime specifically than do older adults.[27] In fact, according to an analysis of FBI supplementary homicide reports conducted by amicus Everytown for Gun Safety, from 2013 to 2017, young adults aged 18 to 20 "commit[ted] gun homicides at a rate *nearly four times higher* than adults 21 and older." Everytown for Gun Safety Analysis, *Uniform Crime Reporting Program: Supplementary Homicide Reports (SHR) 2013–2017* (2018) (emphasis added), https://everytownresearch.org/stat/eighteen-to-20-year-olds-commit-gun-homicides-at-a-rate-nearly-four-times-higher-than-adults-21-and-older/; *see also* Br. for Amicus Curiae Brady at 11 (quoting Everytown for Gun Safety, *Concealed Carry Reciprocity: Overriding State Public Safety Laws* (June 25, 2018), https://everytownresearch.org/report/concealed-carry-reciprocity-overriding-state-public-safety-laws/ (same)).

---

[27] *See, e.g.*, Off. of Juvenile Just. & Delinquency Prevention, U.S. Dep't of Justice, *Arrest Rates by Offense and Age Group 2019*, https://www.ojjdp.gov/ojstatbb/crime/ucr.asp?table_in=1&selYrs=2019&rdoGroups=1&rdoData=r (documenting that in 2019, Americans aged 18 to 20 committed 320.8 violent crimes per 100,000 individuals, compared with rates of 167.3 per 100,000 for all individuals 18 and older and 145.2 per 100,000 for all individuals 25 and older); *NRA*, 700 F.3d at 210 ("In 2009, 18-to-20 year-olds accounted for over 19% of all murder and non-negligent manslaughter arrests, 14% of all arrests for forcible rape, almost 24% of all robbery arrests, and 12% of all aggravated assault arrests . . . even though they comprised only about 4.3% of the population."); *Horsley*, 808 F.3d at 1133 ("An FBI analysis of crime in 2014 reflects that 18-to-20-year-olds were responsible for more than 15.8% of all charges issued for murder and nonnegligent manslaughter," despite comprising just "5.4% of the population over the age of 14."); *Mitchell*, 483 F. Supp. 3d at 996 (noting that young adults age 18 to 20 account "for approximately one-quarter of firearm homicides committed where an offender was identified" and that "[a]rrest rates for murder, robbery, and other violent crimes peak around ages 17 to 20"); *Powell*, 926 F. Supp. 2d at 392–93 (citing a 2011 survey conducted by the FBI and the DOJ finding that "eighteen- to twenty-year-olds accounted for approximately 16.6% of all arrests made for weapons offenses" despite comprising "only about 4.3% of the national population").

Nor is the connection between age and firearm injuries limited to intentional violence. It also appears that young adults are much more likely to die in a gun accident than older adults are. *See* Sarah J. Solnick and David Hemenway, *Unintentional Firearm Deaths in the United States 2005–2015*, Inj. Epidemiology, 6:42 at 3–4 (2019) (finding in a survey of 16 states that "children and teens, ages 10 to 19" and "young adults, aged 20 to 29" are at an elevated risk of dying in a gun accident with "[a]ll other age groups hav[ing] a markedly lower rate" of accidental deaths).

These statistics "give credence to the notions that young adults' access to firearms is an issue of significant governmental concern and that there is a close fit between this concern and the [challenged provisions]." *Powell*, 926 F. Supp. 2d at 393 (finding that crime statistics supported the constitutionality of an age-based restriction on carrying firearms). Thus, I would treat these crime and accident statistics, like the modern scientific research on the biological immaturity of young adults, as yet more evidence confirming the reasonableness of the challenged provisions.

     v.     *The challenged provisions are supported by state enactments*

Finally, when considering whether the challenged provisions are a reasonable fit for Congress's interest in promoting public safety, I find it highly relevant that "all fifty states in the Union, as well as the District of Columbia, feature laws imposing age-based restrictions [on] firearms, and [that] many of these laws set the minimum age for the possession and use of firearms at twenty-one." *Id.* at 387. Specifically, at least twenty-one

states and the District of Columbia regulate, and often prohibit altogether, the sale of handguns to or the purchase of such guns by individuals under twenty-one.[28]

While state legislatures cannot determine the parameters of constitutional rights, the fact that many states currently agree with Congress on the need to regulate young adults' access to handguns speaks to the ongoing reasonableness of the actions Congress took back in 1968. In other words, courts may look to the ubiquity of state-level restrictions in determining the reasonableness of a challenged provision's fit, and thus its constitutionality. *See, e.g.*, *United States v. Yancey*, 621 F.3d 681, 683–84 (7th Cir. 2010) (per curiam) (finding that state-level restrictions on the ability of habitual drug users to possess firearms supported the constitutionality of 18 U.S.C. § 922(g)(3)'s federal ban on firearm possession by drug addicts, as such restrictions demonstrated that "Congress was not alone in concluding that habitual drug abusers are unfit to possess firearms").

\*\*\*

To summarize: Congress had a compelling interest in promoting public safety and the challenged provisions are a reasonable fit for that objective. The reasonableness of the fit is abundantly illustrated by the legislative text and history, scientific research, crime and

---

[28] *See* Cal. Penal Code § 27505; Conn. Gen. Stat. § 29-34(b); D.C. Code § 22-4507; Del. Code tit. 24, §§ 901, 903; Fla. Stat. § 790.065(13); Haw. Rev. Stat. § 134-2(d); 430 Ill. Comp. Stat. 65/3(a), 65/4(a)(2)(i-5); Iowa Code § 724.22(2); Md. Code, Pub. Safety § 5-134(b)(1); Mass. Gen. Laws ch. 140, § 130; Mich. Comp. Laws § 28.422(1), (3); Mo. Rev. Stat. § 571.080; Neb. Rev. Stat. §§ 69-2403, 69-2404; N.J. Stat. § 2C:58-3(c)(4).; N.Y. Penal Law 400.00(1); Ohio Rev. Code Ann. § 2923.21; 11 R.I. Gen. Laws § 11-47-37; Vt. Stat. Ann. tit. 13 § 4020; Wash. Rev. Code § 9.41.240(1); W. Va. Code § 61-7-10(c); Wyo. Stat. Ann. § 6-8-404(d).

accident statistics, and contemporary state laws, all of which show that Congress reasonably believed it could reduce gun harm by enacting the challenged provisions.

D.

The majority, of course, disagrees. Its disagreement is rooted in three arguments. First, as discussed above, the majority believes that Congress did not adequately document the link between handguns sold by federally licensed dealers and crime. Second, the majority contends that the challenged provisions are impermissibly overinclusive—that "a showing of *disproportionate* bad conduct by a group cannot justify categorical restrictions on rights when the percentage of the group engaged in the unwanted conduct is minuscule." Maj. Op. at 65. Third, the majority contends that the challenged provisions are impermissible because "it is unclear whether these laws have been effective at all." *Id.* at 81.

I believe these arguments are misguided and do not justify concluding that the challenged provisions fail intermediate scrutiny. Having addressed the majority's first argument above, I will now address its remaining two.

i.    *The challenged provisions are not impermissibly overinclusive*

The majority's over-inclusiveness analysis is guided by the Supreme Court's decision in *Craig v. Boren*, 429 U.S. 190 (1976). According to the majority, "just as sex was a poor proxy for drunk driving in *Craig*," so too is age "a poor proxy for gun violence in this case." Maj. Op. at 67. While *Craig* undeniably supports the unremarkable idea that overinclusive enactments may lack the reasonable fit we demand under intermediate

scrutiny, the majority's comparison of this matter to *Craig* suffers from at least four problems that substantially reduce its relevance to this case.

First and most fundamentally, the majority attempts to calcify the "flexible" world of intermediate scrutiny into a rigid statistical framework. *Heller III*, 801 F.3d at 282–83 (Henderson, J., concurring in part and dissenting in part) ("Intermediate scrutiny is a flexible framework that allows for different perspectives and a range of approaches to firearms regulation."); *see also Kolbe*, 849 F.3d at 133 (explaining that intermediate scrutiny is "less onerous" than strict scrutiny, requiring only a *reasonable* fit with a substantial governmental interest). According to the majority, because less than one percent of all young adults commit a violent crime in any given year, the challenged provisions fail the "unduly tenuous threshold" of 2 percent supposedly established by *Craig*. Maj. Op. at 71.

But nothing in *Craig* purported to establish a roving two-percent threshold applicable to all contexts in which courts might apply intermediate scrutiny, and I am unaware of a case in the Fourth Circuit or anywhere else treating it as having done so. Rather, our circuit precedent on the Second Amendment rejects such efforts to establish hard and fast statistical rules for determining whether an enactment is a reasonable fit for furthering an important government interest. *See Carter*, 750 F.3d at 468–69 & n.15 (explaining that Congress is free to regulate based on correlation evidence and that while "[s]cientists may insist on p-values of 0.05," Congress "is not so constrained").

Second, any statistical comparison between *Craig* and the instant matter is muddied by the fact that violent crime is *nearly 100 hundred times less common* than drinking and

driving.[29] The majority believes that "[t]he question is . . . the percentage of the group that uses a gun in an impermissible manner." Maj. Op. at 71. According to the majority, "[t]hat statistic gives us some insight into the likelihood that any one person in the group will use a gun improperly." *Id.* So, the majority reasons, because the percentage of young adults that will misuse a gun in any given year is less than two percent—which, remember, is just the percentage of young men arrested for drunk driving in Oklahoma at one point in the 1970s—the connection between youth and gun violence is "unduly tenuous [under the] threshold from *Craig*." *Id.*

This approach might make more sense if drinking and driving and gun violence were equally common. But in reality, the percentage of young adults that commit a gun crime in any given year is below two percent because gun violence, blessedly, is much rarer than drinking and driving. That alone tells us nothing about the reasonableness of regulating youth access to firearms.

To illustrate this point, consider two extreme examples. Suppose some high percentage of all people, say 80%, will engage in some infraction in a given year. Well, then, a statistic that only 2% of a specific subset of people will commit that infraction means not only that they rarely engage in that behavior, but also that they are far *less* likely

---

[29] There are approximately "111 million self-reported episodes of alcohol-impaired driving among U.S. adults each year." *Impaired Driving: Get the Facts*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/transportationsafety/impaired_driving/impaired-drv_factsheet.html. In contrast, there were approximately 1.2 million violent crimes committed in the United States in 2019. Federal Bureau of Investigation, *2019: Crime in the United States*, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-1.

than the average person to do so. Now suppose that only 0.00000001% of all people will engage in the infraction in a given year. Under this new hypothetical, the fact that 2% of a specific subset of people engages in that behavior takes on a very different meaning: it might still be rare among that subset, but they are *far* more likely than the average person to engage in the behavior. Governmental regulation of the subset is exponentially more justifiable in the second case than in the first, even though the 2% figure remained constant, because of the difference in frequency of the infraction in the overall population.

In other words, by plucking the two-percent statistic from a specific factual context and plopping it down in a very different one, the majority erroneously justifies striking down a long-established Congressional enactment. *Craig* mandates no such judicial immodesty.

Third, *Craig* and the instant matter involve two very different kinds of classification—one is based on gender, the other on age. We treat classifications based on gender with suspicion because gender "generally provides no sensible ground for differential treatment," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985), and because such classifications are generally rooted "in our Nation's 'long and unfortunate history of sex discrimination,'" *Wilcox v. Lyons*, 970 F.3d 452, 459 (4th Cir. 2020) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973) (plurality opinion)). Meanwhile, age is not a suspect classification at all. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000); *see also Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 711–12, 722–23 (4th Cir. 2018) (applying rational-basis review to equal protection challenge to city law barring 18- to 21-year-olds from owning "sexually oriented

businesses"). The restriction at issue in *Craig* was therefore repugnant to the nation's commitment to equal protection in a way the challenged provisions in this case are not. *See Craig*, 429 U.S. at 204, 208 n.22 (arguing that "proving broad sociological propositions by statistics" was "in tension with the normative philosophy that underlies the Equal Protection Clause").[30]

Finally, even assuming that *Craig* is relevant here, the majority's calculations still have a numerator problem. The majority estimates that approximately 0.3% of young adults aged 18 to 20 commit a violent crime each year. Because that figure is below the so-called *Craig* threshold, the majority concludes that the challenged provisions are over-

---

[30] The majority wonders whether "the Second Amendment rights of men can be categorically restricted" because they commit more crimes than women. Maj. Op. at 70. To state the obvious, any such enactment would face major Second Amendment *and* Equal Protection Clause problems not faced by the challenged provisions. For a start, sex is generally immutable, meaning that any restriction placed on male access to firearms would be permanent for most people and therefore a much greater infringement on gun rights than the temporary provisions at issue here. Any such restriction would also run straight into an equal-protection problem not raised by classifying on the basis of the non-protected status of age. This hypothetical is hardly a checkmate.

The majority also wonders about restrictions for "those living in . . . specific geographic location[s]" and restrictions on those under age 25. Maj. Op. at 70–71. Our analysis of any such regulation would turn on the specifics of the enactment. Any such assessment would be highly fact-bound and is therefore not suited for abstract and speculative discussion. With that said, municipalities can enact their own firearm regulations, and some commentators believe that local conditions should be permitted to play a role in assessing the constitutionality of those provisions. *See, e.g.*, Joseph Blocker, *Firearm Localism*, 123 Yale L.J. 82, 85 (2013) (arguing that Second Amendment jurisprudence "should incorporate the longstanding and sensible differences regarding guns and gun control in rural and urban areas, giving more protection to gun rights in rural areas and more leeway to gun regulation in cities"). As for any aged-based regulation applying to individuals under twenty-five, the same forces that make armed young adults under twenty-one unique threats to the safety of themselves and others may indeed extend later into those young adults' twenties. But we have no cause to address that matter today.

inclusive. But this exclusive focus on the percentage of young adults that commit a violent crime each year is too narrow.

As discussed above, while the challenged provisions were aimed primarily at reducing violent crime, they also aspired to promote public safety by targeting deaths and injuries from suicides and accidents. While exact numbers are difficult to come by, it appears that each year, hundreds, if not thousands, of Americans aged 18 to 20 are accidentally injured in handgun accidents or intentionally harm themselves with a handgun.[31] These figures for accidents and suicides, while not large enough to get above the *Craig* "threshold," should still be included in any over-inclusivity analysis as Congress aimed to promote public safety by reducing both gun crime *and* other forms of gun harm. Similarly, any proper comparison of this case to *Craig* would have to factor in the number

---

[31] It can be estimated that about 900 Americans aged 18 to 20 are injured by handguns each year, either unintentionally or through self-harm. I derive this estimate from figures provided by Victor Lee et al., *Emergency Department Visits for Firearm-Related Injuries Among Youth in the United States, 2006–2015*, 48 J. L., Med. & Ethics 67, 70 (2020). The study found that in the 18 to 20 cohort between 2006 and 2015, 36,780 individuals reported to a hospital emergency room for unintentional firearm injury and 2,399 reported for firearm injury caused by a suicide attempt or self-harm. *Id.* The study further reported that handguns were involved in 23 percent of all injuries this age cohort sustained over this period, with the categories "other" and "unspecified" accounting for 70.9 percent of injuries, and shotguns, hunting, and military firearms making up the remaining 6.2 percent of injuries. *Id.* I then assumed that because handguns were used in 23 percent of all injuries for this cohort, they were used in 23 percent of injuries caused unintentionally or through self-harm. I then calculated $((36,780 + 2,399) \times 0.23) / 10$ (the years of the study) for a total of 901.1 handgun injuries per year from accidents and self-harm. While it could be that handguns are involved in less than 23 percent of such injuries to this cohort, which would inflate my estimate, there are deflationary pressures on my estimate as well—namely, the classification of a huge majority of guns as "other" or "unknown" and the fact that not all individuals injured by a firearm go to the emergency room.

of individuals who, as a result of the challenged provisions being in effect, never purchased handguns and thus never harmed themselves or others with a handgun. This number is also missing from the majority's calculations.[32]

In light of all these issues with comparing this case to *Craig*, I cannot agree that *Craig* renders the challenged provisions unconstitutionally overbroad in violation of the Second Amendment.

### ii.    *The purported ineffectiveness of the challenged provisions does not render them unconstitutional*

The majority also argues that the challenged provisions "lack the reasonable fit required to pass intermediate scrutiny" because they are ineffective at reducing youth crime rates. Maj. Op. 78–82. Relatedly, the majority argues that the law is underinclusive, meaning that it is ineffective or at least not as effective as it could be. Thus, according to the majority, Congress did not do enough to combat harm caused by guns, and what it did do was too ineffective—and maybe even counterproductive—to be allowed. This approach is strongly misguided for at least four reasons.

First, it forgets that the Second Amendment is an area in which we owe substantial deference to the judgments of Congress. Congress's judgment that enacting the challenged

---

[32] While there is evidence to suggest that the challenged provisions reduce gun harm in the form of crime, accidents, and suicides, *Craig* did not establish that the Oklahoma laws at issue reduced drunk driving. *See* 429 U.S. at 202 n.14 (noting the apparent "futility of controlling driving behavior by the 3.2% beer statute" and that the Court "obviously ha[d] no means of estimating how many individuals, if any, actually were prevented from drinking by these laws").

provisions would promote public safety is "precisely the type of judgment that legislatures are allowed to make without second-guessing by a court." *Kolbe*, 849 F.3d at 140.

Second, it unfairly punishes Congress for not passing a more restrictive measure and thus violates the standard principle that "a statute is not invalid under the Constitution because it might have gone farther than it did." *NRA*, 700 F.3d at 211 (quoting *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (per curiam)); *see also N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 263 ("[G]un-control legislation 'need not strike at all evils at the same time' to be constitutional." (quoting *NRA*, 700 F.3d at 211)); *Mance v. Sessions*, 896 F.3d 699, 701, 704, 708–09 (5th Cir. 2018) (per curiam) (holding that federal laws preventing federally licensed dealers from directly selling handguns to out-of-state buyers survived strict scrutiny despite their underinclusivity, as governments "need not address all aspects of a problem in one fell swoop" (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015))).

Third, as the majority recognizes, it "[is] difficult to determine the effectiveness of these laws now." Maj. Op. at 81. Given this conceded uncertainty, I would not have this Court stray far beyond its area of expertise to strike down a long-established law because of its perceived ineffectiveness. *Cf. United States v. Masciandaro*, 638 F.3d 458, 475–76 (4th Cir. 2011) ("*We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. . . . If ever there was an occasion for restraint, this would seem to be it.*" (emphasis added)).

Fourth, courts should be especially hesitant to hold gun control measures unconstitutional due to their perceived infectiveness, because doing so will place the nation and its lawmakers in a formidable catch-22: pass too onerous a regulation and see it struck down for violating the Second Amendment; pass too permissive a measure and suffer the same result. This heads-I-win, tails-you-lose approach is a recipe for national inaction on gun violence. While the people are free to choose that course, it ought not be imposed from on high by us.[33]

---

[33] This would be a particularly perverse and heartbreaking result here given the widespread belief back in 1968 that far stronger legislative action was needed to curb gun violence. The challenged provisions are a very modest effort at gun control. *See* Winkler, *supra*, at 253 ("In an era that would become known for the aggressive, bold federal legislation enacted to combat a variety of social ills . . . the gun control laws of 1968 were notable for their timidity."). Indeed, they have been recognized as cautious measures since before their birth. While the provisions were still being debated, Senator Joseph Tydings of Maryland called Title IV of the Crime Control and Safe Streets Act "a very limited, stripped down, bare minimum gun traffic control bill." 114 Cong. Rec. 13639 (1968) (statement of Sen. Tydings). Senator Hiram Fong of Hawaii agreed, stating that the challenged provisions and the rest of Title IV were "entirely inadequate" and fell "far short of the strong and effective firearms control legislation so urgently required to control crime." S. Rep. 90-1097, at 184 (1968) (individual views of Sen. Fong); *accord* 114 Cong. Rec. 12298–99 (1968) (statement of Sen. Fong) ("[The provision barring those under 21 from purchasing handguns from federally licensed dealers] represents the least Congress can do to meet the pressing public interest to protect against unrestricted gun traffic . . . . But it is not nearly enough."). President Johnson echoed the same theme in his signing statement, calling the measures a "halfway step toward the protection of our families and homes." 114 Cong. Rec. 18091 (1968) (reprint of statement of President Johnson upon signing the Omnibus Crime Control and Safe Streets Act of 1968). In short, many of the individuals who helped to enact the challenged provisions wanted to go further but believed the provisions were better than nothing. Now, more than fifty years later, the majority becomes the first court in the country to strike these measures down, leaving the American people with nothing in their place—*because the provisions did not go further*. The irony is bitter.

I therefore would not usurp the legislative role by invalidating these measures based on a judicial assessment that they have not worked.[34]

## III.

The words of our colleague, Judge Wilkinson, bear repeating as a fitting admonition for the majority's decision: "No one really knows what the right answer is with respect to the regulation of firearms," thus, we federal judges ought not "[d]isenfranchis[e] the American people on this life and death subject" by arrogating to ourselves "decisions that have been historically assigned to other, more democratic, actors." *Kolbe*, 849 F.3d at 149–150 (Wilkinson, J., concurring).

Today, by failing to heed that admonition, the majority fundamentally errs as a matter of law. I must, respectfully, dissent.

---

[34] Having concluded that the challenged provisions violate the Second Amendment, the majority does not resolve whether the provisions also discriminate against Marshall based on her age in violation of the equal protection guarantee of the Fifth Amendment. Because "age is not a suspect classification," *Kimel*, 528 U.S. at 83, the government "may 'discriminate on the basis of age without offending' the constitutional guarantee of equal protection 'if the age classification in question is rationally related to a legitimate state interest,'" *NRA*, 700 F.3d at 212 (quoting *Kimel*, 528 U.S. at 83) (concluding that the challenged provisions survived rational-basis review). Because I would hold that the challenged provisions survive intermediate scrutiny, I would also, of course, conclude that they survive rational-basis review. Therefore, I would hold that Marshall's Fifth Amendment claim fails.